**ALLEN & OVERY LLP**
Jacob S. Pultman
Chintan V. Panchal
1221 Avenue of the Americas
New York, NY 10020
(212) 610-6300
jacob.pultman@allenovery.com
chintan.panchal@allenovery.com

*Attorneys for Plaintiff* KPN B.V.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



JUDGE KOELTL

08 CV 1549

KPN B.V.,

                                        Plaintiff,

              - against -

CORCYRA D.O.O.,
KSD PACIFIC, LLC,
MOSHE HAR ADIR, and
YOSSI ATTIA,

                                        Defendants

**COMPLAINT**

       Plaintiff KPN B.V., formerly known as KPN Telecom B.V., ("KPN" or "Seller"), by its

attorneys Allen & Overy LLP, as and for its Complaint against CORCYRA d.o.o.

("CORCYRA"), KSD Pacific, LLC ("KSD"), Mr. Moshe Har Adir ("Mr. Adir"), and Mr. Yossi

Attia ("Mr. Attia"), alleges as follows:

                        **Nature of the Action**

       1.       These claims are brought by KPN in order to obtain redress for the failure of

defendants CORCYRA, its successor-in-interest KSD, and KSD's alter-ego Mr. Attia, to honor

their agreement with KPN concerning the purchase of 2,326,043 shares of common stock (the

"Purchased Shares") of EuroWeb International Corporation, a Delaware corporation

("EuroWeb"). This action also seeks redress for Mr. Adir's failure to honor his guarantee of CORCYRA's obligations arising out of this agreement.

2.    On or about January 28, 2005, KPN and CORCYRA entered into a Stock Purchase Agreement and a related Escrow Agreement, which provided for the Purchased Shares to be sold to CORCYRA in two separate tranches. After KPN successfully completed delivery of the first tranche, CORCYRA requested additional time to close the transaction, which KPN reluctantly granted in the form of an amendment to the Stock Purchase and Escrow Agreements. This amendment added additional terms to the agreement for the payment of interest and costs in the event that CORCYRA failed to close. When the time to close again drew near, CORCYRA once again requested additional time. Again and for the final time, KPN, reserving all of its rights under the Stock Purchase Agreement, Escrow Agreement and related amendments, including the interest and costs provisions, agreed to a second amendment. Per this second amendment, a final closing date was set for July 2, 2007.

3.    Although KPN stood ready to close the transaction on the terms set forth in the agreements and negotiated by the parties, CORCYRA failed to close. Since then, defendants have persisted in their refusal to close and Mr. Adir has failed to honor his agreement to guarantee the obligations of CORCYRA.

4.    KPN seeks specific performance of the stock purchase and related agreements (defined below), including a closing on the outstanding Purchased Shares, damages in an amount in excess of $2,679,476.00, as necessary to make KPN whole, and such other relief as the Court deems just.

## Factual Background to KPN's Claims

5.    KPN brings these claims against:

2

      i)      CORCYRA for specific performance or compensatory damages for its breach of contract in its refusal to pay for the outstanding Purchased Shares, which CORCYRA had purchased under a valid contract in the form of a Purchase Agreement dated January 28, 2005 ("Purchase Agreement") (annexed to this Complaint as Exhibit 1), as amended on April 28, 2006 ("Amendment No. 1") (Exhibit 2) and on December 1, 2006 ("Amendment No. 2") (Exhibit 3), and an associated Escrow Agreement dated January 28, 2005 ("Escrow Agreement") (Exhibit 4), as amended on April 28, 2006 ("Escrow Amendment No. 1") (Exhibit 5) and on December 1, 2006 ("Escrow Amendment No. 2") (Exhibit 6) (the Purchase Agreement, Amendment No. 1, Amendment No. 2, the Escrow Agreement, Escrow Amendment No. 1 and Escrow Amendment No. 2, together, the "Agreement");

      ii)      KSD as the successor in interest to CORCYRA for compensatory damages for said breach of contract;

      iii)      Mr. Attia directly as alter ego of KSD and thus of CORCYRA for compensatory damages for said breach of contract;

      iv)      Mr. Adir for enforcement of his guarantee dated January 28, 2005 ("Guarantee") (Exhibit 7), as confirmed April 28, 2006 (Exhibit 8) and December 1, 2006 (Exhibit 9) of all amounts due under the Agreement.

### The Parties, Jurisdiction and Venue

6.      KPN B.V. is a limited liability company incorporated under the laws of the Netherlands, with its principal place of business at Maanplein 55, 2516 CK, The Hague, The Netherlands, which operates in the telecommunications industry. KPN is the wholly owned subsidiary of Koninklijke KPN N.V., also incorporated under the laws of the Netherlands, which is a public company registered with the U.S. Securities and Exchange Commission.

7.      On information and belief, defendant CORCYRA d.o.o. is a company with its business address at Valdabeckiput 118, Pula, 52100, Croatia, dedicated to acquiring assets on behalf of its beneficial owner. At the time of the Purchase Agreement, Mr. Adir was the sole beneficial owner of CORCYRA; at the time of Amendments No. 1 and No. 2, Mr. Attia was its sole beneficial owner via his ownership of KSD.

8.      Defendant KSD Pacific, LLC is a limited liability company organized in Nevada, with its business address at 1061 1/2 N. Spaulding Avenue, West Hollywood, CA 90046. On information and belief, KSD transacts in real estate. Mr. Attia is KSD's sole officer, director and member.

9.      On information and belief, defendant Mr. Adir is a business entrepreneur who resides in Croatia. His business address was last given as Verudela 17, Pula, 52100, Croatia. On information and belief, all of CORCYRA's capital was contributed by Mr. Adir for the purpose of acquiring the Purchased Shares.

10.     On information and belief, defendant Mr. Attia has been self employed as a real estate developer since 2000. The business address of Mr. Attia is 1061 1/2 N. Spaulding Avenue, West Hollywood, CA 90046.

11.     This Court has diversity jurisdiction over this dispute under 28 U.S.C. § 1332(a) because this action involves a controversy exceeding $75,000 and there is a complete diversity of the parties. The controversy is between, on the one hand, the citizen of a foreign state, KPN, and on the other hand, foreign citizens CORCYRA and Mr. Adir, a citizen of the State of Nevada, KSD (the successor-in-interest to CORCYRA) and Mr. Attia, a dual U.S. and Israeli citizen who is domiciled in California.

4

12.     Defendant CORCYRA is subject to the personal jurisdiction of this Court because it explicitly agreed to this Court's jurisdiction in the Agreement, wherein CORCYRA:

> ...irrevocably and unconditionally submit[ted] to the exclusive jurisdiction of ... the United States District Court for the Southern District of New York, for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby." (Section 7(d) of the Escrow Agreement of January 28, 2005, as amended on April 28, 2006 and December 1, 2006) (Exhibit 4)

13.     Pursuant to Civil Practice Laws and Rules of the State of New York § 302(a)(1), personal jurisdiction over CORCYRA, its agents and successors is also proper because CORCYRA has availed itself of the privilege of conducting business activities within New York.

14.     Personal jurisdiction over KSD is proper because KSD is the successor-in-interest to CORCYRA, and, on information and belief, KSD conducts business in the State of New York.

15.     Personal jurisdiction over Mr. Attia is proper because he is the alter ego of both CORCYRA and KSD and, on information and belief, Mr. Attia conducts business in the State of New York.

16.     Personal jurisdiction over Mr. Adir is proper because he executed the Purchase Agreement, Escrow Agreement and Guarantee at a closing at the offices of Allen & Overy LLP in New York, NY, because he conducts business in the State of New York, and because this action derives from Mr. Adir's activities in New York.

17.     Venue in this Court is authorized under 28 U.S.C. § 1391(d) because certain Defendants are aliens under § 1391(a), because a substantial part of the events, including execution of the Purchase Agreement, occurred in New York, NY, and because the parties explicitly agreed to irrevocably and unconditionally waive any objection to the laying of venue in this Court. Specifically, CORCYRA:

... irrevocably and unconditionally waive[d], pursuant to the provisions of Section 5-1402 of the New York General Obligations Law, any objection to the laying of venue of any action, suit, or proceeding arising out of this Agreement, any Ancillary Agreement or the transactions contemplated hereby and thereby in ... the U.S. District Court of the Southern District of New York" (Section 7(d) of the Escrow Agreement of January 28, 2005, as amended on April 28, 2006 and December 1, 2006) (Exhibit 4)

## The Agreement

18.    EuroWeb, the company whose shares form the basis for this dispute, owned internet service providers in Hungary, Slovakia, and Romania. At the time the parties entered into the Purchase Agreement in January 2005, KPN owned a 43.5% stake in EuroWeb.

19.    CORCYRA and KPN entered into the Purchase Agreement as of January 28, 2005, in which KPN agreed to sell the Purchased Shares, its entire stake in EuroWeb, to CORCYRA at a price of $3.45 per share, subject to adjustment to reflect an increase in market value (the "Additional Payment"). The Purchased Shares were to be paid for by CORCYRA in two tranches, with Premium Payments (defined below) to be paid on a quarterly basis. Final payment was due from CORCYRA to KPN on April 30, 2006.

20.    Mr. Adir signed the Agreement on behalf of CORCYRA, as the sole director and officer of CORCYRA.

21.    Specifically, the Purchase Agreement and Escrow Agreement obligated CORCYRA to do the following:

i)    on or about February 1, 2005 (the "Initial Closing"), deliver to KPN immediately available funds in U.S. dollars in an amount equal to $1,000,000.00 (the "Initial Closing Purchase Price") as payment for 289,855 EuroWeb shares (the "Initial Shares"); and

ii)    on or about April 30, 2006, (the "Purchase Agreement Final Closing"), as payment for the remaining 2,036,188 EuroWeb shares (the "Final Shares"), deliver to KPN

immediately available funds in U.S. dollars in an amount equal to the sum of (x) the amount

listed on Exhibit C to the Purchase Agreement that corresponds to the date of the Purchase

Agreement Final Closing plus (y) any Additional Payment plus (z), any Premium Payments,

defined as quarterly payments of $105,609.00 on May 1, 2005, August 1, 2005, November 1,

2005 and February 1, 2006, due and payable prior to the Final Closing.

22.     Mr. Adir personally guaranteed the Premium Payments and the amounts due at

Final Closing, in a letter delivered in connection with the Purchase Agreement, on

January 28, 2005 (Exhibit 7).

23.     The Purchase Agreement and Escrow Agreement specifically obligated KPN to

do the following:

        i)     at the Initial Closing, deliver to CORCYRA one or more certificates

representing the Initial Shares;

        ii)     use its best efforts to cause the resignation of Seller's sole two

representatives on the Board of Directors of EuroWeb, and propose to EuroWeb that two

representatives of CORCYRA be designated to fill the vacancies;

        iii)     deliver to JPMorgan Chase Bank N.A. ("JPMorgan") (the "Escrow

Agent") one or more certificates representing the Final Shares (also defined as the "Escrowed

Shares"), to be held in escrow in a segregated escrow account in accordance with the terms of the

Escrow Agreement;

        iv)     so long as CORCYRA was not in default of its obligations under the

Purchase Agreement, and the Purchase Agreement remained in effect, vote the Escrowed Shares

(also known as the Final Shares) according to instructions from CORCYRA, provided such

instructions were received sufficiently in advance of the applicable vote and such voting would

not violate applicable law or require amendments to any SEC filing of Seller or CORCYRA; and

      v)    on the Purchase Agreement Final Closing date, cause the Escrow Agent to

transfer to CORCYRA one or more certificates representing the Final Shares to be purchased at

the Purchase Agreement Final Closing.

    24.    KPN fulfilled all of its obligations under the Purchase Agreement and Escrow

Agreement, each dated January 28, 2005. Specifically, KPN:

      i)    delivered to CORCYRA a stock certificate dated February 1, 2005, in the

name of CORCYRA d.o.o., representing 289,855 fully paid and non-assessable, transferable

shares of common stock of EuroWeb;

      ii)    delivered to the Escrow Agent a stock certificate dated February 1, 2005,

in the name of KPN B.V., representing 2,036,188 fully paid and non-assessable, transferable

shares of common stock of EuroWeb; and

      iii)    promptly tendered the resignation of its representatives, Mr. Hans Lipman

and Mr. Daniel Kwantes, and voted the Escrowed Shares in favor of Mr. Ilan Kenig and Mr.

Attia, who joined EuroWeb's Board of Directors at a meeting dated January 31, 2005, two days

after the Agreement was signed.

    25.    CORCYRA failed to fulfill its obligations under the Agreement.  While

CORCYRA paid KPN $1,000,000.00 at the Initial Closing on February 1, 2005, it did not,

however, pay KPN for the remaining Purchased Shares (i.e., the Final Shares, also referred to as

the Escrowed Shares) or make the accumulated Premium Payments by the Purchase Agreement

Final Closing date of April 30, 2006.

8

26.    The amount due at the Purchase Agreement Final Closing was $7,130,457.00, and the accumulated amount of Premium Payments due was $422,436.00.

### Amendment No. 1

27.    By the last permitted date for Final Closing, CORCYRA had sold or reached agreement to sell EuroWeb's assets to third parties.  However, CORCYRA sought additional time to pay KPN for the Final Shares.  During the negotiations, and in an obvious effort to delay making the contractually required payment to KPN, CORCYRA alleged that KPN had not fully disclosed certain liabilities, and was in breach of the Purchase Agreement.  CORCYRA later admitted, in an amendment to the Purchase Agreement discussed below, that these allegations were baseless.

28.    In response to CORCYRA's request for additional time, KPN agreed to amend the Purchase Agreement, Escrow Agreement and Guarantee.  Mr. Attia, CORCYRA's sole officer and director, executed Amendment No. 1 to the Purchase Agreement on April 28, 2006.

29.    Under Amendment No. 1 agreed to by the parties, CORCYRA was required to pay KPN for the then outstanding Purchased Shares (i.e., the "Final Shares," also referred to as the "Escrowed Shares") in two additional tranches, with monthly Premium Payments due at the time of final payment, which was to be no later than December 1, 2006.  The price was once again subject to adjustment (the "Additional Payment") in order to reflect any increase in market value above $3.45 per share.  Furthermore, penalty interest of the prime rate of interest announced by Citibank N.A. on December 1, 2006 plus 15% was to apply if any payments were not made by CORCYRA when due.

30.    Specifically, under Amendment No. 1 and Escrow Amendment No. 1, CORCYRA was required to do the following:

       i)      on April 28, 2006 (the "Special Closing ") purchase 434,783 EuroWeb shares (the "Special Purchase Shares") by delivering to KPN immediately available funds, in U.S. dollars, in an amount equal to $1,500,000.00, subject to adjustment if the market value of the shares exceeded $3.45 per share (the "Special Closing Purchase Price");

       ii)     on December 1, 2006 (the "First Amendment Final Closing"), as payment for the remaining 1,601,405 EuroWeb shares (the "Amendment No. 1 Final Shares"), deliver to KPN immediately available funds, in U.S. dollars, in the amount equal to the sum of (x) the amount listed on Exhibit 1 to Amendment No. 1 under the caption "Base Final Closing Purchase Price" that corresponded to the date of the First Amendment Final Closing plus (y) any Additional Payment plus (z) the Premium Payments, defined as those set forth on Exhibit 1 to Amendment No. 1, due and payable at the First Amendment Final Closing;

       iii)    to pay interest, upon Seller's demand from time to time, on any amount that became due on the First Amendment Final Closing date up to (but not including) the date of actual payment (as well as before judgment) at a rate per annum (computed on the terms of the actual number of days elapsed over a year of 360 days), to the extent permitted by law, equal to the prime rate of interest announced by Citibank N.A. on December 1, 2006 plus 15% (including without limitation by defaulting on its obligation to purchase the Amendment No. 1 Final Shares); and

       iv)     send any and all notices to KPN B.V. to Messrs. Cees Boogaerdt and Michiel Roovers.

31.     As part of the consideration for Amendment No. 1, CORCYRA agreed that there was no basis for its allegations regarding any lack of disclosure and gave KPN a broad release from any liability deriving from any such claim.

32.    Under Amendment No. 1 and Escrow Amendment No. 1, KPN was specifically required to:

i)    deliver to CORCYRA irrevocable instructions to the Escrow Agent to transfer to CORCYRA one or more certificates representing the Special Purchase Shares to be purchased on the Special Closing Date; and

ii)    irrevocably cause the Escrow Agent to transfer to CORCYRA one or more certificates representing the Amendment No. 1 Final Shares (also referred to herein as the "Amendment No. 1 Escrowed Shares") to be paid for at the First Amendment Final Closing.

33.    All other terms and conditions of the Purchase Agreement dated January 28, 2005 continued to remain in full force and effect in accordance with its terms.  Likewise, the Escrow Agreement continued to remain in full force and effect in accordance with its terms, except as amended.

34.    Effectively, CORCYRA was required to pay for approximately one-fifth of the remaining Purchased Shares (434,783 shares) on the Special Closing date, April 28, 2006, and to pay for the balance of the Purchased Shares (1,601,405 shares), with accrued Premium Payments, on the amended First Amendment Final Closing date, December 1, 2006, all of which was subject to penalty interest in the event CORCYRA failed to close on time.

35.    Mr. Adir confirmed his continuing obligation to guarantee all amounts due under Amendment No. 1 and Escrow Amendment No. 1 in a letter dated April 28, 2006 (Exhibit 8).

36.    KPN fulfilled all of its obligations under Amendment No. 1.  Specifically, KPN:

i)    delivered to CORCYRA a stock certificate dated May 16, 2006, in the name of CORCYRA d.o.o., representing 434,783 fully paid and non-assessable, transferable shares of common stock of EuroWeb; and

ii)     delivered to the Escrow Agent a stock certificate dated May 16, 2006, in the name of KPN B.V., representing 1,601,405 fully paid and non-assessable, transferable shares of common stock of EuroWeb.

37.     After initially paying KPN $1,500,000.00 on the Special Closing date, CORCYRA did not fulfill its remaining obligations under Amendment No. 1. Instead, CORCYRA requested another extension of time.

38.     Since the signing of Amendment No. 1, Mr. Attia had consolidated his control of EuroWeb, becoming CEO on June 15, 2006, and President and CEO on August 14, 2006. Mr. Attia then purchased CORCYRA on August 31, 2006 from Mr. Adir, through KSD Pacific, LLC, of which Mr. Attia was the sole officer, director and member. On information and belief, CORCYRA's only asset at this time was its interest in EuroWeb.

39.     CORCYRA, now controlled by Mr. Attia, once again did not pay KPN for the remaining Purchased Shares (i.e., the Amendment No. 1 Final Shares, also referred to as the Amendment No. 1 Escrowed Shares) or the accumulated Premium Payments by the First Amendment Final Closing date, December 1, 2006. The amount due to KPN on December 1, 2006 was $5,830,377.00, which included Premium Payments; there was no Additional Payment due. Instead of fulfilling this obligation, Mr. Attia invested EuroWeb's assets in five real estate projects in California and Nevada. This was done by Mr. Attia despite the fact that CORCYRA had received over $18,500,000.00 in reported proceeds from the disposal of various EuroWeb assets.

40.     As the Final Closing approached, CORCYRA sought a further extension of its payment term from KPN, claiming that Mr. Attia would face hardship in paying because of his

intent imminently to provide a personal guarantee of $72,000,000.00 relating to another investment.

41.    Consistent with its previous conduct, CORCYRA's continued gamesmanship during the second re-negotiation included claiming that KPN had somehow breached the Agreement by its alleged failure to vote the Amendment No. 1 Escrowed Shares per CORCYRA's instructions. In fact, KPN had fulfilled all of its obligations and had done exactly that by voting the Amendment No. 1 Escrowed Shares according to CORCYRA's instructions. Nevertheless, CORCYRA made this claim in an effort to avoid its contractual obligations despite the fact that CORCYRA itself had failed to address notice of its instructions to the proper party under Amendment No. 1.

### Amendment No. 2

42.    In a final effort to resolve the matter of CORCYRA's failure to meet its contractual obligations, on December 1, 2006 KPN agreed to amend the Purchase Agreement and Escrow Agreement for a second and final time. At the time of Amendment No. 2, CORCYRA was controlled by Mr. Attia, who was then not only CORCYRA's sole officer and director, but its sole beneficial owner, via his complete control of KSD. CORCYRA and KSD could only act with the consent, permission and authorization of Mr. Attia, alone. Furthermore, Mr. Attia executed Amendment No. 2 on CORCYRA's behalf.

43.    Under Amendment No. 2 agreed to by the parties, CORCYRA was required to pay KPN for the then outstanding Purchased Shares (1,601,405 Shares) in two additional tranches, with monthly Premium Payments due at the time of final payment, which was to be no later than July 2, 2007. The price was to again be subject to adjustment (the "Additional Payment") to reflect any increase in market value above $3.45 per share. Penalty interest of the

13

prime rate of interest announced by Citibank N.A. on July 2, 2007 plus 15% applied if any payments were not made when due. Additionally, an advance payment or bank guarantee was also required by January 15, 2007.

44.     Under Amendment No. 2 and Escrow Amendment No. 2, CORCYRA was specifically required to do the following:

i)     on December 1, 2006 (the "Second Special Closing ") purchase 781,106 EuroWeb shares (the "Second Special Purchase Shares") by delivering to KPN immediately available funds, in U.S. dollars, in an amount equal to $3,000,000.00, subject to adjustment if market value of the shares exceeded $3.45 per share (the "Special Closing Purchase Price");

ii)     on July 2, 2007 (the "Second Amendment Final Closing"), as payment for the remaining 820,399 EuroWeb shares (the "Amendment No. 2 Final Shares"), deliver to KPN immediately available funds, in U.S. dollars, in the amount equal to the sum of (x) the amount listed on Exhibit 1 to Amendment No. 2 under the caption "Base Final Closing Purchase Price" that corresponded to the date of the Second Amendment Final Closing plus (y) the Additional Payment (as defined below) plus (z) the Premium Payments, defined as those set forth on Exhibit 1 to Amendment No. 2 (Exhibit 3);

iii)     to pay interest, upon KPN's demand from time to time, on any amount that became due on the Second Amendment Final Closing date up to (but not including) the date of actual payment (as well as before judgment) at a rate per annum (computed on the terms of the actual number of days elapsed over a year of 360 days), to the extent permitted by law, equal to the prime rate of interest announced by Citibank N.A. on July 2, 2007 plus 15%, (including without limitation by defaulting on its obligation to purchase the Amendment No. 2 Final Shares); and

14

iv)    deliver to KPN a U.S. bank guarantee satisfactory to Seller that guarantees CORCYRA's remaining payment obligation no later than January 15, 2007 or to pay to KPN $250,000.00 (the "Advance").

45.    Mr. Adir once again confirmed his obligation to guarantee all amounts due under Amendment No. 2 and Escrow Amendment No. 2 in a letter dated December 1, 2006 (Exhibit 9).

46.    Under Amendment No. 2 and Escrow Amendment No. 2, KPN was specifically required to:

i)    upon receipt of the Advance, deliver to CORCYRA irrevocable instructions to the Escrow Agent to transfer to CORCYRA one or more certificates representing the Second Special Purchase Shares;

ii)    irrevocably cause the Escrow Agent to transfer to CORCYRA one or more certificates representing the Amendment No. 2 Final Shares to be paid for at the Second Amendment Final Closing (also referred to herein as the "Amendment No. 2 Escrowed Shares").

47.    All other terms and conditions of the Purchase Agreement as amended on April 28, 2006, continued to remain in full force and effect in accordance with its terms. Likewise, except as amended, the Escrow Agreement continued to remain in full force and effect in accordance with its terms.

48.    Effectively, under Amendment No. 2, CORCYRA was required to pay $3,000,000.00 to KPN for less than half of the remaining Purchased Shares (781,006 shares) on the Second Special Closing date, December 1, 2006, and to pay KPN for the balance of the Purchased Shares (820,399 shares) on the Second Amendment Final Closing date, July 2, 2007 at the latest, with accrued Premium Payments. Penalty interest was applicable to unpaid amounts due after July 2, 2007.

49.     In its filing with the U.S. Securities and Exchange Commission of December 8, 2006 relating to Amendment No. 2 (Exhibit 10), CORCYRA, KSD, and Mr. Attia acknowledged the obligation of CORCYRA to pay KPN for the remaining Purchased Shares by July 2, 2007, and the obligation of Mr. Adir whereby he personally guaranteed CORCYRA's payment to KPN. They also confirmed in this filing that Mr. Attia was the sole officer and director of CORCYRA, and the sole member and manager of KSD, which in turn was the sole owner of CORCYRA.

### CORCYRA's Continued Failure to Adhere to its Contractual Obligations and its Failure to Perform Under the Agreement

50.     KPN fulfilled all of its obligations under Amendment No. 2 to the Purchase Agreement. Specifically, KPN:

i)     delivered to CORCYRA a stock certificate dated February 5, 2007, in the name of CORCYRA d.o.o. and in the amount of 781,006 fully paid and non-assessable, transferable shares of common stock of EuroWeb; and

ii)     delivered to the Escrow Agent a stock certificate dated February 2, 2007, in the name of KPN B.V., in the amount of 820,399 fully paid and non-assessable, transferable shares of common stock of EuroWeb.

51.     CORCYRA, however, failed to fulfill its obligations under Amendment No. 2. While it initially paid KPN $3,000,000.00 and the advance of $250,000.00 in lieu of obtaining a bank guaranty, it failed to close and pay KPN the outstanding $2,679,476.00 plus interest due.

52.     On June 21, 2007 Mr. Attia, the sole member and sole owner of KSD and the sole officer and director of CORCYRA, transferred the common stock of CORCYRA into the name of KSD. No cash was exchanged. In its filing with the U.S. Securities and Exchange Commission of June 29, 2007, Emvelco, Corp. (formerly known as EuroWeb) stated that

"...with respect to the Final Shares, all references to CORCYRA shall mean KSD's voting and disposition power as effectuated through CORCYRA pursuant to the Transfer" (Exhibit 11, p.7). KSD is the direct successor in interest to, and alter ego of, CORCYRA. Mr. Attia, the sole member and owner of KSD, exercises day-to-day control of KSD and, through his ownership of KSD, day-to-day control of CORCYRA.

53.    CORCYRA, now a shell company and mere instrumentality of Mr. Attia, failed to pay for the remaining Purchased Shares (i.e., the Amendment No. 2 Final Shares, also referred to as the Amendment No. 2 Escrowed Shares) and failed to make the required Premium Payments under Amendment No. 2 of December 1, 2006.

54.    The amount due at the Second Amendment Final Closing of July 2, 2007 was $2,679,476.00 ($2,929,476.00 less the advance of $250,000.00), which included Premium Payments; there was no Additional Payment due. At the time of CORCYRA's breach, interest began to accrue, to the extent permitted by law, at the prime rate announced by Citigroup N.A. on July 2, 2007 plus 15%, per section 2.4(f) of Amendment No. 2 (Exhibit 3). As of the date of this filing, the total interest accrued is $393,719.10.

55.    Following CORCYRA's failure to close, KSD admitted, through its attorney, that it is the responsible party for CORCYRA's obligations under Amendment No. 2, stating that "following a meeting of the Board next month, Mr. Attia will be in a better position to provide you with some degree of certainty as to a date when KSD Pacific, LLC ("KSD") will make final payment to KPN under the January 28, 2005 Stock Purchase Agreement, as amended (the "SPA")" and that "KSD has every intention of making its final payment to KPN...." (Letter from Elliot H. Lutzker to Dirk Peter Velthuijsen (Aug. 6, 2007)) (Exhibit 12). Mr. Lutzker also stated that after a September 17, 2007 EMVELCO Corp. Board Meeting, "KSD Pacific, LLC will be in

17

a position to advise [KPN] as to when [KSD] will be able to make payment to KPN." (Letter from Elliot H. Lutzker to Dirk Peter Velthuijsen (September 7, 2007)) (Exhibit 13).

### Mr. Adir's Failure to Perform Under the Agreement

56.    Mr. Adir failed to fulfill his obligations under the Guarantee, as confirmed on April 28, 2006 and reconfirmed on December 1, 2006, to personally fund any and all payments due under the Agreement and to have sufficient personal current assets to satisfy all obligations of CORCYRA under the SPA.  On July 30, 2007 KPN sent Mr. Adir a demand letter, with which he has failed to comply.  (Exhibit 14).

### First Cause of Action – Breach of Contract

57.    KPN repeats and realleges each of the allegations made in Paragraphs 1 through 56 of the Complaint as if fully stated herein.

58.    A valid and binding agreement exists between KPN and CORCYRA, in the form of the Purchase Agreement, as amended on April 28, 2006 and December 1, 2006 and the Escrow Agreement, also as amended on April 28, 2006 and December 1, 2006, under which CORCYRA has promised to buy, and KPN has promised to deliver, the Purchased Shares. These agreements are valid and enforceable.

59.    KPN reasonably relied on CORCYRA's December 1, 2006 promise to pay for the remaining Purchased Shares.  Furthermore, throughout the period between January 28, 2005, and June 29, 2007, CORCYRA repeatedly represented to investors that it effectively owned KPN's full interest in EuroWeb, and the substantial liquid assets reported by CORCYRA's beneficial owner and alter-ego, Mr. Attia.

60.    Throughout the period between January 28, 2005, and July 2, 2007, KPN has fully performed its obligations under the Agreement, completely surrendering strategic control of

EuroWeb to CORCYRA and its owners. At all times until July 2, 2007, when CORCYRA materially breached the Purchase Agreement, as amended, KPN voted the Purchased Shares held in escrow according to CORCYRA's instructions, even as the beneficial owner of CORCYRA liquidated EuroWeb's assets, utilized the proceeds to pay substantial bonuses to management and settle minority shareholder actions, and exited the telecommunications industry in favor of leveraged real estate speculation, including with related parties. The residual value of the remaining Purchased Shares in escrow has dropped as a result of CORCYRA's strategy, in which KPN has had no input or influence, and which has had no relation to KPN's own business. The remaining Purchased Shares are now worth significantly less than their value on January 28, 2005, when the Purchase Agreement was signed.

61.     During the period between January 28, 2005, and July 2, 2007, CORCYRA twice raised specious allegations against KPN, apparently attempting to coerce KPN to renegotiate the Agreement. In so doing, CORCYRA has violated the duty of good faith and fair dealing that it owed to KPN under the Agreement.

62.     CORCYRA has refused, without justification, to perform its obligations under the Agreement. CORCYRA is in material breach of Section 2.4 of Amendment No. 2 because it has not paid KPN for the 820,399 EuroWeb shares it agreed to purchase, it has not made the Premium Payments, and it has not paid interest on the unpaid amounts due.

63.     Meanwhile, CORCYRA has substantially damaged KPN's potential residual interest in the remaining Purchased Shares being held in escrow.

64.     KPN has been deprived of its consideration under the Agreement, and has incurred and will continue to incur substantial costs in preparing for, bringing and enforcing this action.

## Second Cause of Action – Breach of Contract

65.     KPN repeats and realleges each of the allegations made in Paragraphs 1 through 56 of the Complaint as if fully stated herein.

66.     On January 28, 2005 Moshe Har Adir entered into a valid and binding Guarantee of CORCYRA's obligations under the Purchase Agreement, in the form of a Commitment Letter, whereby Mr. Adir "commit[ed] to personally fund the Premium Payments (as described in Section 2.3 of the SPA) and the Final Closing Purchase Price (as defined in Section 2.1(o) of the SPA) in accordance with the terms and conditions of the SPA" (Exhibit 7). Mr. Adir reconfirmed this Commitment Letter on April 28, 2006 (Exhibit 8) and on December 1, 2006 (Exhibit 9). Upon CORCYRA's failure to satisfy its obligations under the Purchase Agreement, KPN timely demanded payment from Mr. Adir on July 30, 2007. (Exhibit 14)

67.     Mr. Adir has refused, without justification, to perform his obligations under the Guarantee. Mr. Adir is in material breach of the Guarantee because he has not paid KPN for the 820,399 EuroWeb shares CORCYRA agreed to purchase, he has not made the Premium Payments, and he has not paid interest on the unpaid amounts due.

68.     KPN has been deprived of its consideration under the Guarantee, and has incurred and will continue to incur substantial costs in preparing for, bringing and enforcing this action.

## Prayer for Relief

69.     WHEREFORE, KPN demands judgment against Defendants for breach of contract and damages in the amount of:

        i)      Specific performance of the Agreement and Guarantee, and a closing on the agreed terms;

ii)     $2,679,476.00 as the amount due as payment for the remaining Purchased

Shares;

iii)     pre-judgment interest on the amount above calculated at the prime rate of

interest announced by Citibank N.A. on July 2, 2007 plus 15%;

iv)     all costs, counsel fees and other expenses incurred or to be incurred by

KPN in preparing, bringing and enforcing this action against CORCYRA; and

v)     such other and further relief as the Court deems just and proper.

Dated: New York, New York          Respectfully submitted,
       February 14, 2008

                                   **ALLEN & OVERY LLP**

                                   By:_____
                                       Jacob S. Pultman
                                       Chintan V. Panchal

                                       1221 Avenue of the Americas
                                       New York, NY 10020
                                       (212) 610-6300
                                       Jacob.pultman@allenovery.com

                                       *Attorneys for Plaintiff*
                                       KPN B.V.

# EXHIBIT 1

# STOCK PURCHASE AGREEMENT

by and between

**KPN TELECOM B.V.,**
a limited liability company
organized under the laws of The Netherlands,

and

**CORCYRA d.o.o.**
a Croatian company

Dated as of January 28, 2005

## CONTENTS

| Section | | | Page |
|---|---|---|---|
| 1. | DEFINITIONS | | 1 |
| 2. | PURCHASE AND SALE OF SHARES | | 4 |
| | 2.1 | Purchase Price | 4 |
| | 2.2 | Initial Closing | 4 |
| | 2.3 | Premium Payments | 6 |
| | 2.4 | Final Closing | 6 |
| 3. | REPRESENTATIONS AND WARRANTIES OF SELLER | | 7 |
| | 3.1 | Organization | 7 |
| | 3.2 | Authority Relative to this Agreement | 7 |
| | 3.3 | No Conflict; Required Filings and Consents | 7 |
| | 3.4 | No Commissions | 8 |
| | 3.5 | Title to Shares | 8 |
| | 3.6 | Litigation | 8 |
| 4. | REPRESENTATIONS AND WARRANTIES OF PURCHASER | | 8 |
| | 4.1 | Organization | 8 |
| | 4.2 | Authority Relative to this Agreement | 9 |
| | 4.3 | Restricted Securities | 9 |
| | 4.4 | Securities Act | 9 |
| | 4.5 | No Conflict; Required Filings and Consents | 9 |
| | 4.6 | No Commissions | 9 |
| | 4.7 | Due Diligence | 10 |
| | 4.8 | Availability of Funds | 10 |
| | 4.9 | Schedule 13D | 10 |
| | 4.10 | Litigation | 10 |
| | 4.11 | United States Margin Regulations | 11 |
| 5. | ADDITIONAL AGREEMENTS | | 11 |
| | 5.1 | Legal Conditions to Closing | 11 |
| | 5.2 | Additional Actions | 11 |
| | 5.3 | Press Releases | 11 |
| | 5.4 | Board of Directors | 11 |
| | 5.5 | Registration Rights | 11 |
| | 5.6 | Other Proposals | 12 |
| | 5.7 | Voting by Seller | 12 |
| 6. | COVENANTS | | 13 |
| | 6.1 | Purchaser Information | 13 |
| 7. | CONDITIONS TO CLOSING | | 13 |
| | 7.1 | Conditions to Purchaser's Obligation | 13 |
| | 7.2 | Conditions to Seller's Obligation | 14 |
| | 7.3 | No Rescission | 14 |
| 8. | TERMINATION | | 15 |

| | 8.1 | Termination | 15 |
| | 8.2 | Effect of Termination | 15 |
| 9. | | INDEMNIFICATION | 16 |
| | 9.1 | Survival of Representations and Warranties | 16 |
| | 9.2 | Seller's Agreement to Indemnify | 16 |
| | 9.3 | Purchaser's Agreement to Indemnify | 16 |
| | 9.4 | Procedures for Resolution and Payment of Claims for Indemnification | 16 |
| | 9.5 | Materiality, Limitation of Liability | 17 |
| 10. | | MISCELLANEOUS | 18 |
| | 10.1 | Notices | 18 |
| | 10.2 | Assignment; Binding Effect; No Third-Party Rights | 19 |
| | 10.3 | Entire Agreement | 19 |
| | 10.4 | Expenses | 19 |
| | 10.5 | Waivers; Amendments | 19 |
| | 10.6 | Reformation and Severability | 19 |
| | 10.7 | Governing Law | 20 |
| | 10.8 | Counterparts | 20 |
| | 10.9 | Headings | 20 |
| | 10.10 | Payments in U.S. Dollars | 20 |
| | 10.11 | Confidentiality Obligations | 20 |
| | 10.12 | No Partnership | 20 |

## Exhibits

| Exhibit A | Form of Escrow Agreement |
| Exhibit B | Letter of Moshe Har Adir |
| Exhibit C | Final Closing Purchase Price |
| Exhibit D | Form of Seller Officer's Certificate |
| Exhibit E | Form of Purchaser Officer's Certificate |

## Schedules

| Schedule 4.9 | Schedule 13D |

## STOCK PURCHASE AGREEMENT

**THIS STOCK PURCHASE AGREEMENT** is made and entered into as of January 28, 2005, by and between:

(1)  **KPN TELECOM B.V.**, a limited liability company organized under the laws of The Netherlands (**Seller**); and

(2)  **CORCYRA d.o.o.**, a company organized under the laws of Croatia (**Purchaser**).

### RECITALS:

**WHEREAS,** Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, 2,326,043 shares of common stock (the **Shares**) of EuroWeb International Corp., a Delaware corporation (the **Company**), constituting approximately 43.5% of the issued and outstanding shares of the Company (based on 5,342,533 shares issued and outstanding as of January 27, 2005, according to information provided by the Company's transfer agent), on the terms and subject to the conditions set forth herein.

**NOW, THEREFORE,** in consideration of and subject to the premises and the mutual agreements, terms and conditions herein contained, the benefits to be derived therefrom and other good and valuable consideration, the receipt and the sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

### 1.    DEFINITIONS

1.1    As used in this Agreement and the Schedules and Exhibits related hereto, the terms used are defined as follows, except where the context of this Agreement or a Schedule or Exhibit hereto clearly indicates otherwise:

**Affiliate** of a party means a corporation, limited liability company, or other entity that (i) is controlled by a party; (ii) is controlled by another corporation, limited liability company, or entity that also controls the party; or (iii) controls the party, where the terms "control" and "controlled" mean direct or indirect ownership of more than fifty percent (50%) of the stock or interest having a right to vote for directors or managers and the power to direct or cause the direction of the management and policies of such person, whether through the ownership of voting securities, by contract, or otherwise.

**Agreement** means this Stock Purchase Agreement, dated as of January 28, 2005, by and between Seller and Purchaser, including the attached Schedules and Exhibits, as the same may be modified, supplemented and amended.

**Business Day** means any day other than a Saturday, Sunday or other day on which commercial banks in The Netherlands or New York are authorized or required to be closed or on which The Nasdaq SmallCap Market is closed.

**Closing** means, as applicable, the Initial Closing or the Final Closing.

**Closing Date** means a date on which the Initial Closing or the Final Closing shall occur.

**Company** has the meaning ascribed to it in the recital set forth above.

**Consent** means any approval, consent, authorization, waiver, notice, filing or exemption to, from, or with respect to a specified action.

**Damages** has the meaning ascribed to it in Section 9.2.

**Escrow Agent** means JPMorgan Chase Bank N.A.

**Escrow Agreement** means the escrow agreement, dated as of January 28, 2005, executed by Purchaser, Seller and the Escrow Agent, and substantially in the form of Exhibit A.

**Exhibit** means an attachment referred to in this Agreement that is made a part of this Agreement by its attachment hereto.

**Final Closing** means the closing of the sale of the Final Shares to Purchaser as contemplated by this Agreement.

**Final Closing Date** means the date on which the Final Closing shall occur.

**Final Closing Purchase Price** has the meaning ascribed to it in Section 2.4(c).

**Final Shares** has the meaning ascribed to it in Section 2.4(a).

**Financing** has the meaning ascribed to it in Section 4.8.

**Governmental Authority** means any court, government or political subdivision or department thereof, any governmental or regulatory body, board, bureau, arbitrator or alternative dispute resolution body, administrative agency or commission, securities exchange or other governmental agency or instrumentality of competent jurisdiction.

**Governmental Consent** means a Consent of any Governmental Authority.

**Indemnitee** has the meaning ascribed to it in Section 9.4(a).

**Indemnitee's Notice** has the meaning ascribed to it in Section 9.4(a).

**Indemnitor** has the meaning ascribed to it in Section 9.4(a).

**Initial Closing** means the closing of the sale of the Initial Shares to Purchaser as contemplated by this Agreement.

**Initial Closing Purchase Price** has the meaning ascribed to it in Section 2.2(c).

**Initial Shares** has the meaning ascribed to it in Section 2.2(a).

**knowledge** in the phrase "to its knowledge", "to the best of its knowledge" or "has knowledge of" or a similar phrase, when used to qualify a statement of a party, shall be deemed to be that knowledge held and, in the case of the phrase "to the best of its knowledge," knowledge which would have been held, assuming commercially reasonable investigation and inquiry, in each case by the officers, directors and managers of (i) Seller, if Seller is making such statement, and (ii) Purchaser, if Purchaser is making such statement, at the time such statement is made.

**Law** means any applicable international, foreign, national, provincial, state or local (or other political subdivision) statute, law (including common law), ordinance, order, rule, regulation or binding requirement of a Governmental Authority.

**Liability** means, with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, direct or indirect, accrued or unaccrued, assessed or non-assessed, liquidated or unliquidated, secured or unsecured, joint or several, due under a guarantee of another Person's Liability, due or to become due, vested or unvested, executory, determined or determinable and whether or not the same is required to be accrued on such Person's financial statements.

**Material Adverse Effect** means, with respect to any Person, a material adverse effect on the financial condition, business, assets, Liabilities, properties, prospects or results of operations of such Person and its subsidiaries taken as a whole or a material adverse effect on its ability to consummate the Transactions.

**Notice** has the meaning ascribed to it in <u>Section 10.1</u>.

**parties** means, unless the context otherwise requires, Seller and Purchaser.

**Person** means any individual, firm, corporation, partnership, trust, joint venture, Governmental Authority or other entity, and shall include any successor (by merger or otherwise) of such entity.

**Proceeding** means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

**Purchase Price** means the Initial Closing Purchase Price and the Final Closing Purchase Price.

**Purchaser** means CORCYRA d.o.o.

**Purchaser Indemnitee** has the meaning ascribed to it in <u>Section 9.2</u>.

**Representatives** means, with respect to any Person, any of such Person's officers, directors, employees, agents, attorneys, accountants, consultants, equity partners or financial advisors or other Persons acting on behalf of such Person.

**Schedule** means an attachment referred to in this Agreement that is made a part of this Agreement by its attachment hereto.

**Securities Act** means the United States Securities Act of 1933, as amended.

**Seller** means KPN Telecom B.V., a limited liability company organized under the laws of The Netherlands.

**Seller Indemnitee** has the meaning ascribed to it in <u>Section 9.3</u>.

**Shares** has the meaning ascribed to it in the recital set forth above. The Initial Shares and the Final Shares together are the Shares.

3

**Subsidiary** of a specified person is an Affiliate controlled by such person directly, or indirectly through one or more intermediaries.

**Third Party Claim** has the meaning ascribed to it in Section 9.4(a).

**Transactions** means the sales of Shares to Purchaser at the Initial Closing and the Final Closing.

**U.S.$** or **U.S. Dollars** means United States dollars.

1.2     In this Agreement:

    (a)    words denoting persons shall include bodies corporate and unincorporated associations of persons;

    (b)    subject to Section 10.2, references to a party to this Agreement include references to the successors or assigns (immediate or otherwise) of that party; and

    (c)    if any payment obligation set forth in Section 2 of this Agreement falls due on a day that is not a Business Day, payment shall be due on the next following Business Day.

## 2.     PURCHASE AND SALE OF SHARES

### 2.1     Purchase Price

The aggregate consideration payable by Purchaser as the Purchase Price for the Shares shall be:

    (i)    the Initial Closing Purchase Price (as defined in Section 2.2(c)) in respect of the Initial Shares; and

    (ii)    the Final Closing Purchase Price (as defined in Section 2.4(c)) in respect of the Final Shares.

### 2.2     Initial Closing

(a)    Subject to the terms and conditions of this Agreement, at the Initial Closing Seller shall sell and Purchaser shall purchase 289,855 Shares (the **Initial Shares**) for the Initial Closing Purchase Price (as defined below).

(b)    The Initial Closing shall take place at 4:00 p.m., Central European Time, on or about February 1, 2005 or, if earlier, on the first Business Day occurring five days following satisfaction or waiver of all of the conditions set forth in Section 7.1 and Section 7.2 (other than those conditions that by their nature are to be satisfied at the Initial Closing). The Initial Closing shall occur at such location as the parties may mutually agree.

(c)    At the Initial Closing:

    (i)    Purchaser shall deliver to Seller:

        (A)    payment, by wire transfer to the bank account designated in writing by Seller, immediately available funds in U.S. dollars in an amount equal to

U.S.$1,000,000 (the **Initial Closing Purchase Price**) as full consideration for the Initial Shares;

(B)     the officer's certificate referred to in <u>Section 7.2(c)</u>;

(C)     resignation letters of Ilan Kenig and Yossi Attia, which shall only be effective in the event that (a) CORCYRA does not timely satisfy the conditions contained in <u>Section 7.2</u> of this Agreement or (b) this Agreement is otherwise terminated pursuant to <u>Section 8.1</u> hereof, including if CORCYRA shall be in default of its obligation to make any Premium Payment specified in <u>Section 2.3</u> of this Agreement; and

(D)     the Escrow Agreement, dated as of the date of the Initial Closing, executed by Purchaser and substantially in the form of <u>Exhibit A</u>, and providing that Seller shall retain all voting and other rights associated with the Final Shares (and Seller shall continue to be the beneficial owner of the Final Shares) until the Final Closing Purchase Price is paid in full; provided, however, that so long as Purchaser is not in default in its obligations hereunder, and this Agreement remains in effect, the Seller shall vote the Final Shares in accordance with instructions from Purchaser, so long as such instructions are received sufficiently in advance of the applicable vote and such voting would not violate applicable law or require amendments to any SEC filing of Seller or Purchaser. Seller shall not be obligated to vote the Final Shares in accordance with Purchaser's instructions in connection with any matter (i) proposed by or on behalf of Purchaser or any of its Affiliates that Purchaser did not previously disclose to Seller in its Schedule 13D or (ii) as to which Purchaser or any of its Affiliates would have an interest that is different from the interests of the other stockholders of the Company such as an interest that would be of a nature that would have to be disclosed pursuant to Item 1005(d) of Regulation M-A or Item 404 of Regulation S-K, if either of such provisions were applicable.

(ii)     Seller shall deliver to Purchaser:

(A)     one or more certificates representing the Initial Shares, together with duly executed stock powers endorsed in blank;

(B)     the officer's certificate referred to in <u>Section 7.1(c)</u>; and

(C)     the Escrow Agreement executed by Seller and JPMorgan Chase Bank N.A. (the **Escrow Agent**).

(iii)     Seller shall deliver to Escrow Agent:

(A)     the Escrow Agreement executed by Purchaser and Seller; and

(B)     one or more certificates representing the Final Shares (as defined in <u>Section 2.4(a)</u>) to be held in escrow in a segregated escrow account in accordance with the terms of the Escrow Agreement.

5

(d)     Attached hereto as Exhibit B, and effective upon the signing of this Agreement, is a letter from Moshe Har Adir, the sole officer, director and shareholder of Purchaser, pursuant to which Moshe Har Adir has committed personally to fund the obligations of Purchaser under Article 2 of this Agreement.

## 2.3    Premium Payments

Purchaser shall deliver to Seller, by wire transfer to the bank account listed in Section 2.2(c), in immediately available funds in U.S. dollars, a premium payment of U.S.$105,609 on each of May 1, 2005, August 1, 2005, November 1, 2005 and February 1, 2006 (together, the **Premium Payments**). Each Premium Payment when made shall be final and indefeasible. For the avoidance of doubt, Premium Payments paid shall not be returned, and shall not entitle Purchaser to receive any Shares, if this Agreement is terminated prior to the Final Closing. The obligation to make each Premium Payment shall be unconditional so long as this Agreement shall not have been terminated or the Final Closing Purchase Price shall not have been paid.

## 2.4    Final Closing

(a)     Subject to the terms and conditions of this Agreement, at the Final Closing Seller shall sell and Purchaser shall purchase 2,036,188 Shares (the **Final Shares**), the number of Final Shares being subject to appropriate adjustment in the event of a stock dividend, recapitalization, stock split, reverse stock split, subdivision, combination, reclassification or similar change in the Company's capital structure, for the Final Closing Purchase Price (as defined below).

(b)     The Final Closing shall take place at 4:00 p.m., Central European Time on April 30, 2006; provided, however, upon 14 days' prior written notice to Seller, Purchaser may accelerate the Final Closing Date to an earlier month-end date as specified in such notice; provided, further, that the Final Closing is subject to the satisfaction or waiver of all of the conditions set forth in Section 7.1 and Section 7.2 (other than those conditions that by their nature are to be satisfied at the Final Closing). The Final Closing shall occur at such location outside of the United States as the parties may mutually agree.

(c)     At the Final Closing:

    (i)     Purchaser shall deliver to Seller:

        (A)     payment, by wire transfer to the bank account designated in writing by Seller, immediately available funds in U.S. dollars in the amount equal to the sum of (x) the amount listed on Exhibit C that corresponds to the date of the Final Closing as determined in accordance with Section 2.4(b) plus (y) the Additional Payment (as defined below) plus (z) in accordance with Section 2.3, any Premium Payments due and payable prior to the Final Closing but remaining unpaid (the **Final Closing Purchase Price**); and

        (B)     the officer's certificate referred to in Section 7.2(c).

    (ii)     Seller shall cause the Escrow Agent to transfer to Purchaser one or more certificates representing the Final Shares to be purchased at the Final Closing.

    (iii)     Seller shall deliver to Purchaser the officer's certificate referred to in Section 7.1(c).

6

(d)     As used herein, with respect to any Final Closing Date, the Additional Payment shall mean, if positive, the product of (A) 2,036,188, (B) 0.5 and (C) the difference between (I) the average closing price of a share of Company common stock on The Nasdaq SmallCap Market (as reported by The Wall Street Journal) for the 60 trading days ending on the second Business Day prior to the applicable Final Closing Date minus (II) $3.45 (the **Additional Payment**). The Additional Payment shall be subject to appropriate adjustment in the event of a stock dividend, recapitalization, stock split, reverse stock split, subdivision, combination, reclassification or similar change in the Company's capital structure.

## 3.      REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser that the representations and warranties set forth in this Article 3 are true and correct on the date hereof and on each Closing Date.

### 3.1    Organization

Seller is a corporation duly organized, validly existing and in good standing under the laws of The Netherlands, has the requisite corporate power and authority to own, operate and lease its properties and to carry on its business as it is now being conducted. Seller is duly qualified to do business in each jurisdiction in which the nature of its business or the properties owned, operated or leased by it makes such qualification necessary.

### 3.2    Authority Relative to this Agreement

Seller has all necessary corporate power and authority to enter into this Agreement and to carry out its obligations hereunder. The execution and delivery by Seller of this Agreement and the consummation of the Transactions contemplated hereby have been duly authorized by Koninklijke KPN N.V., its sole director, and all other corporate proceedings on the part of Seller necessary to authorize this Agreement and the Transactions have been taken. This Agreement has been duly executed and delivered by Seller.

### 3.3    No Conflict; Required Filings and Consents

(a)     Assuming the accuracy of the Purchaser's representations made herein, the execution, delivery and performance of this Agreement by Seller do not (i) conflict with or violate the charter or other organizational document of Seller, (ii) conflict with or violate any Law or order applicable to Seller or (iii) breach or constitute a default (or an event which with notice or lapse of time or both would become a default) under or give to others any rights of termination, amendment, acceleration or cancellation of, or result in any loss of any material benefit, or the creation of a lien on any of Seller's assets pursuant to, any note, bond, mortgage, indenture, contract, agreement, lease, permit or other instrument or obligation to which Seller is a party.

(b)     Assuming the accuracy of the Purchaser's representations made herein, the execution, delivery and performance by Seller of this Agreement do not require any Governmental Consent to be obtained by Seller prior to the Closing.

7

## 3.4   No Commissions

No Person has or will have, as a result of the Transactions, any right, interest or valid claim against or upon any party hereto for any commission, fee or other compensation as a finder or broker because of any act or omission by Seller or any of its Representatives.

## 3.5   Title to Shares

As of the date hereof, Seller owns beneficially and of record all of the Shares. No Person (other than Purchaser) has any written or oral agreement or option or any right or privilege, whether by law, preemptive right or contract, that is capable of becoming an agreement or option for the purchase or acquisition from Seller of any of the Shares. The Shares will not be transferred to Purchaser in violation of any preemptive, preferential or first refusal rights. Upon delivery to Purchaser at the Initial Closing of certificates representing the Initial Shares, duly endorsed by Seller for transfer to Purchaser, and upon Seller's receipt of the Initial Closing Purchase Price therefor, Purchaser will acquire all of Seller's rights and interests in the Initial Shares to be sold at the Initial Closing, free of all liens, encumbrances, mortgages, pledges, security interests or charges of any kind (other than under the Securities Act, and any other applicable securities law), or any other adverse claim, assuming that Purchaser obtains control of the certificates and does not have notice of any adverse claim. Upon delivery to Purchaser at the Final Closing of certificates representing the Final Shares, duly endorsed by Seller for transfer to Purchaser, and upon Seller's receipt of the Final Closing Purchase Price therefor, Purchaser will acquire all of Seller's rights and interests in the Final Shares to be sold at the Final Closing, free of all liens, encumbrances, mortgages, pledges, security interests or charges of any kind (other than under the Securities Act, and any other applicable securities law), or any other adverse claim, assuming that Purchaser obtains control of the certificates and does not have notice of any adverse claim.

## 3.6   Litigation

There are not any (i) Proceedings pending or threatened against or affecting Seller or any of its Affiliates or (ii) investigations by any Governmental Authority that are pending or threatened against or affecting Seller or any of its Affiliates that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Seller.

## 4.   REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that the representations and warranties set forth in this Article 4 are true and correct on the date hereof and on each Closing Date.

## 4.1   Organization

Purchaser is a company duly organized, validly existing and in good standing under the laws of Croatia and has the requisite corporate power and authority to own, operate and lease its properties and to carry on its business as it is now being conducted. Purchaser is duly qualified to do business in each jurisdiction in which the nature of its business or the properties owned, operated or leased by it makes such qualification necessary.

8

**4.2    Authority Relative to this Agreement**

Purchaser has all necessary corporate power and authority to enter into this Agreement and to carry out its obligations hereunder. The execution and delivery by Purchaser of this Agreement and the consummation of the Transactions contemplated hereby have been duly authorized and all other corporate proceedings on the part of Purchaser necessary to authorize this Agreement and the Transactions have been taken. This Agreement has been duly executed and delivered by Purchaser.

**4.3    Restricted Securities**

Purchaser understands that:

   (i)    the Shares being delivered pursuant to this Agreement (A) are "restricted securities" under the Federal securities laws of the United States inasmuch as they have not been registered under the Securities Act, and are being acquired from Seller in a transaction exempt from registration under the Securities Act pursuant to Section 4(1) thereof and/or Regulation S promulgated thereunder; (B) must be held indefinitely unless a subsequent disposition thereof is registered under the Securities Act or is exempt from registration; and (C) will bear a legend to such effect; and

   (ii)   the Company may make a notation on its transfer books in accordance with Section 4.3(i).

**4.4    Securities Act**

The Shares to be purchased by Purchaser pursuant to this Agreement are being acquired for investment only and not with a view to any public distribution thereof, and Purchaser shall not offer to sell or otherwise dispose of the Shares so acquired by it in violation of any of the registration requirements of the Securities Act.

**4.5    No Conflict; Required Filings and Consents**

(a)    The execution, delivery and performance of this Agreement by Purchaser do not (i) conflict with or violate the charter or other organizational document of Purchaser, (ii) conflict with or violate any Law or order applicable to Purchaser or (iii) breach or constitute a default (or an event which with notice or lapse of time or both would become a default) under or give to others any rights of termination, amendment, acceleration or cancellation of, or result in any loss of any material benefit, or the creation of a lien on any of Purchaser's assets pursuant to, any note, bond, mortgage, indenture, contract, agreement, lease, permit or other instrument or obligation to which Purchaser is a party.

(b)    The execution, delivery and performance by Purchaser of this Agreement do not require any Governmental Consent to be obtained by Purchaser prior to the Closing.

**4.6    No Commissions**

Any Person that has or will have, as a result of the Transactions, any right, interest or valid claim against or upon any party hereto for any commission, fee or other compensation as a finder or

9

broker on behalf of Purchaser shall be compensated by Purchaser and shall only make a claim against Purchaser, and Seller shall have no liability therefor.

### 4.7    Due Diligence

(a)    Purchaser acknowledges that it and its Representatives have conducted their own independent investigation, review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company based on available public information, which Purchaser acknowledges is sufficient for its purposes, which investigation, review and analysis was done by Purchaser and, to the extent Purchaser deemed appropriate, by its Representatives. Purchaser is a sophisticated investor with knowledge and experience in business and financial matters and has received information from Seller concerning the Company, and has had the opportunity to obtain additional information as desired in order to evaluate the purchase contemplated hereby.

(b)    Purchaser has no knowledge that any of the representations and warranties of Seller made in this Agreement are not true and correct and Purchaser has no knowledge of any material errors in, or material omissions from, the Schedules to the Agreement.

(c)    Purchaser acknowledges that, except as expressly set forth in this Agreement, none of Seller, the Company or any other person has made any representation or warranty, express or implied, to it as to any matter relating to the Company or the Shares, including without limitation, as to the accuracy or completeness of any information regarding Company furnished or made available to Purchaser or its Representatives.

### 4.8    Availability of Funds

Purchaser has cash available or has existing borrowing facilities or firm commitments that together are sufficient to enable it to pay the Purchase Price and consummate the Transactions. True and correct copies of any such facilities and commitments have been delivered to Seller. The financing required to consummate the Transactions is collectively referred to as the Financing. As of the date hereof, Purchaser has no reason to believe that any of the conditions to the Financing will not be satisfied or that the Financing will not be available on a timely basis for the Transactions.

### 4.9    Schedule 13D

Attached hereto as Schedule 4.9 is a draft of the Schedule 13D that Purchaser anticipates filing with the SEC in connection with the Initial Closing. Purchaser has no current intention to take any material action with respect to the Company that is not disclosed therein.

### 4.10    Litigation

There are not any (i) Proceedings pending or threatened against or affecting Purchaser or any of its Affiliates or (ii) investigations by any Governmental Authority that are pending or threatened against or affecting Purchaser or any of its Affiliates that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Purchaser.

**4.11    United States Margin Regulations**

Purchaser is not a United States person or foreign person controlled by or acting on behalf of or in conjunction with a United States person within the meaning of Regulation X of the Board of Governors of the United States Federal Reserve System.

**5.    ADDITIONAL AGREEMENTS**

**5.1    Legal Conditions to Closing**

Each of Seller and Purchaser shall use its respective reasonable efforts, and take all reasonable actions necessary, to comply promptly with all legal requirements that may be imposed on such party with respect to the Transactions, and shall promptly cooperate with and furnish information to such other party or parties in connection with any such requirements, as may reasonably be imposed upon such other party or parties in connection with the Transactions.

**5.2    Additional Actions**

Neither Seller nor Purchaser shall, prior to a Closing, directly or indirectly, take any action or agree to take any action, without the prior written consent of the other party, that would or is reasonably likely to result in any of the representations or warranties set forth in this Agreement being untrue in any material respect, or in any of the conditions to the Closing not being satisfied.

**5.3    Press Releases**

Neither Seller nor Purchaser shall issue or cause the publication or issuance of a press release or public announcement with respect to this Agreement or the Transactions; provided, however that if the need shall arise for a press release through no fault or action of either party, the relevant party may prepare a press release with respect to its involvement in the Transactions. Such press release shall be subject to the consent of the other party hereto, which consent shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, nothing in this Agreement shall restrict either party's ability to make required filings under the U.S. Federal securities laws.

**5.4    Board of Directors**

In connection with the Initial Closing, Seller shall (i) use its best efforts to cause the resignation of Seller's sole two representatives on the Board of Directors of the Company, and (ii) propose to the Company that two representatives of Purchaser be designated to fill the vacancies created by the action in (i) above. Notwithstanding anything herein contained, it is hereby agreed that in the event that Seller is not able to cause the resignations of both Seller representatives by delivering signed resignations to Purchaser at the Initial Closing, then in such event, this Agreement shall immediately terminate, and shall be null and void.

**5.5    Registration Rights**

Seller shall request that the Company grant Purchaser registration rights over the Initial Shares at the Initial Closing. Seller agrees to transfer to Purchaser at the Final Closing its registration rights that it acquired pursuant to the Share Subscription Agreement dated as of November 19, 1999 (and amended and restated on December 13, 1999) between the Company, Seller and certain directors of the Company (the **Subscription Agreement**), provided that, in accordance

11

with the terms of the Subscription Agreement, Purchaser has undertaken to each of the parties to the Subscription Agreement in a form satisfactory to them to be bound by all the obligations of Seller under the Subscription Agreement.

5.6   **Other Proposals.**

Until the earlier of (i) the Initial Closing or (ii) rightful termination of this Agreement before Initial Closing, the Seller shall not, nor shall the Seller authorize or permit any Representative of Seller to, directly or indirectly: (a) initiate contact with any person in an effort to solicit any Purchase Proposal; (b) cooperate with, or furnish or cause to be furnished any non-public information concerning the business, properties, or assets of the Company to any person in connection with any Purchase Proposal; (c) negotiate with any Person with respect to any Purchase Proposal; or (d) enter into any agreement or understanding with the intent to effect a Purchase Proposal. Seller will promptly give written notice to Purchaser of the details of any Purchase Proposal of which any of them becomes aware.

For the purposes of this Agreement, the term **"Purchase Proposal"** shall mean any proposal, other than one contemplated by this Agreement, (i) for a merger, consolidation, reorganization, or other business combination involving the Company, (ii) for the acquisition of any interest in the equity of the Company, (iii) for the acquisition of the right to cast any votes on any matter with respect to the Company or (iv) for the acquisition of a substantial portion of the Company's assets other than in the ordinary course of business.

Nothing in this Section 5.6 shall relate to or affect the rights, obligations or activities of the Seller's representation on the Board of Directors of the Company to the extent they are acting in that capacity.

5.7   **Voting by Seller.**

   (a)   It is agreed and understood that until the earlier of Initial Closing or rightful termination of this Agreement, the Seller shall not vote its shares in the Company for:

      (i)   any merger, consolidation, reorganization, or other business combination involving the Company, except as contemplated by this Agreement;

      (ii)   any sale, lease, exchange or disposition of assets of the Company, except as contemplated by this Agreement;

      (iii)   any issuance of any corporate interests of the Company or, any option, warrant, or other right calling for the issuance of any such interest, or any security convertible into or exchangeable for any such interest (other than any such interest, including stock options and executive compensation, proposed in the ordinary course of business);

      (iv)   any authorization of any class of capital stock of the Company;

      (v)   the amendment of the certificate of incorporation of the Company; or

      (vi)   any proposition the effect of which is reasonably likely to inhibit, restrict, or delay the consummation of the Transactions contemplated by this Agreement or

impair the contemplated benefits to Purchaser, the Company or the Seller of the Transactions contemplated by this Agreement.

## 6.    COVENANTS

### 6.1    Purchaser Information

Until Final Closing, Purchaser shall deliver to Seller:

(i)    promptly, all notices or other documents dispatched by Purchaser to Purchaser's shareholders (or any class thereof) or its creditors generally (or any class thereof);

(ii)    promptly, such specific information in the possession or control of Purchaser regarding the financial condition and operations of Purchaser or any of its Subsidiaries that is material for evaluation of Purchaser's ability to perform its obligations under this Agreement; and

(iii)    details of any litigation, arbitration or administrative proceedings that affect Purchaser or any of its Subsidiaries and which, if adversely determined, are reasonably likely to have a Material Adverse Effect on the ability of Purchaser to perform its obligations under this Agreement, as soon as practicable after the same are instituted or, to the knowledge of Purchaser, threatened.

## 7.    CONDITIONS TO CLOSING

### 7.1    Conditions to Purchaser's Obligation

The obligation of Purchaser to purchase and pay for the Shares at any Closing Date is subject to the satisfaction (or waiver by Purchaser), as of the applicable Closing Date, of each of the following conditions:

(a)    Accuracy of Representations and Warranties.  There shall not have occurred and be continuing on the Closing Date a material breach of a representation or warranty of Seller made herein.

(b)    Performance of Obligations.  Seller shall have performed or complied in all material respects with its covenants and agreements contained in this Agreement required to be performed or complied with on or prior to the Closing Date.

(c)    Officer's Certificate.  Seller shall have delivered to Purchaser a certificate signed by an officer or officers with authority to bind Seller (dated as of the Closing Date), in the form of Exhibit D.

(d)    No Injunctions.  No Law or injunction or other legal restraint or prohibition preventing the consummation of the Transactions shall have been enacted, entered, promulgated, enforced or issued by any Governmental Authority.

(e)    No Litigation.  No Proceeding shall be pending before any court or quasi-judicial or administrative agency of any Federal, state, local, or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling, or charge

would (A) prevent consummation of the Transactions or impose damages or (B) cause any of the material transactions contemplated by this Agreement to be rescinded following consummation, and no law, statute, ordinance, rule, regulation or order shall have been enacted, enforced or entered which would cause any of the effects under clause (A) or (B) of this Section 7.1(e) to occur.

## 7.2    Conditions to Seller's Obligation

The obligation of Seller to sell the Shares to Purchaser at any Closing Date is subject to the satisfaction (or waiver by Seller), as of the applicable Closing Date, of each of the following conditions:

(a)    Accuracy of Representations and Warranties.    There shall not have occurred and be continuing on the Closing Date a material breach of a representation or warranty of Purchaser made or incorporated herein.

(b)    Performance of Obligations.    Purchaser shall have performed or complied in all material respects with its covenants and agreements contained in this Agreement required to be performed or complied with on or prior to the Closing Date.

(c)    Officer's Certificate.    Purchaser shall have delivered to Seller a certificate signed by an officer or officers with authority to bind Purchaser (dated as of the Closing Date), in the form of Exhibit E.

(d)    No Injunctions.    No Law or injunction or other legal restraint or prohibition preventing the consummation of the Transactions shall have been enacted, entered, promulgated, enforced or issued by any Governmental Authority.

(e)    No Litigation.    No Proceeding shall be pending before any court or quasi-judicial or administrative agency of any Federal, state, local, or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling, or charge would (A) prevent consummation of the Transactions or impose damages or (B) cause any of the material transactions contemplated by this Agreement to be rescinded following consummation, and no law, statute, ordinance, rule, regulation or order shall have been enacted, enforced or entered which would cause any of the effects under clause (A) or (B) of this Section 7.2(e) to occur.

(f)    Board Approval.    The Board of Directors of the Company shall have approved the Transactions for purposes of Section 203 of the Delaware General Corporation Law (it being understood that this condition shall be deemed satisfied for the Initial Closing and the Final Closing if the Board approves the acquisition by Purchaser of all the Shares prior to the Initial Closing).

## 7.3    No Rescission

Purchaser shall not be entitled to rescind this Agreement before or after the Initial Closing, except as set forth in Section 8.1 below.

## 8.   TERMINATION

### 8.1   Termination

(a)   This Agreement may be terminated at any time prior to the Initial Closing:

    (i)   by the mutual written consent of Seller and Purchaser;

    (ii)   by written notice from Purchaser to Seller if the conditions specified in Section 7.1 with respect to the Initial Closing have not been satisfied or waived prior to February 1, 2005, or shall have become incapable of fulfillment;

    (iii)   by written notice from Seller to Purchaser if the conditions specified in Section 7.2 with respect to the Initial Closing have not been satisfied or waived prior to February 1, 2005, or shall have become incapable of fulfillment; or

    (iv)   by either party if the other party is in material breach of its obligations under this Agreement;

provided that a party shall not have the right to terminate this Agreement if the non-occurrence of the Initial Closing is the result of such party's breach of this Agreement.

(b)   Following the Initial Closing, this Agreement may be terminated at any time prior to the Final Closing:

    (i)   by the mutual written consent of Seller and Purchaser;

    (ii)   by written notice from Purchaser to Seller if the conditions specified in Section 7.1 with respect to the Final Closing have not been satisfied or waived prior to May 1, 2006, or shall have become incapable of fulfillment;

    (iii)   by written notice from Seller to Purchaser if the conditions specified in Section 7.2 with respect to the Final Closing have not been satisfied or waived prior to May 1, 2006, or shall have become incapable of fulfillment;

    (iv)   by Seller if Purchaser shall be in default of its obligation to make any Premium Payment specified in Section 2.3 within five Business Days after the due date for such Premium Payment; or

    (v)   by either party if the other party is in material breach of its obligations under this Agreement;

provided that a party shall not have the right to terminate this Agreement if the non-occurrence of the Final Closing is the result of such party's breach of this Agreement.

### 8.2   Effect of Termination

In the event of termination of this Agreement pursuant to Section 8.1, all obligations of the parties under this Agreement shall terminate, except that Article 1, Article 8, Article 10 and Sections 3.3, 4.5 and 5.3 shall continue in full force and effect. In the event of termination of this Agreement pursuant to Section 8.1(b), the Escrow Agreement shall be deemed to be terminated and the Final

Shares shall be returned to Seller. Nothing in this Section 8.2 shall be deemed to release any party from any liability for any breach by such party of the terms and provisions of this Agreement that occurred while such terms and provisions were in effect. No party shall have liability for consequential or punitive damages arising from a breach or alleged breach of this Agreement.

## 9.    INDEMNIFICATION

### 9.1    Survival of Representations and Warranties

All representations and warranties made by any party pursuant to this Agreement shall survive the Initial Closing for three years.

### 9.2    Seller's Agreement to Indemnify

From and after the Initial Closing, subject to the terms and conditions of this Agreement, Seller shall indemnify, defend and hold harmless Purchaser and its Affiliates and their respective officers, directors, employees and Representatives (each an **Purchaser Indemnitee**) from and against any and all claims, demands, losses, assessments, fines, penalties, interest, liabilities, damages, reasonable expenses of investigations, reasonable experts' fees, reasonable disbursements and other reasonable costs (including reasonable attorneys' fees) (all of the foregoing hereinafter referred to collectively as Damages) asserted against, resulting to, imposed upon or incurred by any Purchaser Indemnitee, that consist of, arise from or are attributable to a breach of any representation or warranty of Seller contained in Article 3 of this Agreement.

### 9.3    Purchaser's Agreement to Indemnify

Effective as of the date hereof, Purchaser agrees to indemnify, defend and hold harmless Seller and its Affiliates and their respective officers, directors, employees and Representatives (each a **Seller Indemnitee**) from and against any and all Damages asserted against, resulting to, imposed upon or incurred by any Seller Indemnitee, that consist of, arise from or are attributable to (a) a breach of any representation or warranty contained in Article 4 of this Agreement, or (b) any action taken by Purchaser in its capacity as owner of any of the Shares or by Seller in accordance with voting instructions delivered pursuant to Section 2.2(c)(i)(C).

### 9.4    Procedures for Resolution and Payment of Claims for Indemnification

(a)    Except as provided in Section 9.5, below, if a Person entitled to be indemnified under this Article 9 (the **Indemnitee**) shall incur any Damages or determine that it may incur any Damages, either pursuant to a claim or demand asserted against or sought to be collected from it by a third party (a **Third Party Claim**) or a claim or demand that does not involve a claim or demand being asserted against or sought to be collected from it by a third party and believes that it is entitled to be indemnified against such Damages by a party hereunder (the **Indemnitor**), such Indemnitee shall deliver to the Indemnitor a notice (an **Indemnitee's Notice**) signed by the Indemnitee, specifying in reasonable detail the nature of such Claim and the amount estimated to be involved in each claim for Damages, which amounts may be reasonably modified from time to time by Indemnitee; provided that any failure to give such Indemnitee's Notice will not waive any rights of the Indemnitee, except for a willful failure or to the extent that the rights of the Indemnitor are actually prejudiced.

16

(b)    If a Third Party Claim is made against an Indemnitee, the Indemnitor shall be entitled to participate in the defense thereof and, if it so chooses, to assume the defense thereof with counsel selected by the Indemnitor; *provided, however,* that such counsel is not reasonably objected to by the Indemnitee. Any Indemnitee shall have the right to employ separate legal counsel in any Third Party Claim and to participate in the defense thereto, but the fees and expenses of such counsel shall not be at the expense of the Indemnitor unless (i) the Indemnitor shall have failed, within 30 days after having received an Indemnitee Notice, to assume the defense of such Claim with counsel reasonably acceptable to the Indemnitee, (ii) the employment of such counsel has been specifically authorized by the Indemnitor or (iii) the named parties to any such action (including, without limitation, any impleaded parties) include both such Indemnitee and the Indemnitor and, in the reasonable judgment of the Indemnitee, joint representation of both would be inappropriate due to actual or potential differing interests, and in that event the reasonable fees and expense of such separate counsel shall be paid by the Indemnitor. Except as otherwise herein provided, the Indemnitor shall not be liable to indemnify an Indemnitee for any settlement of any such action or claim effected without the consent of the Indemnitor (which consent shall not be unreasonably withheld or delayed). If the Indemnitor assumes the defense of a Third Party Claim, the Indemnitee shall agree to any settlement, compromise or discharge of a Third Party Claim that the Indemnitor shall recommend and that by its terms obligates the Indemnitor to pay the full amount of the liability in connection with such claim.

(c)    The Indemnitor shall provide the Indemnitee, or vice versa, as the case may be, with copies of all complaints, motions, answers and other pleadings filed or received in connection with any Third Party Claim promptly after filing or receipt thereof.

9.5    Materiality, Limitation of Liability

(a)    Notwithstanding anything to the contrary herein, in no event shall any indemnity pursuant to this Article 9 include any consequential or punitive damages unless and to the extent that such damages have been asserted against the Indemnitee in a Third Party Claim.

(b)    Notwithstanding anything to the contrary herein, in no event shall Seller be liable under Section 9.2 for Damages to the extent they exceed the Purchase Price.

(c)    Notwithstanding anything to the contrary herein, in no event shall Seller be liable under Section 9.2 for Damages to the extent that it relates to any fact, event, liability or obligation:

    (i)     that would not have arisen but for a change in legislation announced after the Initial Closing; or

    (ii)    with respect to which Purchaser or any Affiliate had knowledge at the time of the Initial Closing; or

    (iii)   resulting from any action taken or omitted to be taken by Purchaser or any Affiliate of Purchaser (other than pursuant to instructions from Seller).

(d)    Notwithstanding anything to the contrary herein, in no event shall Purchaser be liable under Section 9.3 for Damages to the extent they exceed the Purchase Price.

(e)    Notwithstanding anything to the contrary herein, in no event shall Purchaser be liable under Section 9.3 for Damages to the extent that it relates to any fact, event, liability or obligation:

    (i)     that would not have arisen but for a change in legislation announced after the Initial Closing; or

    (ii)    with respect to which Seller or any Affiliate had knowledge at the time of the Initial Closing; or

    (iii)   resulting from any action taken or omitted to be taken by Seller or any Affiliate of Seller (other than pursuant to instructions from Purchaser).

(f)    Each of the parties further acknowledges and agrees that, should the Initial Closing occur, its sole and exclusive remedy with respect to any and all claims relating to this Agreement, the Company and the Transactions (other than claims of, or causes of action arising from, fraud and claims relating to breaches of Section 2.3 or 2.4 hereof) shall be pursuant to the indemnification provisions set forth in this Article 9. In furtherance of the foregoing, Purchaser hereby waives, from and after the Initial Closing, any and all rights, claims and causes of action it, the Company or any Affiliate may have against Seller and its Affiliates arising under or based on any Federal, state or local Law or otherwise (except pursuant to this Article 9).

## 10.   MISCELLANEOUS

### 10.1   Notices

All reports, approvals, and notices required or permitted by this Agreement to be given to a party (each a **Notice**) shall be given in writing, by personal delivery, telecopy or overnight courier, to the party concerned at its address as set forth below (or at such other address as a party may specify by written notice pursuant to this Section 10.1 to the other):

If to Purchaser:

CORCYRA d.o.o.
Verudela 17, Pula Croatia 52100
Fax: +385 52 590 731
Attn: Moshe Har Adir

With a copy to:

Robinson & Cole LLP
885 Third Avenue, Suite 2800
New York, NY 10022
Fax: +1 212 451 2999
Attn: Elliot H. Lutzker, Esq.

If to Seller:

KPN Telecom B.V.
Maanplein 55
2516 CK The Hague
The Netherlands
Fax: +31 70 343 2112
Attn: Gert-Jan Wunderink

All Notices shall be deemed effective, delivered and received (a) if given by personal delivery, or by overnight courier, when actually delivered and signed for, or (b) if given by facsimile, when such facsimile is transmitted to the facsimile number specified above and receipt therefor is confirmed.

## 10.2    Assignment; Binding Effect; No Third-Party Rights

Except as otherwise provided in this Agreement, neither this Agreement nor the rights granted hereunder may be assigned or transferred by Seller or Purchaser and any attempted assignment, delegation or transfer in violation hereof, shall be void and of no force and effect. Except as expressly stated in this Agreement, this Agreement is for the sole benefit of the parties hereto and is not intended to and shall not confer upon any Person other than the parties hereto any rights or remedies hereunder. Except as otherwise provided in this Agreement, this Agreement shall be binding on the permitted successors and assigns of the parties, each such permitted successor and assign being deemed to be a party hereunder in substitution of its respective transferor.

## 10.3    Entire Agreement

This Agreement contains the entire understanding and agreement among the parties with respect to the subject matter hereof and supersede all prior oral and written understandings and agreements relating thereto.

## 10.4    Expenses

All expenses incurred by a party or on its behalf in connection with this Agreement or related to the preparation, negotiation, execution and performance of this Agreement, shall be borne by the party incurring such expenses.

## 10.5    Waivers; Amendments

Any waiver by any party of a breach of any provision of this Agreement shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Agreement. The failure of a party to insist upon strict adherence to any term of this Agreement on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement. Any waiver must be in a writing signed by the waiving party. This Agreement may only be amended with the written consent of Seller and Purchaser.

## 10.6    Reformation and Severability

Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future Laws effective during the term hereof or would cause any party to violate any such Law, then (i) in lieu of such illegal, invalid or unenforceable provision, the parties shall endeavor in good faith negotiations to agree on a provision as similar to such illegal, invalid or unenforceable provision as may be possible while still being legal, valid and enforceable, provided that no party shall be required to agree to any provision that would materially alter any of its rights or obligations under this Agreement and (ii) the legality, validity and enforceability of the remaining provisions of this Agreement shall not in

any way be affected or impaired thereby except where the fundamental relationship among the parties has been materially altered.

**10.7    Governing Law**

This Agreement (and any claims or disputes arising out of or related thereto or to the transactions contemplated thereby or to the inducement of any party to enter therein, whether for breach of contract, tortious conduct, or otherwise and whether predicated on common law, statute or otherwise) shall in all respects be governed by and construed in accordance with the laws of the State of New York, including all matters of construction, validity and performance, in each case without reference to any conflict of law rules that might lead to the application of the laws of any other jurisdiction.

**10.8    Counterparts**

This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**10.9    Headings**

The headings in this Agreement are solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

**10.10  Payments in U.S. Dollars**

Except as expressly set forth herein, all payments made hereunder shall be calculated and made in U.S. Dollars and any payment calculated by reference to or tendered in any other currency shall not be deemed to discharge the underlying obligation.

**10.11  Confidentiality Obligations**

Each party hereto shall keep confidential, and shall cause its Affiliates and Representatives to keep confidential, all information contained in or relating to this Agreement, except as required by applicable law or administrative process, except as specified in this Agreement and except for information that is available to the public on the date hereof or becomes available to the public after the date hereof other than as a result of a breach of this Section 10.11. The covenant contained in this Section 10.11 shall survive the Initial Closing for a period of five years after the Closing Date.

**10.12  No Partnership**

Nothing in this Agreement shall be deemed to create a partnership, joint venture or group within the meaning of Section 13(d)(3) under the Securities Exchange Act of 1934, as amended, and to the extent that any such partnership, joint venture or group would be deemed to have been created, the Seller shall have the right to terminate this Agreement pursuant to Section 8.1 hereof.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**CORCYRA d.o.o.**

By: _____

Name: Moshe Har Adir
Title: Sole Officer, Director and Shareholder

**KPN TELECOM B.V.**

By:  **KONINKLIJKE KPN N.V.,**
     Its sole Director

      By: _____
          Name:
          Title:

CORCYRA d.o.o.

By:
    Name: Moshe Har Adir
    Title:

KPN TELECOM B.V.

By:    KONINKLIJKE KPN N.V.
       its sole Director

    By:
        Name:
        Title:    G.J. Wunderink
                  Senior Vice President

## EXHIBIT A

### Form of Escrow Agreement

**ESCROW AGREEMENT** dated as of January 28, 2005

AMONG:

(1)    **KPN TELECOM B.V.**, a limited liability company organized under the laws of The Netherlands (**Seller**);

(2)    **CORCYRA d.o.o.**, a Croatian company (**Purchaser**); and

(3)    **JPMORGAN CHASE BANK N.A.**, a bank organized under the laws of the State of New York (**Escrow Agent**).

**WHEREAS**, Seller and Purchaser have entered into a stock purchase agreement dated January 28, 2005 (the **Purchase Agreement**), pursuant to which Purchaser has agreed to purchase and Seller has agreed to sell 2,326,043 shares of common stock of EuroWeb International Corp., a Delaware corporation (the **Company**), on the terms and subject to the conditions set forth in the Purchase Agreement. Capitalized terms used but not otherwise defined herein shall have the respective meanings given them in the Purchase Agreement.

**WHEREAS**, pursuant to the Purchase Agreement, Seller has agreed to sell and Purchaser has agreed to purchase 289,855 shares of Company common stock at the Initial Closing for the Initial Closing Purchase Price. Seller shall deliver to Purchaser the Initial Shares at the Initial Closing, and accordingly, the Initial Shares will not be placed in escrow and will not be subject to this Agreement.

**WHEREAS**, pursuant to the Purchase Agreement, Seller has agreed to sell and Purchaser has agreed to purchase 2,036,188 shares of Company common stock at the Final Closing for the Final Closing Purchase Price.

**WHEREAS**, in accordance with Section 2.2(c) of the Purchase Agreement, Seller is depositing with Escrow Agent one or more certificates representing the 2,036,188 shares of Company common stock (the **Escrowed Shares**) to be purchased at the Final Closing.

**NOW, THEREFORE**, the parties, intending to be legally bound, hereby agree as follows:

1.    **Deposit of Escrowed Shares**

(a)    In accordance with the Purchase Agreement, Seller is depositing with Escrow Agent one or more certificates representing the Escrowed Shares and appropriate stock powers executed by Seller in blank with respect to the Escrowed Shares (the **Stock Powers**). Escrow Agent acknowledges receipt thereof.

(b)    Escrow Agent hereby agrees to act as escrow agent and to hold, safeguard and deliver the Escrowed Shares pursuant to the terms and conditions hereof. The Escrowed Shares shall be treated by the parties for all purposes as owned by Seller unless and until the Escrowed Shares are released to Purchaser pursuant to the terms of this Agreement.

**2.    Voting of Escrowed Shares**

Seller shall retain all voting and other rights associated with the Escrowed Shares until the Final Closing Purchase Price is paid in full pursuant to the terms of the Purchase Agreement at the Final Closing; provided, however, that so long as Purchaser is not in default in its obligations under the Purchase Agreement, and the Purchase Agreement remains in effect, Seller shall vote the Escrowed Shares in accordance with instructions from Purchaser, so long as such instructions are received sufficiently in advance of the applicable vote and such voting would not violate applicable law or require amendments to any SEC filing of Seller or Purchaser. Seller shall not be obligated to vote the Final Shares in accordance with Purchaser's instructions in connection with any matter (i) proposed by or on behalf of Purchaser or any of its Affiliates that Purchaser did not previously disclose to Seller in its Schedule 13D or (ii) as to which Purchaser or any of its Affiliates would have an interest that is different from the interests of the other stockholders of the Company such as an interest that would be of a nature that would have to be disclosed pursuant to Item 1005(d) of Regulation M-A or Item 404 of Regulation S-K, if either of such provisions were applicable.

**3.    Release of Escrowed Shares**

(a)    Upon Purchaser's payment of the Final Closing Purchase Price pursuant to the terms of the Purchase Agreement, and upon satisfaction (or waiver by Seller) of the closing conditions to Seller's obligation contained in Section 7.2 of the Purchase Agreement, Seller shall give notice to Escrow Agent directing Escrow Agent to transfer to Purchaser one or more certificates representing the Escrowed Shares purchased at the Final Closing. Upon the receipt of such notice, Escrow Agent shall deliver the Stock Powers endorsed to Purchaser together with one or more certificates representing the Escrowed Shares.

(b)    In the event that (a) Purchaser does not timely satisfy the conditions contained in Section 7.2 of the Purchase Agreement or (b) the Purchase Agreement is otherwise terminated pursuant to Section 8.1 of the Purchase Agreement, including if Purchaser shall be in default of its obligation to make any Premium Payment specified in Section 2.3 of the Purchase Agreement, then upon notice to such effect from Seller, Escrow Agent shall return the certificates representing the Escrowed Shares and the Stock Powers to Seller, and this Agreement shall terminate. In such event, neither Purchaser nor Seller shall have any claim against the other arising out of this Agreement.

**4.    Duties of Escrow Agent**

(a)    This Agreement expressly sets forth all the duties of Escrow Agent with respect to any and all matters pertinent hereto. No implied duties or obligations shall be read into this agreement against Escrow Agent. Escrow Agent shall not be bound by the provisions of any agreement among the other parties hereto except this Agreement. Escrow Agent's duties are ministerial in nature.

(b)    Escrow Agent shall not be liable, except for its own gross negligence or willful misconduct, and, except with respect to claims based upon such gross negligence or willful misconduct that are successfully asserted against Escrow Agent, the other parties hereto shall jointly and severally indemnify and hold harmless Escrow Agent (and any successor Escrow Agent) from and against

any and all losses, liabilities, claims, actions, damages and expenses, including reasonable attorneys' fees and disbursements, arising out of and in connection with this Agreement.

(c)    Escrow Agent shall be entitled to rely upon any order, judgment, certification, demand, notice, instrument or other writing delivered to it hereunder without being required to determine the authenticity or the correctness of any fact stated therein or the propriety or validity or the service thereof. Escrow Agent may act in reliance upon any instrument or signature believed by it to be genuine and may assume that any person purporting to give notice or receipt or advice or make any statement or execute any document in connection with the provisions hereof has been duly authorized to do so.

(d)    Escrow Agent may act pursuant to the advice of counsel with respect to any matter relating to this Agreement and shall not be liable for any action taken or omitted in accordance with such advice.

(e)    Escrow Agent does not have any interest in the Escrowed Shares deposited hereunder but is serving as escrow agent only and having only possession thereof.

(f)    Escrow Agent makes no representation as to the validity, value, genuineness or the collectability of any security or other documents or instrument held by or delivered to it.

(g)    Escrow Agent (and any successor Escrow Agent) may at any time resign as such by delivering the Escrowed Shares to any successor Escrow Agent jointly designated by the other parties hereto in writing, or to any court of competent jurisdiction, whereupon Escrow Agent shall be discharged of and from any and all further obligations arising in connection with this Agreement. The resignation of Escrow Agent shall take effect on the earlier of (i) the appointment of a successor (including a court of competent jurisdiction) or (ii) the day that is 30 days after the date of delivery of its written notice of resignation to the other parties hereto. If at that time Escrow Agent has not received a designation of a successor Escrow Agent, Escrow Agent's sole responsibility after that time shall be to retain and safeguard the Escrowed Shares until receipt of a designation of successor Escrow Agent or a joint written disposition instruction by the other parties hereto or a final and nonappealable order of a court of competent jurisdiction.

(h)    In the event that Escrow Agent in good faith is in doubt as to what action it should take hereunder, Escrow Agent shall be entitled to retain the Escrowed Shares until Escrow Agent shall have received (i) a final nonappealable order of a court of competent jurisdiction directing delivery of the Escrowed Shares or (ii) a written agreement executed by Seller and Purchaser directing delivery of the Escrowed Shares, in which event Escrow Agent shall deliver the Escrowed Shares in accordance with such order or agreement. Escrow Agent shall act on any court order without further question.

(i)    Seller and Purchaser shall pay Escrow Agent compensation as payment in full for the services to be rendered by Escrow Agent hereunder in the amount of U.S.$7,500 at the time of execution of this Agreement. Any such compensation and reimbursement to which Escrow Agent is entitled shall be borne 50% by Seller, 50% by Purchaser.

(j)    Anything in this agreement to the contrary notwithstanding, in no event shall Escrow Agent be liable for special, indirect or consequential damage of any kind whatsoever (including but not limited to lost profits), even if Escrow Agent has been advised of the likelihood for such loss or damage and regardless of the form of action. The parties hereto acknowledge that this Section

4(j) shall survive the resignation or removal of Escrow Agent or the termination of this agreement.

5.    **Notices**

All notices, requests, claims, demands and other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand or sent by facsimile or sent, postage prepaid, return receipt requested, by registered, certified or express mail or overnight courier service and shall be deemed given when so delivered by hand or facsimile, or if mailed, three days after mailing (one Business Day in the case of express mail or overnight courier service), to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 5):

(i)     if to Seller

KPN Telecom B.V.
Maanplein 55
2516 CK The Hague
The Netherlands
Fax: +31 70 343 2112
Attn: Gert-Jan Wunderink

(ii)    if to Purchaser

CORCYRA d.o.o.
Verudela 17, Pula Croatia 52100
Fax: +385 52 590 731
Attn: Moshe Har Adir

with a copy to:

Robinson & Cole LLP
885 Third Avenue, Suite 2800
New York, NY 10022
Fax: +1 212 451 2999
Attn: Elliot H. Lutzker, Esq.

(iii)   if to Escrow Agent, to:

JPMorgan Chase Bank
4 New York Plaza
21st Floor
New York, NY 10004
Fax: +1 212 623 6168
Attention: Sandra Frierson

**6.    Termination**

In the event that (a) Purchaser does not timely satisfy the conditions contained in Section 7.2 of the Purchase Agreement or (b) the Purchase Agreement is otherwise terminated pursuant to Section 8.1 of the Purchase Agreement, including if Purchaser shall be in default of its obligation to make any Premium Payment specified in Section 2.3 of the Purchase Agreement, then upon notice to such effect from Seller, Escrow Agent shall return the certificates representing the Escrowed Shares and the Stock Powers to Seller, and this Agreement shall terminate. In such event, neither Purchaser nor Seller shall have any claim against the other arising out of this Agreement.

**7.    Miscellaneous**

(a)    None of the parties may assign any of its rights under this Agreement without the prior consent of the other parties (such consent not to be unreasonably withheld, delayed or conditioned), except that Seller may assign any of its rights under this Agreement to any Subsidiary or affiliate of Seller without the prior written consent of any other party. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the parties. Nothing expressed or referred to in this Agreement will be construed to give any person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and successors and assigns.

(b)    This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the parties and delivered to the other party.

(c)    This Agreement contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

(d)    Each party irrevocably and unconditionally submits to the exclusive jurisdiction of (a) the Supreme Court of the State of New York, New York County, and (b) the United States District Court for the Southern District of New York, for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby. Each party to this Agreement hereby waives formal service of process and agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth above shall be effective service of process for any action, suit or proceeding in New York with respect to any matters to which it has submitted to jurisdiction in this Section 7(d). Each party to this Agreement irrevocably and unconditionally waives, pursuant to the provisions of Section 5-1402 of the New York General Obligations Law, any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement, any Ancillary Agreement or the transactions contemplated hereby and thereby in (i) the Supreme Court of the State of New York, New York County, or (ii) the United States District Court for the Southern District of New York, and hereby and thereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

(e)     This Agreement (and any claims or disputes arising out of or related thereto or to the transactions contemplated thereby or to the inducement of any party to enter therein, whether for breach of contract, tortious conduct or otherwise and whether predicated on common law, statute or otherwise) shall in all respects be governed by and construed in accordance with the laws of the State of New York, including all matters of construction, validity and performance, in each case without reference to any conflict of law rules that might lead to the application of the laws of any other jurisdiction. Each party to this Agreement further agrees that the laws of the State of New York bear a reasonable relationship to this Agreement and irrevocably and unconditionally waives, pursuant to Section 5-1401 of the New York General Obligations Law, any objection to the application of the laws of the State of New York to any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby and further irrevocably and unconditionally waives and agrees not to plead or claim that any such action, suit or proceeding should not be governed by the laws of the State of New York. This Agreement has been negotiated, executed and delivered in the State of New York.

(f)     EACH PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) DIRECTLY OR INDIRECTLY RELATING TO ANY DISPUTE ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY. Each party (i) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 7(f).

(g)     Any corporation into which Escrow Agent in its individual capacity may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which Escrow Agent in its individual capacity shall be a party, or any corporation to which substantially all the corporate trust business of Escrow Agent in its individual capacity may be transferred, shall be Escrow Agent under the Agreement without requirement for further action.

(h)     In the event that Escrow Agent is unable to perform its obligations under the terms of this Agreement because of acts of God, strikes, equipment or transmission failure or other cause reasonably beyond its control, Escrow Agent shall not be liable for damages to the other parties for any damages resulting from such failure to perform otherwise from such causes. Performance under this Agreement shall resume when Escrow Agent is able to perform substantially.

(i)     In the event that any Escrowed Shares shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by any order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the Escrowed Shares deposited under this Agreement, Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or to any other person, firm or corporation,

by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

(j)    This Agreement shall not take effect unless and until the Initial Closing shall have occurred.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first written above.

KPN TELECOM B.V.

By:    KONINKLIJKE KPN N.V.,
its sole Director

By:_____
Name: G.J. Wunderink
Title: Senior Vice President

CORCYRA d.o.o.

By:_____
Name: Moshe Har Adir
Title: Sole Officer, Director and Shareholder

JPMORGAN CHASE BANK, N.A.
as Escrow Agent

By:_____
Name: Saverio A. Lunetta
Title: Vice President

**EXHIBIT B**

**Letter of Moshe Har Adir**

MOSHE HAR ADIR
VERUDELA 17
PULA-CROATIA 52100

January 28, 2005

KPN Telecom B.V.
Maanplein 55
2516 CK The Hague
The Netherlands
Attn: Gert - Jan Wunderink

**Re: CORCYRA d.o.o.**

Gentlemen:

The undersigned, Moshe Har Adir, is the sole owner and sole director of CORCYRA d.o.o, a Croatian company. I am an Israeli citizen who resides in Croatia. I have read and understood the terms and conditions of the Stock Purchase Agreement ("SPA") by and between KPN Telecom B.V. LLC and CORCYRA d.o.o.

I have previously provided you with financial data and background information on myself. I am personally funding the $1,000,000 Initial Closing Purchase Price under the SPA and will transfer such funds to CORCYRA upon the execution of the SPA. I am representing and warranting to you that my financial statements dated December 13, 2004, (the "Financial Statements") are true and correct as of the date thereof. As the sole owner and sole director of CORCYRA, I hereby commit to personally fund the Premium Payments (as described in Section 2.3 of the SPA) and the Final Closing Purchase Price (as defined in Section 2.4(c) of the SPA) in accordance with the terms and conditions of the SPA.

I hereby commit and undertake at all relevant times to have sufficient personal current assets to satisfy all obligations of CORCYRA under the SPA.

Very truly yours,

____________________

Moshe Har Adir

## EXHIBIT C

### Final Closing Purchase Price[*]

| Final Closing Date | Final Closing Purchase Price (in U.S. Dollars) |
|---|---|
| February 28, 2005 | $7,060,051 |
| March 31, 2005 | $7,095,254 |
| April 30, 2005 | $7,130,457 |
| May 31, 2005 | $7,060,051 |
| June 30, 2005 | $7,095,254 |
| July 31, 2005 | $7,130,457 |
| August 31, 2005 | $7,060,051 |
| September 30, 2005 | $7,095,254 |
| October 31, 2005 | $7,130,457 |
| November 30, 2005 | $7,060,051 |
| December 31, 2005 | $7,095,254 |
| January 31, 2006 | $7,130,457 |
| February 28, 2006 | $7,060,051 |
| March 31, 2006 | $7,095,254 |
| April 30, 2006 | $7,130,457 |

[*] In addition to the amounts listed on this Exhibit C, the Final Closing Purchase Price will include the Additional Payment calculated in accordance with Section 2.4(d).

**EXHIBIT D**

**Officer's Certificate**

The undersigned being a _____ of KPN Telecom B.V., a limited liability company organized under the laws of The Netherlands, (Seller), hereby certifies pursuant to the Stock Purchase Agreement dated as of February __, 2005, by and among CORCYRA d.o.o. (**Purchaser**) and Seller (the **Stock Purchase Agreement**) that (capitalized terms used herein and not defined have the meanings assigned thereto in the Stock Purchase Agreement):

1.      There is not continuing on the Closing Date a material breach of a representation or warranty of Seller made in the Stock Purchase Agreement.

2.      Seller has performed or complied in all material respects with its covenants and agreements contained in the Stock Purchase Agreement required to be performed or complied with on or prior to the Closing Date.

3.      Attached hereto as Appendix A is a copy of certain resolutions duly adopted by the [Board of Directors] of Seller on [●], and said resolutions have not been amended, modified or repealed and remain in full force and effect as of the date hereof.

IN WITNESS WHEREOF, the undersigned has duly executed this Certificate on behalf of Seller this __ day of _____, 2005.

_____

**EXHIBIT E**

**Officer's Certificate**

The undersigned being a _____ of CORCYRA d.o.o., a Croatian company (**Purchaser**), hereby certifies pursuant to the Stock Purchase Agreement dated as of February ___, 2005, by and among KPN Telecom B.V., a limited liability company organized under the laws of The Netherlands (**Seller**), and Purchaser (the **Stock Purchase Agreement**) that (capitalized terms used herein and not defined have the meanings assigned thereto in the Stock Purchase Agreement):

1.      There is not continuing on the Closing Date a material breach of a representation or warranty of Purchaser made or incorporated in the Stock Purchase Agreement.

2.      Purchaser has performed or complied in all material respects with its covenants and agreements contained in the Stock Purchase Agreement required to be performed or complied with on or prior to the Closing Date.

3.      Attached hereto as Appendix A is a copy of certain resolutions duly adopted by the [Board of Directors] of Purchaser on [●], and said resolutions have not been amended, modified or repealed and remain in full force and effect as of the date hereof.

IN WITNESS WHEREOF, the undersigned has duly executed this Certificate on behalf of Purchaser this __ day of _____, 2005.

_____

**SCHEDULE 4.9**

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

SCHEDULE 13D
Under the Securities Exchange Act of 1934
(Amendment No. __)*

EUROWEB INTERNATIONAL CORP.
(Name of Issuer)

Common Stock, $0.001 par value
(Title of Class of Securities)

298801408
(CUSIP Number)

CORCYRA d.o.o.
c/o Elliot H. Lutzker, Esq.
Robinson & Cole LLP
885 Third Avenue, New York, New York 10022-4834
(212) 451-2900
(Name, Address and Telephone Number of
Person Authorized to Receive Notices and Communications)

February 1, 2005
(Date of Event which Requires Filing of this Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of Rule 13d-1(e), Rule 13d-1(f) or Rule 13d-1(g), check the following box [ ].

*Note.* Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See Rule 13d-7(b) for other parties to whom copies are to be sent.

* The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 (the "Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

CUSIP No. 298801408

| | |
|---|---|
| 1) | Name of Reporting Person - I.R.S. Identification No. of person (entities only).<br>CORCYRA d.o.o. |
| 2) | Check the Appropriate Box if a Member of a Group (See Instructions)<br>(a) [  ]<br>(b) [X] |
| 3) | SEC Use Only |
| 4) | Source of Funds (See Instructions)<br>AF (See Item 3) |
| 5) | Check if Disclosure of Legal Proceedings Is Required Pursuant to Items 2(d) or 2(e)    [  ] |
| 6) | Citizenship or Place of Organization<br>Republic of Croatia |

| | | |
|---|---|---|
| | 7) | Sole Voting Power<br>0 |
| NUMBER<br>OF SHARES<br>BENEFICIALLY<br>OWNED BY<br>EACH<br>REPORTING<br>PERSON WITH | 8) | Shared Voting Power<br>2,326,043* |
| | 9) | Sole Dispositive Power<br>0 |
| | 10) | Shared Dispositive Power<br>2,326,043* |

| | |
|---|---|
| 11) | Aggregate Amount Beneficially Owned by Each Reporting Person<br>2,326,043* |
| 12) | Check Box if the Aggregate Amount in Row (11) Excludes Certain<br>Shares (See Instructions)  [  ] |
| 13) | Percent of Class Represented by Amount in Row (11)<br>43.5%* |
| 14) | Type of Reporting Person (See Instructions)<br>CO |

*See following page

CUSIP No. 298801408

| | |
|---|---|
| 1) | Name of Reporting Person - I.R.S. Identification No. of person (entities only).<br>Moshe Har Adir |
| 2) | Check the Appropriate Box if a Member of a Group (See Instructions)<br>(a) [ ]<br>(b) [X] |
| 3) | SEC Use Only |
| 4) | Source of Funds (See Instructions)<br>PF (See Item 3) |
| 5) | Check if Disclosure of Legal Proceedings Is Required Pursuant to Items 2(d) or 2(e)    [ ] |
| 6) | Citizenship or Place of Organization<br>Israel |

|  | | | |
|---|---|---|---|
| | 7) | Sole Voting Power<br>0 | |
| NUMBER<br>OF SHARES<br>BENEFICIALLY<br>OWNED BY<br>EACH<br>REPORTING<br>PERSON WITH | 8) | Shared Voting Power<br>2,326,043* | |
| | 9) | Sole Dispositive Power<br>0 | |
| | 10) | Shared Dispositive Power<br>2,326,043* | |

| | |
|---|---|
| 11) | Aggregate Amount Beneficially Owned by Each Reporting Person<br>2,326,043* |
| 12) | Check Box if the Aggregate Amount in Row (11) Excludes Certain<br>Shares (See Instructions)  [ ] |
| 13) | Percent of Class Represented by Amount in Row (11)<br>43.5%* |
| 14) | Type of Reporting Person (See Instructions)<br>IN |

* See following page

\* Pursuant to the Stock Purchase Agreement dated as of January 28, 2005 (the "Purchase Agreement"), by and between CORCYRA d.o.o. ("CORCYRA") and KPN Telecom B.V. ("KPN"), CORCYRA acquired from KPN, and now holds directly approximately 5.4% or 289,855 shares of common stock of EuroWeb International Corp. (the"Issuer"). Moshe Har Adir, as sole officer, director and shareholder of CORCYRA, has indirect beneficial ownership of the shares of common stock of the Issuer directly beneficially owned by CORCYRA. Pursuant to the Purchase Agreement, CORCYRA has agreed to purchase KPN's remaining 2,036,188 shares (subject to appropriate adjustment) of common stock of the Issuer on April 30, 2006; provided, however, that upon fourteen days' prior written notice to KPN, CORCYRA may accelerate the closing to an earlier month-end date as specified in such notice. Accordingly, pursuant to Rule 13d-3(d)(1), this Schedule 13D reports beneficial ownership of 43.5% or 2,326,043 shares, consisting of the 289,855 shares CORCYRA currently holds and the 2,036,188 shares to be acquired by CORCYRA.

Item 1. Security and Issuer.

This statement on Schedule 13D (this "Statement") relates to the common stock, par value $0.001 per share ("Common Stock") of EuroWeb International Corp., a Delaware corporation (the "Issuer"). The principal executive offices of the Issuer are located at Vaci ut 141, 1138 Budapest, Hungary.

Item 2. Identity and Background.

(a)    This Statement is being filed by CORCYRA d.o.o. ("CORCYRA"), a Croatia corporation and Moshe Har Adir ("Moshe"), the sole officer, director and shareholder of CORCYRA.

(b)    The business address of CORCYRA and Moshe is c/o CORCYRA d.o.o., Verudela 17, Pula – Croatia 52100.

(c)    CORCYRA is currently a designated single asset company and is reviewing opportunities to merge or acquire one or more ongoing entities in order to maximize its resources.   Moshe is the sole owner and officer of CORCYRA and is also a self employed business entrepreneur.

(d)-(e)  Neither CORCYRA nor Moshe has, during the last five years, been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors), or been a party to a civil proceeding of a judicial or administrative body of competent jurisdiction resulting in a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, Federal or state securities laws or finding any violation with respect to such laws.

(f)    CORCYRA is a Croatia corporation. Moshe is a citizen of Israel.

Item 3. Source and Amount of Funds or Other Consideration.

Pursuant to a Stock Purchase Agreement dated as of January 28, 2005, by and between KPN Telecom B.V., a Netherlands corporation ("KPN") and CORCYRA (the "Purchase Agreement"), a copy of which is attached hereto as Exhibit 1, CORCYRA has paid to KPN U.S.$1,000,000 to purchase 289,855 shares of Common Stock of the Issuer using personal funds of Moshe contributed to CORCYRA for the purpose of purchasing such shares.

As more fully described in Item 4 hereof, CORCYRA will receive additional funds from Moshe (which he will contribute to CORCYRA out of his personal funds) in an amount sufficient to purchase KPN's remaining stake of 2,036,188 shares (subject to appropriate adjustment) of Common Stock of the Issuer on the terms and subject to the conditions set forth in the Purchase Agreement.  Moshe has delivered a letter to KPN, a copy of which is attached hereto as Exhibit 2, pursuant to which Moshe has committed personally to fund CORCYRA's payment obligations under the Purchase Agreement.

Item 4. Purpose of Transaction.

As set forth below, CORCYRA has agreed to acquire from KPN an aggregate of 2,326,043 shares of Common Stock of the Issuer pursuant to the Purchase Agreement. All dollar amounts referred to herein are in U.S. dollars.

Pursuant to the Purchase Agreement, on February 1, 2005 (the "Initial Closing"), CORCYRA purchased 289,855 shares (the "Initial Shares") of Common Stock of the Issuer for $1,000,000. CORCYRA has agreed to purchase KPN's remaining 2,036,188 shares, subject to appropriate adjustment,

(the "Final Shares") of Common Stock of the Issuer on April 30, 2006 (the "Final Closing"); provided, however, that upon fourteen days' prior written notice to KPN, CORCYRA may accelerate the Final Closing to an earlier month-end date as specified in such notice (with no penalty for accelerating the Final Closing); provided, further, that the Final Closing is subject to the satisfaction or waiver of all of the conditions to closing set forth in the Purchase Agreement.

CORCYRA is required to pay a premium payment of $105,609 on each of May 1, 2005, August 1, 2005, November 1, 2005 and February 1, 2006 (together, the "Premium Payments"). At the Final Closing, CORCYRA will purchase the Final Shares for an amount (the "Final Closing Purchase Price") equal to the sum of (i) the amount listed on Exhibit C of the Purchase Agreement that corresponds to the date of the Final Closing plus (ii) the Additional Payment (as defined below) plus (iii) any Premium Payments due and payable by CORCYRA to KPN prior to the Final Closing but remaining unpaid. "Additional Payment" means, if positive, the product of (a) 2,036,188, (b) 0.5 and (c) the difference between (i) the average closing price per share of Common Stock of the Issuer on The Nasdaq SmallCap Market for the sixty (60) trading days ending on the second business day prior to the applicable Final Closing date minus (ii) $3.45.

The Final Shares are being held in escrow pursuant to an Escrow Agreement dated as of January 28, 2005 by and between KPN, CORCYRA and JPMorgan Chase Bank N.A. (the "Escrow Agreement"), a copy of which is attached hereto as Exhibit 3, until the Final Closing Purchase Price is paid in full upon satisfaction of the closing conditions contained in the Purchase Agreement or until the Purchase Agreement is otherwise terminated in accordance with its terms. See Item 6 of this Statement for a description of CORCYRA's voting rights with respect to the Final Shares.

In connection with the Initial Closing, KPN agreed to use its best efforts to cause the resignation of KPN's sole two representatives on the Board of Directors of the Issuer, and propose to the Issuer that two representatives of CORCYRA be designated to fill the vacancies created thereby. Accordingly, Hans Lipman and Daniel Kwantes resigned from the Board of Directors of the Issuer effective upon Initial Closing, and at a meeting dated January 31, 2005, the Board of Directors of the Issuer voted for Ilan Kenig and Yossi Attia to fill the vacancies created by the resignations of Messrs. Lipman and Kwantes.

Pursuant to a proposal letter dated December 2, 2004 (the "Proposal") addressed to CORCYRA, Cukierman & Co. Consulting Ltd. ("Cukierman") will act as advisor in establishing a future strategic plan for the Issuer to enhance shareholder wealth, which may include, among other things, raising capital, entering into strategic alliances and partnerships and/or making acquisitions, rearranging the Issuer's assets and aggressively seeking opportunities that will enable the Issuer to grow. The Proposal on the scope of the business and strategic plan by Cukierman is attached hereto as Exhibit 4 and is an integral part of this Statement.

Except as otherwise described herein and/or in the Purchase Agreement and/or the Proposal, neither CORCYRA, nor Moshe has any plans or proposals as of the date hereof that relate to or would result in (a) the acquisition by any person of additional securities of the Issuer or the disposition of any such securities, (b) an extraordinary corporate transaction, such as a merger, reorganization or liquidation, involving the Issuer or any of its subsidiaries, (c) a sale or transfer of a material amount of assets of the Issuer or any of its subsidiaries, (d) any change in the present board of directors or management of the Issuer, (e) any material change in the present capitalization or dividend policy of the Issuer, (f) any other material change in the Issuer's business or corporate structure, (g) any change in the Issuer's charter or By-laws or other actions which may impede the acquisition of control of the Issuer by any person, (h) causing a class of securities of the Issuer to be delisted from any national securities exchange or to cease to be authorized to be quoted on an inter-dealer quotation system of a registered national securities association, (i) causing a class of equity securities of the Issuer to be eligible for termination of

registration pursuant to Section 12(g)(4) of the Exchange Act, or (j) any action similar to those enumerated in (a) through (i) above.

References to, and descriptions of, the Purchase Agreement, the Escrow Agreement and the Proposal as set forth herein are qualified in their entirety by reference to the copy of the Purchase Agreement, the Escrow Agreement and the Proposal, respectively, included as Exhibits 1, 3, and 4, respectively, to this Statement, and such agreements are incorporated herein in their entirety where such references and descriptions appear.

## Item 5. Interest in Securities of the Issuer.

(a)    Pursuant to the Purchase Agreement, CORCYRA acquired, and now holds directly approximately 5.4% or 289,855 shares of Common Stock of the Issuer. Moshe has indirect beneficial ownership of the shares of Common Stock of the Issuer directly beneficially owned by CORCYRA. Pursuant to the Purchase Agreement, CORCYRA has agreed to purchase KPN's remaining 2,036,188 shares of Common Stock of the Issuer on April 30, 2006; provided, however, that upon fourteen days' prior written notice to KPN, CORCYRA may accelerate the closing to an earlier month-end date as specified in such notice. Accordingly, pursuant to Rule 13d-3(d)(1), this Statement reports beneficial ownership of 43.5% or 2,326,043 shares, consisting of the 289,855 shares of Common Stock of the Issuer that CORCYRA currently holds and the 2,036,188 shares of Common Stock of the Issuer to be acquired by CORCYRA. The beneficial ownership percentages reported above are based upon 5,342,533 shares of Common Stock of the Issuer issued and outstanding as of January 27, 2005, as set forth in the Purchase Agreement. Neither CORCYRA, nor Moshe own any other shares of the Issuer.

(b)    CORCYRA and Moshe have shared disposition and voting power with respect to 289,855 shares of Common Stock of the Issuer. Pursuant to Rule 13d-3(d)(1), CORCYRA, Moshe and KPN may be deemed to have shared disposition and voting power with respect to 2,036,188 shares of Common Stock of the Issuer.

(c)    Other than as provided herein, no other transactions in the Common Stock of the Issuer were effected by CORCYRA or Moshe in the past 60 days.

(d)    Not Applicable.

(e)    Not Applicable.

## Item 6. Contracts, Arrangements, Understandings or Relationships with Respect to Securities of the Issuer.

Pursuant to the Purchase Agreement and Escrow Agreement, KPN will retain all voting and other rights associated with the Final Shares and will continue to be the beneficial owner of the Final Shares until the Final Closing Purchase Price is paid in full; provided, however, that so long as CORCYRA is not in default in its obligations under the Purchase Agreement, and the Purchase Agreement remains in effect, KPN has agreed to vote the Final Shares in accordance with instructions from CORCYRA, so long as such instructions are received sufficiently in advance of the applicable vote and such voting would not violate applicable law or require an amendment to any filings by KPN or CORCYRA with the Securities and Exchange Commission. Notwithstanding the foregoing, KPN is not obligated to vote the Final Shares in accordance with CORCYRA's instructions in connection with any matter (i) proposed by or on behalf of CORCYRA or any of its affiliates that CORCYRA did not previously disclose to KPN in this Statement, or (ii) as to which CORCYRA or any of its affiliates would have an interest that is different from the interests of the other stockholders of the Issuer, such as an interest that would be of a nature that

would have to be disclosed pursuant to Item 1005(d) of Regulation M-A or Item 404 of Regulation S-K, if either of such provisions were applicable.

Under the Purchase Agreement, KPN has agreed to request that the Issuer grant CORCYRA registration rights over the Initial Shares at the Initial Closing [which was granted on January 31, 2005] and transfer to CORCYRA at the Final Closing its registration rights that it acquired pursuant to the Amended and Restated Share Subscription Agreement dated December 13, 1999, between the Issuer, KPN and certain directors of the Issuer (the "Subscription Agreement"), a copy of which is attached hereto as Exhibit 5; *provided, however,* that in accordance with the terms of the Subscription Agreement, CORCYRA has undertaken to each of the parties to the Subscription Agreement in a form satisfactory to them, to be bound by all the obligations of KPN under the Subscription Agreement.

Pursuant to the Subscription Agreement, KPN purchased from the Issuer shares of Common Stock of the Issuer and received (i) piggy-back registration rights to have such shares of Common Stock registered under the Securities Act of 1933 (the "Securities Act") in the event the Issuer proposed to register any of its securities under the Securities Act for sale to the public (except with respect to registration statements on Forms S-4, S-8 or another form not available for registering such shares to the public), and (ii) demand registration rights to request Issuer to register under the Securities Act all or a portion of such shares of Common Stock it acquired under the Subscription Agreement, subject to certain conditions as provided therein. The Subscription Agreement further provides that in the event any of the shares sold thereunder are sold or transferred by KPN, the benefit of each of the obligations undertaken by the Issuer thereunder may be assigned to the purchaser or transferee who may enforce them as if it had been named as the subscriber in the Subscription Agreement; *provided, however,* that the purchaser shall, as a condition of the sale or transfer, undertake to each of the parties to the Subscription Agreement in a form satisfactory to them to be bound by all of the obligations of KPN thereunder.

Moshe has delivered a letter to KPN, attached hereto as Exhibit 2, pursuant to which Moshe has committed personally to fund CORCYRA's payment obligations under the Purchase Agreement.

Other than as set forth herein, there are no contracts, arrangements, understandings or relationships (legal or otherwise) between CORCYRA and Moshe, or between CORCYRA, Moshe and any other person or entity with respect to any securities of the Issuer, including, but not limited to, transfer or voting of any of the securities, finder's fees, joint ventures, loan or option arrangements, puts or calls, guarantees of profits, division of profits or loss, or the giving or withholding of proxies.

Item 7. Materials to be Filed as Exhibits.

| Exhibit Number | Description |
|---|---|
| 1 | Stock Purchase Agreement dated as of January 28, 2005, by and between KPN Telecom B.V. and CORCYRA d.o.o. |
| 2 | Letter dated January 28, 2005 from Moshe Har Adir to KPN Telecom B.V. |
| 3 | Escrow Agreement dated as of January 28, 2005 by and between KPN Telecom B.V., CORCYRA d.o.o. and JPMorgan Chase Bank N.A. |
| 4 | Cukierman & Co Consulting Ltd. Proposal dated December 2, 2004. |
| 5 | Amended and Restated Share Subscription Agreement dated December 13, 1999 between EuroWeb International Corp., KPN Telecom B.V. and certain |

directors of EuroWeb International Corp. (Incorporated by reference to
Exhibit 1 contained in the Schedule 13D of KPN Telecom B.V. filed with the
Securities and Exchange Commission on February 24, 2000).

## SIGNATURE

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this Statement is true, complete and correct.

Dated: February ___, 2005

CORCYRA d.o.o.

By: _____

Moshe Har Adir, sole officer, director
and shareholder

_____

Moshe Har Adir, individually

## EXHIBIT INDEX

| Exhibit Number | Description |
| --- | --- |
| 1 | Stock Purchase Agreement dated as of January 28, 2005, by and between KPN Telecom B.V. and CORCYRA d.o.o. |
| 2 | Letter dated January 28, 2005 from Moshe Har Adir to KPN Telecom B.V. |
| 3 | Escrow Agreement dated as of January 28, 2005 by and between KPN Telecom B.V., CORCYRA d.o.o. and JPMorgan Chase Bank N.A. |
| 4 | Cukierman & Co Consulting Ltd. Proposal dated December 2, 2004. |
| 5 | Amended and Restated Share Subscription Agreement dated December 13, 1999 between EuroWeb International Corp., KPN Telecom B.V. and certain directors of EuroWeb International Corp. (Incorporated by reference to Exhibit 1 contained in the Schedule 13D of KPN Telecom B.V. filed with the Securities and Exchange Commission on February 24, 2000). |

# EXHIBIT 2

**AMENDMENT NO. 1** (this Amendment) dated as of April 28, 2006 to the Stock Purchase Agreement (the SPA) dated as of January 28, 2005, by and between KPN Telecom B.V., a limited liability company organized under the laws of The Netherlands (Seller) and Corcyra d.o.o., organized under the laws of Croatia (Purchaser).

**WHEREAS:**

The parties wish to amend certain terms of the SPA.

Now, therefore, in consideration of and subject to the premises and the mutual agreements, terms and conditions herein contained, the benefits to be derived therefrom and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **DEFINITIONS.**

      Capitalized terms used herein and not defined shall have the meanings ascribed thereto in the SPA.

2.    **PURCHASE AND SALE OF SHARES.**

2.1   Special Purchase. Subject to the terms and conditions of this Amendment, and notwithstanding anything to the contrary in the SPA, on April 28, 2006 (the Special Closing Date) Seller shall sell and Purchaser shall purchase 434,783 Shares (the **Special Purchase Shares**) for US$ 1,500,000.00, subject to adjustment if the average closing price of a Share on the Nasdaq Capital Market (as reported by The Wall Street Journal) for the 60 trading days ending on the second Business Day prior to the Special Closing Date exceeds $3.45 (the **Special Closing Purchase Price**).

2.2   Special Closing. On the Special Closing Date:

      (a)    Purchaser shall deliver to Seller:

             (i)     payment, by wire transfer to the bank account designated by Seller on Exhibit 3 to this Amendment, immediately available funds, in U.S. dollars, in an amount equal to the Special Closing Purchase Price;

             (ii)    the officer's certificate referred to in Section 7.2(c) of the SPA; and

             (iii)   an executed copy of the amendment to the Escrow Agreement in the form attached hereto as Exhibit 2 to this Amendment.

      (b)    Seller shall deliver to Purchaser:

             (i)     irrevocable instructions to the Escrow Agent to transfer to Purchaser one or more certificates representing the Special Purchase Shares to be purchased on the Special Closing Date;

             (ii)    the officer's certificate referred to in Section 7.1(c) of the SPA; and

             (iii)   an executed copy of the amendment to the Escrow Agreement in the form attached hereto as Exhibit 2 to this Amendment.

2.3    Premium Payments. At the Final Closing, Purchaser shall make the Premium Payments set forth on Exhibit 1 to this Amendment as part of the Final Closing Purchase Price. No Premium Payments shall be due from Purchaser prior to the Final Closing.

2.4    Final Closing.

(a)    Notwithstanding anything to the contrary in the SPA, the number of Final Shares shall be 1,601,405, subject to appropriate adjustment in the event of a stock dividend, recapitalization, stock split, reverse stock split, subdivision, combination, reclassification or similar change in the Company's capital structure.

(b)    Notwithstanding anything to the contrary in the SPA, at the Final Closing, Seller shall sell and Purchaser shall purchase the Final Shares for the Final Closing Purchase Price (as defined below in this Amendment).

(c)    Notwithstanding anything to the contrary in the SPA, the Final Closing shall take place at 4:00 pm, Central European Time, on December 1, 2006; provided, however, upon 14 days' prior written notice to Seller, Purchaser may accelerate the Final Closing Date to an earlier month-end date as specified in such notice; provided, further, that the Final Closing is subject to the satisfaction or waiver of all of the conditions set forth in Section 7.1 and Section 7.2 of the SPA (other than those conditions that by their nature are to be satisfied at the Final Closing). The Final Closing shall occur at such location outside of the United States as the parties may mutually agree.

(d)    At the Final Closing, and notwithstanding anything to the contrary in the SPA:

(i)    Purchaser shall deliver to Seller:

(A)    payment, by wire transfer to the bank account designated by Seller on Exhibit 3 to this Amendment, immediately available funds in U.S. dollars in the amount equal to the sum of (x) the amount listed on Exhibit 1 to this Amendment under the caption "Base Final Closing Purchase Price" that corresponds to the date of the Final Closing as determined in accordance with Section 2.4(c) of this Amendment plus (y) the Additional Payment (as defined below) plus (z) in accordance with Section 2.3 of this Amendment, the Premium Payments due and payable at the Final Closing (the sum of (x), (y) and (z) being the **Final Closing Purchase Price**); and

(B)    the officer's certificate referred to in Section 7.2(o) of the SPA.

(ii)    Seller shall irrevocably cause the Escrow Agent to transfer to Purchaser one or more certificates representing the Final Shares to be purchased at the Final Closing.

(iii)    Seller shall deliver to Purchaser the officer's certificate referred to in Section 7.1(c) of the SPA.

(e)    As used in this Amendment, with respect to any Final Closing Date, the Additional Payment shall mean, if positive, the product of (A) 1,601,405, (B) 0.35 and (C) the difference between (I) the average closing price of a share of Company common stock on the Nasdaq Capital Market (as reported by The Wall Street Journal) for the 60 trading days ending on the second Business

Day prior to the applicable Final Closing Date minus (II) $3.45 (the **Additional Payment**). The Additional Payment shall be subject to appropriate adjustment in the event of a stock dividend, recapitalization, stock split, reverse stock split, subdivision, combination, reclassification or similar change in the Company's capital structure.

(f)     If Purchaser shall default in the payment of any amount becoming due hereunder on the Final Closing Date (including without limitation by defaulting on its obligation to purchase the Final Shares), Purchaser shall upon Seller's demand from time to time pay interest on such amount up to (but not including) the date of actual payment (as well as before judgment) at a rate per annum (computed on the terms of the actual number of days elapsed over a year of 360 days), to the extent permitted by law, equal to the prime rate of interest announced by Citibank N.A. on December 1, 2006 plus 15%. The foregoing shall not limit any rights or remedies that would otherwise be available to Seller. In addition, notwithstanding anything to the contrary in the SPA, if Purchaser shall fail to make any payment pursuant to this Section 2.4(f) when due, Purchaser shall also pay to Seller all of Seller's costs and expenses (including attorneys' fees) in connection with Seller's efforts to collect any such amount that is due to Seller. Purchaser acknowledges that the provisions of this Section 2.4(f) are an integral part of the transactions contemplated hereby and that, without these agreements, Seller would not enter into this Amendment.

3.     **RELEASE.**

Purchaser on its own behalf, and on behalf of all of its assigns, past, present and future directors, officers, members, employees, affiliates, shareholders, predecessors or successors, parent companies, wholly or partially owned direct or indirect subsidiaries and any other person or company directly or indirectly controlling, controlled by or under direct or indirect common control with Purchaser, hereby releases and discharges Seller and all of its heirs, attorneys, assigns, past, present and future directors, officers, members, employees, affiliates, shareholders, predecessors or successors, parent companies, wholly or partially owned direct or indirect subsidiaries and any other person or company directly or indirectly controlling, controlled by or under direct or indirect common control with Seller (collectively, **Seller Affiliates**), from those claims, actions, complaints, causes of action, demands or suits, at law or in equity, or other liabilities, known or unknown, including, but not limited to, any claims that were asserted, or could have been asserted, against Seller or any Seller Affiliates, that any of them has had, now has, or hereafter can, shall or may have concerning

(i)     the representations and warranties made to Purchaser in the SPA,

(ii)     disclosure (or any omission thereof) made by Seller in connection with the SPA and the transactions contemplated therein, or

(iii)     liabilities of the Company or its Subsidiaries (whenever arising) that became known or came to Purchaser's attention after the date of the SPA.

Purchaser hereby waives any claim that any prior act or omission by Seller gives rise to any right for Purchaser to rescind or terminate the SPA.

4.     **COVENANT.**

Until Final Closing, Purchaser shall use its best efforts to cause Company to deliver to Seller, promptly upon their becoming available, copies of all financial statements, proxy statements and reports as the

Company shall send or make available to its public security holders generally, all registration statements and regular periodic reports that the Company files with the United States Securities and Exchange Commission, the Nasdaq Capital Market or any other securities regulatory agency or exchange, and all press releases made available generally to the public, all of the foregoing to be delivered to Seller by mail in accordance with the notice provisions of Section 10 of the SPA, as amended by Section 6 hereto, or sent by email to Messrs. Cees Boogaerdt (cees.boogaerdt@kpn.com) and Michiel Roovers (michiel.roovers@kpn.com).

5.    **TERMINATION.**

Section 8 of the SPA is hereby deleted in its entirety and replaced with the following:

The SPA, as amended by this Amendment, may be terminated at any time prior to the Final Closing:

(i)    by written notice from Purchaser to Seller if the conditions specified in Section 7.1 of the SPA with respect to the Final Closing have not been satisfied or waived prior to December 2, 2006, or shall have become incapable of fulfillment;

(ii)    by written notice from Seller to Purchaser if the conditions specified in Section 7.2 of the SPA with respect to the Final Closing have not been satisfied or waived prior to December 2, 2006, or shall have become incapable of fulfillment; or

(iii)    by either party if the other party is in material breach of its obligations under the SPA, as amended by this Amendment.

6.    **GENERAL.**

Except as amended hereby, the SPA continues to be, and shall remain, in full force and effect in accordance with its terms. The miscellaneous provisions set forth in Section 10 of the SPA are incorporated herein by reference and deemed made a part hereof, *mutatis mutandis*. Section 10.1 of the SPA is hereby amended for notices to Seller as follows:

If to Seller:

KPN Telecom B.V.
Maanplein 55
2516 CK The Hague
The Netherlands
Attn: Messrs. Cees Boogaerdt and Michiel Roovers
Fax: +31 70 4464302 / +31 70 4460675

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment as of the date and year first above written

CORCYRA d.o.o.

By: _____
    Name:  Shalom Atia
    Title:  Sole Officer, Director

KPN TELECOM B.V.

By:  KONINKLIJKE KPN N.V., its sole Director

    By: _____
      Name:
      Title:

5

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment as of the date and year first above written

CORCYRA d.o.o.

By:_____
   Name:  Shalom Atia
   Title:  Sole Officer, Director

KPN TELECOM B.V.

By:  KONINKLIJKE KPN N.V., its sole Director

By_____
   Name:  N. G. Roover.)        6. H Boogeerdt
   Title:  Legal Counsel        Deputy Treasurer

## EXHIBIT 1

### Final Closing Purchase Price in US Dollars[*]

| Final Closing Date | Initial Closing Purchase Price | Premium | Final Closing Purchase Price |
|---|---|---|---|
| May 31, 2006 | $5,630,457 | $28,560 | $5,659,017 |
| June 30, 2006 | $5,659,017 | $28,560 | $5,687,577 |
| July 31, 2006 | $5,687,577 | $28,560 | $5,716,137 |
| August 31, 2006 | $5,716,137 | $28,560 | $5,744,697 |
| September 30, 2006 | $5,744,697 | $28,560 | $5,773,257 |
| October 31, 2006 | $5,773,257 | $28,560 | $5,801,817 |
| December 1, 2006 | $5,801,817 | $28,560 | $5,830,377 |

---

[*] In addition to the amounts listed on this Exhibit 1, the Final Closing Purchase Price will include the Additional Payment calculated in accordance with Section 2.4(e) of the Amendment.

## EXHIBIT 2

**Escrow Agreement Amendment**

AMENDMENT NO. 1 (this Escrow Amendment) dated as of April 25, 2006 to the Escrow Agreement (the Escrow Agreement) dated as of January 28, 2005, by and among KPN Telecom B.V., a limited liability company organized under the laws of The Netherlands (Seller), Coreyra d.o.o., a company organized under the laws of Croatia (Purchaser), and JPMorgan Chase Bank N.A., a bank organized under the laws of the State of New York (Escrow Agent).

WHEREAS, Seller and Purchaser have entered into an amendment (the Amended Purchase Agreement) dated as of the date hereof to the Stock Purchase Agreement (the Purchase Agreement) dated as of January 28, 2005, by and between Seller and Purchaser, pursuant to which Seller and Purchaser have amended the terms upon which Purchaser has agreed to purchase and Seller has agreed to sell the 2,036,188 shares of Company common stock deposited with the Escrow Agent pursuant to the Escrow Agreement (the "Escrowed Shares"). A copy of the Amended Purchase Agreement has been delivered to the Escrow Agent. Capitalized terms used but not otherwise defined herein shall have the respective meanings given them in the Amended Purchase Agreement.

WHEREAS, pursuant to the Amended Purchase Agreement, Seller has agreed to sell and Purchaser has agreed to purchase 434,783 of the Escrowed Shares at the Special Closing for the Special Closing Purchase Price.

WHEREAS, pursuant to the Amended Purchase Agreement, Seller has agreed to sell and Purchaser has agreed to purchase 1,601,405 of the Escrowed Shares at the Final Closing for the Final Closing Purchase Price.

WHEREAS, in connection with the foregoing, the parties wish to amend certain terms of the Escrow Agreement.

Now, therefore, in consideration of and subject to the premises and the mutual agreements, terms and conditions herein contained, the benefits to be derived therefrom and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    RELEASE OF ESCROWED SHARES

(a)    Notwithstanding anything to the contrary in the Escrow Agreement, on the Special Closing Date, upon Purchaser's payment of the Special Closing Purchase Price pursuant to the terms of the Amended Purchase Agreement, and upon satisfaction (or waiver by Seller) of the closing conditions to Seller's obligation contained in Section 7.2 of the Purchase Agreement, Seller shall deliver to Purchaser irrevocable instructions (the Instructions) directing Escrow Agent to transfer to Purchaser one or more certificates representing the Special Purchase Shares to be purchased on the Special Closing Date. Upon receipt of the Instructions from Purchaser, Escrow Agent agrees to release the Special Purchase Shares from escrow as soon as practicable after the Special Closing Date, and in accordance therewith, the parties agree to use best efforts to coordinate with the Company's transfer agent following the Special Closing Date in order to (i) deliver a certificate representing the Special Purchase Shares to Purchaser, and (ii) deposit with the Escrow Agent a certificate representing the Final Shares (hereinafter called the Remaining Escrowed Shares) together with an amended Stock Power executed by Seller in blank with respect to the Remaining Escrowed Shares. Escrow Agent shall return the original Stock Power to Seller.

(b)    Upon Purchaser's payment of the Final Closing Purchase Price pursuant to the terms of the Amended Purchase Agreement, and upon satisfaction (or waiver by Seller) of the closing conditions to Seller's obligation contained in Section 7.2 of the Purchase Agreement, Seller shall give notice to Escrow Agent directing Escrow Agent to transfer to Purchaser one or more certificates representing the Remaining Escrowed Shares purchased at the Final Closing in accordance with the Amended Purchase Agreement. Upon the receipt of such notice, Escrow Agent shall deliver the Stock Powers

endorsed to Purchaser together with one or more certificates representing the Remaining Escrowed Shares.

(c) In the event that (a) Purchaser does not timely satisfy the conditions contained in Section 7.2 of the Purchase Agreement or (b) the Amended Purchase Agreement is otherwise terminated pursuant to Section 5 of the Amended Purchase Agreement; then upon notice to such effect from Seller, Escrow Agent shall return the certificates representing the Remaining Escrowed Shares and the Stock Powers to Seller, and the Escrow Agreement and this Escrow Amendment shall terminate. In such event, neither Purchaser nor Seller shall have any claim against the other arising out of the Escrow Agreement and this Escrow Amendment.

## 2. NOTICES

Section 5 of the Escrow Agreement is hereby amended for notices to Seller as follows:

If to Seller:

KPN Telecom B.V.
Maanplein 55
2516 CK The Hague
The Netherlands
Fax: +31 70 4464302 / +31 70 4460675
Attn: Messrs. Cees Boogaerdt and Michiel Roovers

## 3. TERMINATION

In the event that (a) Purchaser does not timely satisfy the conditions contained in Section 7.2 of the Purchase Agreement or (b) the Purchase Agreement is otherwise terminated pursuant to Section 5 of the Amended Purchase Agreement, then upon notice to such effect from Seller, Escrow Agent shall return the certificates representing the Remaining Escrowed Shares and the amended Stock Powers to Seller, and the Escrow Agreement and this Escrow Agreement shall terminate. In such event, neither Purchaser nor Seller shall have any claim against the other arising out of the Escrow Agreement or this Escrow Amendment.

## 4. GENERAL

Except as amended hereby, the Escrow Agreement continues to be, and shall remain, in full force and effect in accordance with its terms. The miscellaneous provisions set forth in Section 7 of the Escrow Agreement are incorporated herein by reference and deemed made a part hereof, *mutatis mutandis*.

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Escrow Amendment as of the date and year first above written

CORCYRA d.o.o.

By:_____
    Name:  Moshe Har Adir
    Title:  Sole Officer, Director and Shareholder

KPN TELECOM B.V.

By:  KONINKLIJKE KPN N.V., its sole Director

    By:_____
        Name:
        Title:

JPMORGAN CHASE BANK, N.A.

By:_____
Name:
Title:

## EXHIBIT 3

### Wire Transfer Instructions

Purchaser shall make all payments to Seller pursuant to this Amendment by wire transfer of immediately available funds, in U.S. dollars, to:

| | |
|---|---|
| Correspondent Bank: | ABN AMRO Bank New York |
| Swiftcode: | ABNAUS33 |
| ABA code: | 026-009-580 |
| | |
| Beneficiary Bank: | ABN AMRO Bank Amsterdam |
| Swiftcode: | ABNANL2A |
| Account No.: | 574070002941 |
| | |
| For further credit to: | Koninklijke KPN NV |
| Account No.: | 62.61.40.404 |

# EXHIBIT 3

**AMENDMENT NO. 2** ( this **Amendment No. 2**) dated as of December 1, 2006 to the Stock Purchase Agreement (the **SPA**) dated as of January 28, 2005, by and between KPN Telecom B.V., a limited liability company organized under the laws of The Netherlands (**Seller**) and Coreyra d.o.o., organized under the laws of Croatia (**Purchaser**), as previously amended by Amendment No. 1 dated as of April 28, 2006 (the **First Amended SPA**).

**WHEREAS:**

The parties wish to amend certain terms of the First Amended SPA.

Now, therefore, in consideration of and subject to the premises and the mutual agreements, terms and conditions herein contained, the benefits to be derived therefrom and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **DEFINITIONS.**

Capitalized terms used herein and not defined shall have the meanings ascribed thereto in the First Amended SPA.

2.    **PURCHASE AND SALE OF SHARES.**

2.1    Second Special Purchase.    Subject to the terms and conditions of this Amendment No. 2, and notwithstanding anything to the contrary in the First Amended SPA, on December 1, 2006 (the **Second Special Payment Date**) Purchaser shall pay for 781,006 Shares (the **Second Special Purchase Shares**) for US$ 3,000,000.00 (including accrued Premium Payments up to the Second Special Payment Date), subject to adjustment if the average closing price of a Share on the Nasdaq Capital Market (as reported by The Wall Street Journal) for the 60 trading days ending on the second Business Day prior to the Second Special Closing Date exceeds $3.45 (the **Second Special Purchase Price**).

2.2    (a)    Second Special Payment.    On the Second Special Payment Date:

   (i)    Purchaser shall deliver to Seller:

      (A)    payment, by wire transfer to the bank account designated by Seller on Exhibit 3 to this Amendment No. 2, immediately available funds, in U.S. dollars, in an amount equal to the Second Special Closing Purchase Price;

      (B)    the officer's certificate referred to in Section 7.2(c) of the SPA; and

      (C)    an executed copy of the amendment to the Escrow Agreement in the form attached hereto as Exhibit 2 to this Amendment No. 2.

   (ii)    Seller shall deliver to Purchaser:

      (A)    the officer's certificate referred to in Section 7.1(c) of the SPA; and

      (B)    an executed copy of the amendment to the Escrow Agreement in the form attached hereto as Exhibit 2 to this Amendment No. 2.

(b) <u>Second Special Closing</u>. Purchaser shall deliver to Seller a U.S. bank guarantee satisfactory to Seller that guarantees Purchaser's remaining payment obligation of the Final Closing Purchase Price (the **Bank Guarantee**) as soon as practicable following the Second Special Payment Date, but in any event no later than January 15, 2007. As soon as reasonably practicable following (A) Purchaser's payment to Seller of the Second Special Purchase Price in accordance with <u>Section 2.2(a)(i)</u> of this Amendment No. 2, (B) satisfaction (or waiver by Seller) of the closing conditions to Seller's obligation contained in <u>Section 7.2</u> of the Purchase Agreement, and (C) Purchaser's delivery to Seller of the Bank Guarantee, Seller shall deliver to Purchaser irrevocable instructions to the Escrow Agent to transfer to Purchaser one or more certificates representing the Second Special Purchase Shares. In the event that Purchaser complies with subsections (A) and (B) of this <u>Section 2.2(b)</u>, but is unable to deliver to Seller the Bank Guarantee on or before January 15, 2007 in accordance with the terms of this <u>Section 2.2(b)</u>, Purchaser shall pay to Seller $250,000 (the **Advance**), and upon receipt of such payment, Seller shall deliver to Purchaser irrevocable instructions to the Escrow Agent to transfer to Purchaser one or more certificates representing the Second Special Purchase Shares. Subject to Final Closing, KPN will credit payment by Purchaser of the Advance toward Purchaser's payment of the Final Closing Purchase Price.

2.3 <u>Premium Payments</u>. At the Final Closing, Purchaser shall make the Premium Payments set forth on <u>Exhibit 1</u> to this Amendment No. 2 as part of the Final Closing Purchase Price. Except for accrued Premium Payments payable as part of the Second Special Purchase Price, no Premium Payments shall be due from Purchaser prior to the Final Closing.

2.4 <u>Final Closing</u>.

(a) Notwithstanding anything to the contrary in the First Amended SPA, the number of Final Shares shall be 820,399, subject to appropriate adjustment in the event of a stock dividend, recapitalization, stock split, reverse stock split, subdivision, combination, reclassification or similar change in the Company's capital structure.

(b) Notwithstanding anything to the contrary in the First Amended SPA, at the Final Closing, Seller shall sell and Purchaser shall purchase the Final Shares for the Final Closing Purchase Price (as defined below in this Amendment No. 2).

(c) Notwithstanding anything to the contrary in the First Amended SPA, the Final Closing shall take place at 4:00 pm, Central European Time, on July 2, 2007; provided, however, upon 14 days' prior written notice to Seller, Purchaser may accelerate the Final Closing Date to an earlier month-end date as specified in such notice; provided, further, that the Final Closing is subject to the satisfaction or waiver of all of the conditions set forth in <u>Section 7.1</u> and <u>Section 7.2</u> of the SPA (other than those conditions that by their nature are to be satisfied at the Final Closing). The Final Closing shall occur at such location outside of the United States as the parties may mutually agree.

(d) At the Final Closing, and notwithstanding anything to the contrary in the SPA:

(i) Purchaser shall deliver to Seller:

(A) payment, by wire transfer to the bank account designated by Seller on Exhibit 3 to this Amendment No. 2, immediately available funds in U.S. dollars in the amount equal to the sum of (x) the amount listed on <u>Exhibit 1</u> to this

Amendment No. 2 under the caption "Base Final Closing Purchase Price" that corresponds to the date of the Final Closing as determined in accordance with Section 2.4(c) of this Amendment No. 2 plus (y) the Additional Payment (as defined below) plus (z) in accordance with Section 2.3 of this Amendment No. 2, the Premium Payments due and payable at the Final Closing (the sum of (x), (y) and (z) being the **Final Closing Purchase Price**); and

    (B)    the officer's certificate referred to in Section 7.2(c) of the SPA.

    (ii)    Seller shall irrevocably cause the Escrow Agent to transfer to Purchaser one or more certificates representing the Final Shares to be purchased at the Final Closing.

    (iii)    Seller shall deliver to Purchaser the officer's certificate referred to in Section 7.1(c) of the SPA.

    (e)    As used in this Amendment No. 2, with respect to any Final Closing Date, the Additional Payment shall mean, if positive, the product of (A) 820,399, (B) 0.35 and (C) the difference between (I) the average closing price of a share of Company common stock on the Nasdaq Capital Market (as reported by The Wall Street Journal) for the 60 trading days ending on the second Business Day prior to the applicable Final Closing Date minus (II) $3.45 (the **Additional Payment**). In the event that Purchaser pays the Advance pursuant to Section 2.2(b) of this Amendment No. 2, the Final Closing Purchase Price is subject to reduction in the amount of the Advance. The Additional Payment shall be subject to appropriate adjustment in the event of a stock dividend, recapitalization, stock split, reverse stock split, subdivision, combination, reclassification or similar change in the Company's capital structure.

    (f)    If Purchaser shall default in the payment of any amount becoming due hereunder on the Final Closing Date (including without limitation by defaulting on its obligation to purchase the Final Shares), Purchaser shall upon Seller's demand from time to time pay interest on such amount up to (but not including) the date of actual payment (as well as before judgment) at a rate per annum (computed on the terms of the actual number of days elapsed over a year of 360 days), to the extent permitted by law, equal to the prime rate of interest announced by Citibank N.A. on July 2, 2007 plus 15%. The foregoing shall not limit any rights or remedies that would otherwise be available to Seller. In addition, notwithstanding anything to the contrary in the SPA, if Purchaser shall fail to make any payment pursuant to this Section 2.4(f) when due, Purchaser shall also pay to Seller all of Seller's costs and expenses (including attorneys' fees) in connection with Seller's efforts to collect any such amount that is due to Seller. Purchaser acknowledges that the provisions of this Section 2.4(f) are an integral part of the transactions contemplated hereby and that, without these agreements, Seller would not enter into this Amendment No. 2.

**3.    RELEASE.**

Purchaser on its own behalf, and on behalf of all of its assigns, past, present and future directors, officers, members, employees, affiliates, shareholders, predecessors or successors, parent companies, wholly or partially owned direct or indirect subsidiaries and any other person or company directly or indirectly controlling, controlled by or under direct or indirect common control with Purchaser, hereby releases and discharges Seller and all of its heirs, attorneys, assigns, past, present and future directors, officers, members, employees, affiliates, shareholders, predecessors or successors, parent companies, wholly or partially owned direct or indirect subsidiaries and any other person or company directly or

indirectly controlling, controlled by or under direct or indirect common control with Seller (collectively, **Seller Affiliates**), from those claims, actions, complaints, causes of action, demands or suits, at law or in equity, or other liabilities, known or unknown, including, but not limited to, any claims that were asserted, or could have been asserted, against Seller or any Seller Affiliates, that any of them has had, now has, or hereafter can, shall or may have concerning

  (i)  the representations and warranties made to Purchaser in the First Amended SPA,

  (ii)  disclosure (or any omission thereof) made by Seller in connection with the First Amended SPA and the transactions contemplated therein, or

  (iii)  liabilities of the Company or its Subsidiaries (whenever arising) that became known or came to Purchaser's attention after the date of the SPA.

Purchaser hereby waives any claim that any prior act or omission by Seller gives rise to any right for Purchaser to rescind or terminate the First Amended SPA.

### 4. COVENANT.

Until Final Closing, Purchaser shall use its best efforts to cause Company to deliver to Seller, promptly upon their becoming available, copies of all financial statements, proxy statements and reports as the Company shall send or make available to its public security holders generally, all registration statements and regular periodic reports that the Company files with the United States Securities and Exchange Commission, the Nasdaq Capital Market or any other securities regulatory agency or exchange, and all press releases made available generally to the public, all of the foregoing to be delivered to Seller by mail in accordance with the notice provisions of Section 10 of the SPA, as amended by Section 6 of the First Amended SPA, or sent by email to Messrs. Cees Boogaerdt (cees.boogaerdt@kpn.com) and Michiel Roovers (michiel.roovers@kpn.com).

### 5. TERMINATION.

Section 5 of the First Amended SPA is hereby deleted in its entirety and replaced with the following:

The SPA, as amended by this Amendment No. 2, may be terminated at any time prior to the Final Closing:

  (i)  by written notice from Purchaser to Seller if the conditions specified in Section 7.1 of the SPA with respect to the Final Closing have not been satisfied or waived prior to July 3, 2007, or shall have become incapable of fulfillment;

  (ii)  by written notice from Seller to Purchaser if the conditions specified in Section 7.2 of the SPA with respect to the Final Closing have not been satisfied or waived prior to July 3, 2007, or shall have become incapable of fulfillment; or

  (iii)  by either party if the other party is in material breach of its obligations under the First Amended SPA, as amended by this Amendment No. 2.

### 6. GENERAL.

Except as amended hereby, the First Amended SPA continues to be, and shall remain, in full force and effect in accordance with its terms. The miscellaneous provisions set forth in Section 10 of the SPA as

amended by Section 6 of the First Amended SPA are incorporated herein by reference and deemed made a part hereof, *mutatis mutandis*.

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment No. 2 as of the date and year first above written

CORCYRA d.o.o.

By:
    Name:
    Title:

KPN TELECOM B.V.

By: KONINKLIJKE KPN N.V., its sole Director

By:_____
    Name:
    Title:

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment No. 2 as of the date and year first above written

CORCYRA d.o.o.

By:_____
   Name:
   Title:

KPN TELECOM B.V.

By: KONINKLIJKE KPN N.V., its sole Director

By_____
   Name: M. G. Roouci
   Title: Corporate Legal Counsel

## EXHIBIT 1

### Final Closing Purchase Price in US Dollars[*]

| Final Closing Date | Base Final Closing Purchase Price | Premium | Final Closing Purchase Price[**] |
|---|---|---|---|
| December 31, 2007 | $2,830,377 | $14,157 | $2,844,534 |
| January 31, 2007 | $2,844,534 | $14,157 | $2,858,691 |
| February 28, 2007 | $2,858,691 | $14,157 | $2,872,848 |
| March 31, 2007 | $2,872,848 | $14,157 | $2,877,005 |
| April 30, 2007 | $2,877,005 | $14,157 | $2,901,162 |
| May 31, 2007 | $2,901,162 | $14,157 | $2,915,319 |
| July 2, 2007 | $2,915,319 | $14,157 | $2,929,476 |

[*] In addition to the amounts listed on this Exhibit 1, the Final Closing Purchase Price will include the Additional Payment calculated in accordance with Section 2.4(e) of Amendment No. 2.

[**] In the event that Purchaser pays the Advance pursuant to Section 2.2(b) of Amendment No. 2, the Final Closing Purchase Price is subject to reduction in the amount of the Advance.

## EXHIBIT 2

**Escrow Agreement Amendment**

## EXHIBIT 3

### Wire Transfer Instructions

Purchaser shall make all payments to Seller pursuant to this Amendment No. 2 by wire transfer of immediately available funds, in U.S. dollars, to:

| | |
|---|---|
| Correspondent Bank: | ABN AMRO Bank New York |
| Swiftcode: | ABNAUS33 |
| ABA code: | 026-009-580 |
| | |
| Beneficiary Bank: | ABN AMRO Bank Amsterdam |
| Swiftcode: | ABNANL2A |
| Account No.: | 574070002941 |
| | |
| For further credit to: | Koninklijke KPN NV |
| Account No.: | 62.61.40.404 |

# EXHIBIT 4

**ESCROW AGREEMENT** dated as of January 28, 2005

**AMONG:**

(1)   **KPN TELECOM B.V.**, a limited liability company organized under the laws of The Netherlands (Seller);

(2)   **CORCYRA d.o.o.**, a Croatian company (Purchaser); and

(3)   **JPMORGAN CHASE BANK N.A.**, a bank organized under the laws of the State of New York (Escrow Agent).

**WHEREAS**, Seller and Purchaser have entered into a stock purchase agreement dated January 28, 2005 (the Purchase Agreement), pursuant to which Purchaser has agreed to purchase and Seller has agreed to sell 2,326,043 shares of common stock of EuroWeb International Corp., a Delaware corporation (the Company), on the terms and subject to the conditions set forth in the Purchase Agreement. Capitalized terms used but not otherwise defined herein shall have the respective meanings given them in the Purchase Agreement.

**WHEREAS**, pursuant to the Purchase Agreement, Seller has agreed to sell and Purchaser has agreed to purchase 289,855 shares of Company common stock at the Initial Closing for the Initial Closing Purchase Price. Seller shall deliver to Purchaser the Initial Shares at the Initial Closing, and accordingly, the Initial Shares will not be placed in escrow and will not be subject to this Agreement.

**WHEREAS**, pursuant to the Purchase Agreement, Seller has agreed to sell and Purchaser has agreed to purchase 2,036,188 shares of Company common stock at the Final Closing for the Final Closing Purchase Price.

**WHEREAS**, in accordance with Section 2.2(c) of the Purchase Agreement, Seller is depositing with Escrow Agent one or more certificates representing the 2,036,188 shares of Company common stock (the Escrowed Shares) to be purchased at the Final Closing.

**NOW, THEREFORE**, the parties, intending to be legally bound, hereby agree as follows:

**1.    Deposit of Escrowed Shares**

(a)   In accordance with the Purchase Agreement, Seller is depositing with Escrow Agent one or more certificates representing the Escrowed Shares and appropriate stock powers executed by Seller in blank with respect to the Escrowed Shares (the Stock Powers). Escrow Agent acknowledges receipt thereof.

(b)   Escrow Agent hereby agrees to act as escrow agent and to hold, safeguard and deliver the Escrowed Shares pursuant to the terms and conditions hereof. The Escrowed Shares shall be treated by the parties for all purposes as owned by Seller unless and until the Escrowed Shares are released to Purchaser pursuant to the terms of this Agreement.

**2.    Voting of Escrowed Shares**

Seller shall retain all voting and other rights associated with the Escrowed Shares until the Final Closing Purchase Price is paid in full pursuant to the terms of the Purchase Agreement at the

1

Final Closing; provided, however, that so long as Purchaser is not in default in its obligations under the Purchase Agreement, and the Purchase Agreement remains in effect, Seller shall vote the Escrowed Shares in accordance with instructions from Purchaser, so long as such instructions are received sufficiently in advance of the applicable vote and such voting would not violate applicable law or require amendments to any SEC filing of Seller or Purchaser. Seller shall not be obligated to vote the Final Shares in accordance with Purchaser's instructions in connection with any matter (i) proposed by or on behalf of Purchaser or any of its Affiliates that Purchaser did not previously disclose to Seller in its Schedule 13D or (ii) as to which Purchaser or any of its Affiliates would have an interest that is different from the interests of the other stockholders of the Company such as an interest that would be of a nature that would have to be disclosed pursuant to Item 1005(d) of Regulation M-A or Item 404 of Regulation S-K, if either of such provisions were applicable.

3.    **Release of Escrowed Shares**

(a)    Upon Purchaser's payment of the Final Closing Purchase Price pursuant to the terms of the Purchase Agreement, and upon satisfaction (or waiver by Seller) of the closing conditions to Seller's obligation contained in Section 7.2 of the Purchase Agreement, Seller shall give notice to Escrow Agent directing Escrow Agent to transfer to Purchaser one or more certificates representing the Escrowed Shares purchased at the Final Closing. Upon the receipt of such notice, Escrow Agent shall deliver the Stock Powers endorsed to Purchaser together with one or more certificates representing the Escrowed Shares.

(b)    In the event that (a) Purchaser does not timely satisfy the conditions contained in Section 7.2 of the Purchase Agreement or (b) the Purchase Agreement is otherwise terminated pursuant to Section 8.1 of the Purchase Agreement, including if Purchaser shall be in default of its obligation to make any Premium Payment specified in Section 2.3 of the Purchase Agreement, then upon notice to such effect from Seller, Escrow Agent shall return the certificates representing the Escrowed Shares and the Stock Powers to Seller, and this Agreement shall terminate. In such event, neither Purchaser nor Seller shall have any claim against the other arising out of this Agreement.

4.    **Duties of Escrow Agent**

(a)    This Agreement expressly sets forth all the duties of Escrow Agent with respect to any and all matters pertinent hereto. No implied duties or obligations shall be read into this agreement against Escrow Agent. Escrow Agent shall not be bound by the provisions of any agreement among the other parties hereto except this Agreement. Escrow Agent's duties are ministerial in nature.

(b)    Escrow Agent shall not be liable, except for its own gross negligence or willful misconduct, and, except with respect to claims based upon such gross negligence or willful misconduct that are successfully asserted against Escrow Agent, the other parties hereto shall jointly and severally indemnify and hold harmless Escrow Agent (and any successor Escrow Agent) from and against any and all losses, liabilities, claims, actions, damages and expenses, including reasonable attorneys' fees and disbursements, arising out of and in connection with this Agreement.

(c)    Escrow Agent shall be entitled to rely upon any order, judgment, certification, demand, notice, instrument or other writing delivered to it hereunder without being required to determine the authenticity or the correctness of any fact stated therein or the propriety or validity or the service

thereof. Escrow Agent may act in reliance upon any instrument or signature believed by it to be genuine and may assume that any person purporting to give notice or receipt or advice or make any statement or execute any document in connection with the provisions hereof has been duly authorized to do so.

(d)     Escrow Agent may act pursuant to the advice of counsel with respect to any matter relating to this Agreement and shall not be liable for any action taken or omitted in accordance with such advice.

(e)     Escrow Agent does not have any interest in the Escrowed Shares deposited hereunder but is serving as escrow agent only and having only possession thereof.

(f)     Escrow Agent makes no representation as to the validity, value, genuineness or the collectability of any security or other documents or instrument held by or delivered to it.

(g)     Escrow Agent (and any successor Escrow Agent) may at any time resign as such by delivering the Escrowed Shares to any successor Escrow Agent jointly designated by the other parties hereto in writing, or to any court of competent jurisdiction, whereupon Escrow Agent shall be discharged of and from any and all further obligations arising in connection with this Agreement. The resignation of Escrow Agent shall take effect on the earlier of (i) the appointment of a successor (including a court of competent jurisdiction) or (ii) the day that is 30 days after the date of delivery of its written notice of resignation to the other parties hereto. If at that time Escrow Agent has not received a designation of a successor Escrow Agent, Escrow Agent's sole responsibility after that time shall be to retain and safeguard the Escrowed Shares until receipt of a designation of successor Escrow Agent or a joint written disposition instruction by the other parties hereto or a final and nonappealable order of a court of competent jurisdiction.

(h)     In the event that Escrow Agent in good faith is in doubt as to what action it should take hereunder, Escrow Agent shall be entitled to retain the Escrowed Shares until Escrow Agent shall have received (i) a final nonappealable order of a court of competent jurisdiction directing delivery of the Escrowed Shares or (ii) a written agreement executed by Seller and Purchaser directing delivery of the Escrowed Shares, in which event Escrow Agent shall deliver the Escrowed Shares in accordance with such order or agreement. Escrow Agent shall act on any court order without further question.

(i)     Seller and Purchaser shall pay Escrow Agent compensation as payment in full for the services to be rendered by Escrow Agent hereunder in the amount of U.S.$7,500 at the time of execution of this Agreement. Any such compensation and reimbursement to which Escrow Agent is entitled shall be borne 50% by Seller, 50% by Purchaser.

(j)     Anything in this agreement to the contrary notwithstanding, in no event shall Escrow Agent be liable for special, indirect or consequential damage of any kind whatsoever (including but not limited to lost profits), even if Escrow Agent has been advised of the likelihood for such loss or damage and regardless of the form of action. The parties hereto acknowledge that this Section 4(j) shall survive the resignation or removal of Escrow Agent or the termination of this agreement.

5.     Notices

All notices, requests, claims, demands and other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand or sent by facsimile or sent,

postage prepaid, return receipt requested, by registered, certified or express mail or overnight courier service and shall be deemed given when so delivered by hand or facsimile, or if mailed, three days after mailing (one Business Day in the case of express mail or overnight courier service), to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 5):

(i)    if to Seller

KPN Telecom B.V.
Maanplein 55
2516 CK The Hague
The Netherlands
Fax: +31 70 343 2112
Attn: Gert-Jan Wunderink

(ii)    if to Purchaser

CORCYRA d.o.o.
Verudela 17, Pula Croatia 52100
Fax: +385 52 590 731
Attn: Moshe Har Adir

with a copy to:

Robinson & Cole LLP
885 Third Avenue, Suite 2800
New York, NY 10022
Fax: +1 212 451 2999
Attn: Elliot H. Lutzker, Esq.

(iii)    if to Escrow Agent, to:

JPMorgan Chase Bank
4 New York Plaza
21ˢᵗ Floor
New York, NY 10004
Fax: +1 212 623 6168
Attention: Sandra Frierson

## 6.    Termination

In the event that (a) Purchaser does not timely satisfy the conditions contained in Section 7.2 of the Purchase Agreement or (b) the Purchase Agreement is otherwise terminated pursuant to Section 8.1 of the Purchase Agreement, including if Purchaser shall be in default of its obligation to make any Premium Payment specified in Section 2.3 of the Purchase Agreement, then upon notice to such effect from Seller, Escrow Agent shall return the certificates representing the Escrowed Shares and the Stock Powers to Seller, and this Agreement shall terminate. In such event, neither Purchaser nor Seller shall have any claim against the other arising out of this Agreement.

7.    **Miscellaneous**

(a)    None of the parties may assign any of its rights under this Agreement without the prior consent of the other parties (such consent not to be unreasonably withheld, delayed or conditioned), except that Seller may assign any of its rights under this Agreement to any Subsidiary or affiliate of Seller without the prior written consent of any other party. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the parties. Nothing expressed or referred to in this Agreement will be construed to give any person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and successors and assigns.

(b)    This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the parties and delivered to the other party.

(c)    This Agreement contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

(d)    Each party irrevocably and unconditionally submits to the exclusive jurisdiction of (a) the Supreme Court of the State of New York, New York County, and (b) the United States District Court for the Southern District of New York, for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby. Each party to this Agreement hereby waives formal service of process and agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth above shall be effective service of process for any action, suit or proceeding in New York with respect to any matters to which it has submitted to jurisdiction in this Section 7(d). Each party to this Agreement irrevocably and unconditionally waives, pursuant to the provisions of Section 5-1402 of the New York General Obligations Law, any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement, any Ancillary Agreement or the transactions contemplated hereby and thereby in (i) the Supreme Court of the State of New York, New York County, or (ii) the United States District Court for the Southern District of New York, and hereby and thereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

(e)    This Agreement (and any claims or disputes arising out of or related thereto or to the transactions contemplated thereby or to the inducement of any party to enter therein, whether for breach of contract, tortious conduct or otherwise and whether predicated on common law, statute or otherwise) shall in all respects be governed by and construed in accordance with the laws of the State of New York, including all matters of construction, validity and performance, in each case without reference to any conflict of law rules that might lead to the application of the laws of any other jurisdiction. Each party to this Agreement further agrees that the laws of the State of New York bear a reasonable relationship to this Agreement and irrevocably and unconditionally waives, pursuant to Section 5-1401 of the New York General Obligations Law, any objection to the application of the laws of the State of New York to any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby and further irrevocably and unconditionally waives and agrees not to plead or claim that any such action, suit or proceeding

should not be governed by the laws of the State of New York. This Agreement has been negotiated, executed and delivered in the State of New York.

(f)    EACH PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) DIRECTLY OR INDIRECTLY RELATING TO ANY DISPUTE ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY. Each party (i) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 7(f).

(g)    Any corporation into which Escrow Agent in its individual capacity may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which Escrow Agent in its individual capacity shall be a party, or any corporation to which substantially all the corporate trust business of Escrow Agent in its individual capacity may be transferred, shall be Escrow Agent under the Agreement without requirement for further action.

(h)    In the event that Escrow Agent is unable to perform its obligations under the terms of this Agreement because of acts of God, strikes, equipment or transmission failure or other cause reasonably beyond its control, Escrow Agent shall not be liable for damages to the other parties for any damages resulting from such failure to perform otherwise from such causes. Performance under this Agreement shall resume when Escrow Agent is able to perform substantially.

(i)    In the event that any Escrowed Shares shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by any order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the Escrowed Shares deposited under this Agreement, Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or to any other person, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

(j)    This Agreement shall not take effect unless and until the Initial Closing shall have occurred.

6

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first written above.

KPN TELECOM B.V.

By:    KONINKLIJKE KPN N.V.,
       its sole Director

       By: _____
       Name:
       Title:    J. Winderink
                 Senior Vice President

CORCYRA d.o.o.

By: _____
    Name: Moshe Har Adir
    Title: Sole Officer, Director and Shareholder

JPMORGAN CHASE BANK, N.A.
as Escrow Agent

By: _____
    Name:
    Title:

7

IN WITNESS WEREREOF, the parties hereto have duly executed this Agreement as of the date first written above.

KPN TELECOM B.V.

By:     KONINKLIJKE KPN N.V.,
        its sole Director

        By:_____
            Name:
            Title:

CORCYRA d.o.o.

By:_____
   Name: Moshe Har-Adir
   Title: Sole Officer, Director and Shareholder

JPMORGAN CHASE BANK, N.A.
as Escrow Agent

By:_____
   Name:
   Title:

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first written above.

KPN TELECOM B.V.

By:   KONINKLIJKE KPN N.V.,
      its sole Director

      By:_____
         Name:
         Title:

CORCYRA d.o.o.

By:_____
   Name: Moshe Har Adir
   Title: Sole Officer, Director and Shareholder

JPMORGAN CHASE BANK, N.A.
as Escrow Agent

By:_____
   Name:   SAVERIO A. LUNETTA
   Title:    VICE PRESIDENT

7

# EXHIBIT 5

AMENDMENT NO. 1 (this Escrow Amendment) dated as of April 28, 2006 to the Escrow Agreement (the Escrow Agreement) dated as of January 28, 2005, by and among KPN Telecom B.V., a limited liability company organized under the laws of The Netherlands (Seller), Corcyra d.o.o., a company organized under the laws of Croatia (Purchaser), and JPMorgan Chase Bank N.A., a bank organized under the laws of the State of New York (Escrow Agent).

WHEREAS, Seller and Purchaser have entered into an amendment (the **Amended Purchase Agreement**) dated as of the date hereof to the Stock Purchase Agreement (the **Purchase Agreement**) dated as of January 28, 2005, by and between Seller and Purchaser, pursuant to which Seller and Purchaser have amended the terms upon which Purchaser has agreed to purchase and Seller has agreed to sell the 2,036,188 shares of Company common stock deposited with the Escrow Agent pursuant to the Escrow Agreement (the "Escrowed Shares"). A copy of the Amended Purchase Agreement has been delivered to the Escrow Agent. Capitalized terms used but not otherwise defined herein shall have the respective meanings given them in the Amended Purchase Agreement.

WHEREAS, pursuant to the Amended Purchase Agreement, Seller has agreed to sell and Purchaser has agreed to purchase 434,783 of the Escrowed Shares at the Special Closing for the Special Closing Purchase Price.

WHEREAS, pursuant to the Amended Purchase Agreement, Seller has agreed to sell and Purchaser has agreed to purchase 1,601,405 of the Escrowed Shares at the Final Closing for the Final Closing Purchase Price.

WHEREAS, in connection with the foregoing, the parties wish to amend certain terms of the Escrow Agreement.

Now, therefore, in consideration of and subject to the premises and the mutual agreements, terms and conditions herein contained, the benefits to be derived therefrom and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    RELEASE OF ESCROWED SHARES

(a)    Notwithstanding anything to the contrary in the Escrow Agreement, on the Special Closing Date, upon Purchaser's payment of the Special Closing Purchase Price pursuant to the terms of the Amended Purchase Agreement, and upon satisfaction (or waiver by Seller) of the closing conditions to Seller's obligation contained in Section 7.2 of the Purchase Agreement, Seller shall deliver to Purchaser irrevocable instructions (the **Instructions**) directing Escrow Agent to transfer to Purchaser one or more certificates representing the Special Purchase Shares to be purchased on the Special Closing Date. Upon receipt of the Instructions from Purchaser, Escrow Agent agrees to release the Special Purchase Shares from escrow as soon as practicable after the Special Closing Date, and in accordance therewith, the parties agree to use best efforts to coordinate with the Company's transfer agent following the Special Closing Date in order to (i) deliver a certificate representing the Special Purchase Shares to Purchaser, and (ii) deposit with the Escrow Agent a certificate representing the Final Shares (hereinafter called the **Remaining Escrowed Shares**) together with an amended Stock Power executed by Seller in blank with respect to the Remaining Escrowed Shares. Escrow Agent shall return the original Stock Power to Seller.

(b)    Upon Purchaser's payment of the Final Closing Purchase Price pursuant to the terms of the Amended Purchase Agreement, and upon satisfaction (or waiver by Seller) of the closing conditions to Seller's obligation contained in Section 7.2 of the Purchase Agreement, Seller shall give notice to Escrow Agent directing Escrow Agent to transfer to Purchaser one or more certificates representing the Remaining Escrowed Shares purchased at the Final Closing in accordance with the Amended Purchase Agreement.

Upon the receipt of such notice, Escrow Agent shall deliver the Stock Powers endorsed to Purchaser together with one or more certificates representing the Remaining Escrowed Shares.

(c)    In the event that (a) Purchaser does not timely satisfy the conditions contained in Section 7.2 of the Purchase Agreement or (b) the Amended Purchase Agreement is otherwise terminated pursuant to Section 5 of the Amended Purchase Agreement, then upon notice to such effect from Seller, Escrow Agent shall return the certificates representing the Remaining Escrowed Shares and the Stock Powers to Seller, and the Escrow Agreement and this Escrow Amendment shall terminate. In such event, neither Purchaser nor Seller shall have any claim against the other arising out of the Escrow Agreement and this Escrow Amendment.

## 2.    NOTICES

Section 5 of the Escrow Agreement is hereby amended for notices to Seller as follows:

If to Seller:

KPN Telecom B.V.
Maanplein 55
2516 CK The Hague
The Netherlands
Fax:  +31 70 4464302 / +31 70 4460675
Attn: Messrs. Cees Boogaerdt and Michiel Roovers

## 3.    TERMINATION

In the event that (a) Purchaser does not timely satisfy the conditions contained in Section 7.2 of the Purchase Agreement or (b) the Purchase Agreement is otherwise terminated pursuant to Section 5 of the Amended Purchase Agreement, then upon notice to such effect from Seller, Escrow Agent shall return the certificates representing the Remaining Escrowed Shares and the amended Stock Powers to Seller, and the Escrow Agreement and this Escrow Agreement shall terminate. In such event, neither Purchaser nor Seller shall have any claim against the other arising out of the Escrow Agreement or this Escrow Amendment.

## 4.    GENERAL

Except as amended hereby, the Escrow Agreement continues to be, and shall remain, in full force and effect in accordance with its terms. The miscellaneous provisions set forth in Section 7 of the Escrow Agreement are incorporated herein by reference and deemed made a part hereof, *mutatis mutandis*.

·IN WITNESS WHEREOF, the parties hereto have duly executed this Escrow Amendment as of the date and year first above written

CORCYRA d.o.o.

By:_____
Name: Shalom Atia
Title: Sole Officer, Director

KPN TELECOM B.V.

By: KONINKLIJKE KPN N.V., its sole Director

By:_____
Name:
Title:

JPMORGAN CHASE BANK, N.A.

By:_____
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have duly executed this Escrow Amendment as of the date and year first above written

CORCYRA d.o.o.

By:_____
    Name:   Shalom Atia
    Title: Sole Officer, Director

KPN TELECOM B.V.

By: KONINKLIJKE KPN N.V., its sole Director

By: _____
Name: M.G.Roovers            E.J.Boogaerdt
Title: Legal Counsel         Deputy Treasurer

JPMORGAN CHASE BANK, N.A.

By:_____
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have duly executed this Escrow Amendment as of the date and year first above written

CORCYRA d.o.o.

By:_____
   Name:
   Title:


KPN TELECOM B.V.

By: KONINKLIJKE KPN N.V., its sole Director

   By:_____
      Name:
      Title:


JPMORGAN CHASE BANK, N.A.

By:_____
Name:
Title:     Rola Tseng
         Vice President

# EXHIBIT 6

**AMENDMENT NO. 2** (this Escrow Amendment No. 2) dated as of December 1, 2006 to the Escrow Agreement (the **Escrow Agreement**) dated as of January 28, 2005, by and among **KPN Telecom B.V.**, a limited liability company organized under the laws of The Netherlands (**Seller**), Corcyra d.o.o., a company organized under the laws of Croatia (**Purchaser**), and JPMorgan Chase Bank N.A., a bank organized under the laws of the State of New York (**Escrow Agent**), as previously amended by Amendment No. 1 to the Escrow Agreement dated as of April 28, 2006 (the **First Amended Escrow Agreement**).

**WHEREAS**, Seller and Purchaser have entered into a second amendment (the **Second Amended Purchase Agreement**) dated as of the date hereof to the Stock Purchase Agreement (the **Purchase Agreement**) dated as of January 28, 2005, as previously amended by Amendment No. 1 to the Purchase Agreement dated as of April 28, 2006, by and between Seller and Purchaser, pursuant to which Seller and Purchaser have amended the terms upon which Purchaser has agreed to purchase and Seller has agreed to sell the 1,601,405 shares of Company common stock deposited with the Escrow Agent pursuant to the Escrow Agreement (the "**Escrowed Shares**"). A copy of the Second Amended Purchase Agreement has been delivered to the Escrow Agent. Capitalized terms used but not otherwise defined herein shall have the respective meanings given them in the Second Amended Purchase Agreement.

**WHEREAS**, pursuant to the Second Amended Purchase Agreement, Seller has agreed to sell and Purchaser has agreed to purchase 781,006 of the Escrowed Shares (the **Second Special Purpose Shares**) at the Second Special Closing for the Second Special Purchase Price.

**WHEREAS**, pursuant to the Second Amended Purchase Agreement, Seller has agreed to sell and Purchaser has agreed to purchase 820,399 of the Escrowed Shares at the Final Closing for the Final Closing Purchase Price.

**WHEREAS**, in connection with the foregoing, the parties wish to amend certain terms of the First Amended Escrow Agreement.

Now, therefore, in consideration of and subject to the premises and the mutual agreements, terms and conditions herein contained, the benefits to be derived therefrom and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## 1.    RELEASE OF ESCROWED SHARES

(a)    Notwithstanding anything to the contrary in the First Amended Escrow Agreement, on or after the Second Special Payment Date, upon (i) Purchaser's payment of the Second Special Purchase Price pursuant to the terms of the Second Amended Purchase Agreement, (ii) satisfaction (or waiver by Seller) of the closing conditions to Seller's obligation contained in Section 7.2 of the Purchase Agreement, and (iii) receipt by Seller of the Bank Guarantee in accordance with Section 2.2(b) of the Second Amended Purchase Agreement, Seller shall deliver to Purchaser irrevocable instructions (the **Instructions**) directing Escrow Agent to transfer to Purchaser one or more certificates representing the Second Special Purchase Shares. In the event that Purchaser satisfies (i) and (ii) of this Section 1(a), but does not deliver to Seller the Bank Guarantee on or before January 15, 2007 in accordance with Section 2.2(b) of the Second Amended Purchase Agreement, Purchaser shall pay to Seller $250,000, and upon receipt of such payment, Seller shall deliver to Purchaser the Instructions.

(b)    Upon receipt of the Instructions from Purchaser in accordance with Section 1(a) of this Escrow Amendment No. 2, Escrow Agent agrees to release the Special Purchase Shares from escrow as soon as practicable, and in accordance therewith, the parties agree to use best efforts to coordinate with the Company's transfer agent following delivery of the Instructions in accordance with this Section 1(a) in order to (A) deliver a certificate representing the Second Special Purchase Shares to Purchaser, and (B)

deposit with the Escrow Agent a certificate representing the Final Shares (hereinafter called the **Remaining Escrowed Shares**) together with an amended Stock Power executed by Seller in blank with respect to the Remaining Escrowed Shares. Escrow Agent shall return the original Stock Power to Seller.

(c)     Upon Purchaser's payment of the Final Closing Purchase Price pursuant to the terms of the Second Amended Purchase Agreement, and upon satisfaction (or waiver by Seller) of the closing conditions to Seller's obligation contained in Section 7.2 of the Purchase Agreement, Seller shall give notice to Escrow Agent directing Escrow Agent to transfer to Purchaser one or more certificates representing the Remaining Escrowed Shares purchased at the Final Closing in accordance with the Amended Purchase Agreement. Upon the receipt of such notice, Escrow Agent shall deliver the Stock Powers endorsed to Purchaser together with one or more certificates representing the Remaining Escrowed Shares.

(d)     In the event that (a) Purchaser does not timely satisfy the conditions contained in Section 7.2 of the Purchase Agreement or (b) the Second Amended Purchase Agreement is otherwise terminated pursuant to Section 5 of the Second Amended Purchase Agreement, then upon notice to such effect from Seller, Escrow Agent shall return the certificates representing the Remaining Escrowed Shares and the Stock Powers to Seller, and the First Amended Escrow Agreement and this Escrow Amendment No. 2 shall terminate. In such event, neither Purchaser nor Seller shall have any claim against the other arising out of the First Amended Escrow Agreement and this Escrow Amendment No. 2.

**2.     TERMINATION**

In the event that (a) Purchaser does not timely satisfy the conditions contained in Section 7.2 of the Purchase Agreement or (b) the Second Amended Purchase Agreement is otherwise terminated pursuant to Section 5 of the Second Amended Purchase Agreement, then upon notice to such effect from Seller, Escrow Agent shall return the certificates representing the Remaining Escrowed Shares and the amended Stock Powers to Seller, and the First Amended Escrow Agreement and this Escrow Amendment No. 2 shall terminate. In such event, neither Purchaser nor Seller shall have any claim against the other arising out of the First Amended Escrow Agreement and this Escrow Amendment No. 2.

**3.     GENERAL**

Except as amended hereby, the First Amended Escrow Agreement continues to be, and shall remain, in full force and effect in accordance with its terms. The miscellaneous provisions set forth in Section 7 of the Escrow Agreement are incorporated herein by reference and deemed made a part hereof, *mutatis mutandis*.

IN WITNESS WHEREOF, the parties hereto have duly executed this Escrow Amendment No. 2 as of the date and year first above written

CORCYRA d.o.o.

By:_____
   Name:
   Title:

KPN TELECOM B.V.

By:  KONINKLIJKE KPN N.V., its sole Director

By:_____
   Name:
   Title:

JPMORGAN CHASE BANK, N.A.

By:_____
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have duly executed this Escrow Amendment No. 2 as of the date and year first above written

CORCYRA d.o.o.

By:_____
      Name:
      Title:

KPN TELECOM B.V.

By: KONINKLIJKE KPN N.V., its sole Director

By:_____
      Name: M. G. Roovers
    . Title: Corporate Legal Counsel

JPMORGAN CHASE BANK, N.A.

By:_____
    Name:
    Title:

IN WITNESS WHEREOF, the parties hereto have duly executed this Escrow Amendment No. 2 as of the date and year first above written

CORCYRA d.o.o.

By:_____

    Name:

    Title:

KPN TELECOM B.V.

By: KONINKLIJKE KPN N.V., its sole Director

By:_____

    Name:

    Title:

JPMORGAN CHASE BANK, N.A.

By:_____

Name:

Title:

Rola/Tseng
Vice President

# EXHIBIT 7

# MOSHE HAR ADIR
## VERUDELA 17
### PULA-CROATIA 52100

January 28, 2005

KPN Telecom B.V., LLC
Maanplein 55
2516 CK The Hague
The Netherlands
Attn: Gert - Jan Wunderink

Re:        CORCYRA d.o.o.

Gentlemen:

The undersigned, Moshe Har Adir, is the sole owner and sole director of CORCYRA d.o.o, a Croatian company. I am an Israeli citizen who resides in Croatia. I have read and understood the terms and conditions of the Stock Purchase Agreement ("SPA") dated the date hereof by and between KPN Telecom B.V, LLC and CORCYRA d.o.o.

I have previously provided you with financial data and background information on myself. I am personally funding the $1,000,000 Initial Closing Purchase Price under the SPA and will transfer such funds to CORCYRA upon the execution of the SPA. I am representing and warranting to you that my financial statements dated December 13, 2004, (the "Financial Statements") are true and correct as of the date thereof. As the sole owner and sole director of CORCYRA, I hereby commit to personally fund the Premium Payments (as described in Section 2.3 of the SPA) and the Final Closing Purchase Price (as defined in Section 2.4(c) of the SPA) in accordance with the terms and conditions of the SPA.

I hereby commit and undertake at all relevant times to have sufficient personal current assets to satisfy all obligations of CORCYRA under the SPA.

Very truly yours,

Moshe Har Adir

# EXHIBIT 8

**MOSHE HAR ADIR**
VERUDELA 17
PULA-CROATIA 52100

April 28, 2006

KPN Telecom B.V.
Maanplein 55
2516 CK The Hague
The Netherlands
Attn: Michiel Roovers

Re:        CORCYRA d.o.o.

Gentlemen:

The undersigned, Moshe Har Adir, hereby confirms that (i) Shalom Atia is the sole officer and director of CORCYRA d.o.o. ("CORCYRA") and is authorized to sign Amendment No. 1 dated April 28, 2006 to the Stock Purchase Agreement ("SPA") dated January 28, 2005, by and between KPN Telecom B.V. ("KPN Telecom") and CORCYRA and (ii) that the letter of the undersigned dated January 28, 2005 with respect to the SPA shall continue to remain in effect with respect to the SPA as modified by Amendment No. 1.

Very truly yours,

Moshe Har Adir

# EXHIBIT 9

# MOSHE HAR ADIR
VERUDELA 17
PULA-CROATIA 52100

December 1, 2006

KPN Telecom B.V.
Maanplein 55
2516 CK The Hague
The Netherlands
Attn: Michiel Roovers

Re:        CORCYRA d.o.o.

Gentlemen:

The undersigned, Moshe Har Adir, hereby confirms that (i) Yossi Attia is the sole officer and director of CORCYRA d.o.o. ("CORCYRA") and is authorized to sign Amendment No. 2 dated December 1, 2006 to the Stock Purchase Agreement ("SPA") dated as of January 28, 2005, by and between KPN Telecom B.V. ("KPN Telecom") and CORCYRA, as previously amended by Amendment No. 1 dated as of April 28, 2006 and (ii) that the letter of the undersigned dated January 28, 2005 with respect to the SPA shall continue to remain in effect with respect to the SPA as modified by Amendment No. 2.

Very truly yours,

Moshe Har Adir

1734155.2

# EXHIBIT 10

# EMVELCO CORP. (EMVL)

468 NORTH CAMDEN DRIVE
SUITE 256(I),
BEVERLY HILLS, CA 90210
(310) 860–56
http://www.emvelco.com/

# SC 13D/A

Filed on 12/08/2006
File Number 005–57093



UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
----------------

SCHEDULE 13D
Under the Securities Exchange Act of 1934
(Amendment No. 3)*

EUROWEB INTERNATIONAL CORP.
(Name of Issuer)

Common Stock, $0.001 par value
(Title of Class of Securities)

298801408
(CUSIP Number)

CORCYRA d.o.o.
c/o Elliot H. Lutzker, Esq.
Phillips Nizer LLP
666 Fifth Avenue, New York, New York 10103-0084
(212) 977-9700
(Name, Address and Telephone Number of
Person Authorized to Receive Notices and Communications)

December 1, 2006
(Date of Event which Requires Filing of this Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of Rule 13d-1(e), Rule 13d-1(f) or Rule 13d-1(g), check the following box [ ].

Note. Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See Rule 13d-7(b) for other parties to whom copies are to be sent.

* The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 (the "Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

CUSIP No.  298801408

---
```
1    NAME OF REPORTING PERSON
     I.R.S. IDENTIFICATION NOS. OF ABOVE PERSON (ENTITIES ONLY).

     CORCYRA d.o.o. - None
---
2    CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (SEE INSTRUCTIONS)
     (a)
     (b)  |X|
---
3    SEC USE ONLY

---
4    SOURCE OF FUNDS (SEE INSTRUCTIONS)

     AF (See Item 3)
---
5    CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED
     PURSUANT TO ITEMS 2(d) OR 2(e)                              |_|

---
6    CITIZENSHIP OR PLACE OF ORGANIZATION

     Republic of Croatia
---
                  7    SOLE VOTING POWER

                       0
     ---
     NUMBER OF    8    SHARED VOTING POWER
      SHARES
   BENEFICIALLY        2,326,043*
    OWNED BY      ---
      EACH        9    SOLE DISPOSITIVE POWER
    REPORTING
     PERSON            0
      WITH       ---
                  10   SHARED DISPOSITIVE POWER

                       2,326,043*
---
11   AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON

     2,326,043*
---
12   CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES
     (SEE INSTRUCTIONS)                                          |_|
---
13   PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)

     43%* (Based on an outstanding number of shares of common stock of 5,414,370
     as of November 9, 2006)
---
14   TYPE OF REPORTING PERSON (SEE INSTRUCTIONS)

     CO
```

*See following page

- 2 -

CUSIP No.  298801408

```
------------------------------------------------------------------------
1    NAME OF REPORTING PERSON
     I.R.S. IDENTIFICATION NOS. OF ABOVE PERSON (ENTITIES ONLY).

     KSD Pacific, LLC - 20-5478852
------------------------------------------------------------------------
2    CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (SEE INSTRUCTIONS)
     (a)   |__|
     (b)   |X|
------------------------------------------------------------------------
3    SEC USE ONLY


------------------------------------------------------------------------
4    SOURCE OF FUNDS (SEE INSTRUCTIONS)

     PF (See Item 3)
------------------------------------------------------------------------
5    CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED
     PURSUANT TO ITEMS 2(d) OR 2(e)                              |__|


------------------------------------------------------------------------
6    CITIZENSHIP OR PLACE OF ORGANIZATION

     Nevada
------------------------------------------------------------------------
                  7    SOLE VOTING POWER

                       0
                  ------------------------------------------------------
     NUMBER OF    8    SHARED VOTING POWER
      SHARES
   BENEFICIALLY         2,326,043*
    OWNED BY     ------------------------------------------------------
      EACH        9    SOLE DISPOSITIVE POWER
   REPORTING
     PERSON            0
      WITH       ------------------------------------------------------
                 10    SHARED DISPOSITIVE POWER

                       2,326,043*
------------------------------------------------------------------------
11   AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON

     2,326,043*
------------------------------------------------------------------------
12   CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES
     (SEE INSTRUCTIONS)                                          |__|
------------------------------------------------------------------------
13   PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)

     43% (Based on an outstanding number of shares of common stock of 5,414,370
     as of November 9, 2006.)
------------------------------------------------------------------------
14   TYPE OF REPORTING PERSON (SEE INSTRUCTIONS)

       OO
------------------------------------------------------------------------
```

* See following page

- 3 -

CUSIP No. 298801408

---
1    NAME OF REPORTING PERSON
     I.R.S. IDENTIFICATION NOS. OF ABOVE PERSON (ENTITIES ONLY).

     Yossi Attia - None
---
2    CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (SEE INSTRUCTIONS)
     (a)  |_|
     (b)  |x|
---
3    SEC USE ONLY

---
4    SOURCE OF FUNDS (SEE INSTRUCTIONS)

     PF (See Item 3)
---
5    CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED
     PURSUANT TO ITEMS 2(d) OR 2(e)                                   |_|

---
6    CITIZENSHIP OR PLACE OF ORGANIZATION

     United_States_and_Israel_(dual_citizenship).
---

|                        | 7  | SOLE VOTING POWER         |
|                        |    | 50,000                    |
| NUMBER OF SHARES       | 8  | SHARED VOTING POWER       |
| BENEFICIALLY OWNED BY  |    | 2,326,043*                |
| EACH REPORTING         | 9  | SOLE DISPOSITIVE POWER    |
| PERSON WITH            |    | 50,000                    |
|                        | 10 | SHARED DISPOSITIVE POWER  |
|                        |    | 2,326,043*                |

---
11   AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON

---
12   CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES
     (SEE INSTRUCTIONS)                                               |_|

---
13   PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)

     43.5% (Based on an outstanding number of shares of common stock of
     5,414,370 as of November 9, 2006.)
---
14   TYPE OF REPORTING PERSON (SEE INSTRUCTIONS)

     IN
---

* See following page

- 4 -

\* Pursuant to the Stock Purchase Agreement dated as of January 28, 2005 (the "Purchase Agreement"), by and between CORCYRA d.o.o. ("CORCYRA") and KPN Telecom B.V. ("KPN"), CORCYRA acquired from KPN, 289,855 shares of common stock of EuroWeb International Corp. (the "Issuer"), which represented 4.96% of the Issuer's issued and outstanding shares as of March 17, 2006. Pursuant to the Purchase Agreement, CORCYRA had agreed to purchase KPN's remaining 2,036,188 shares (subject to appropriate adjustment) of common stock (the "Remaining Stock") of the Issuer on April 30, 2006.

Subsequent to the filing of the initial Schedule 13D, the parties entered into Amendment No. 1 (the "Amended Purchase Agreement") dated as of April 28, 2006, to the Purchase Agreement. In accordance with the terms of the Amended Purchase Agreement, 434,783 shares of the Remaining Stock was purchased by CORCYRA from KPN on April 28, 2006 paying $3.45 per share.

As set forth in Amendment No. 2 to this Schedule 13D, KSD Pacific, LLC, a Nevada limited liability company ("KSD") purchased from Moshe Har Adir all of the issued and outstanding shares of capital stock of CORCYRA in exchange for $10,830,377. Yossi Attia, sole officer and director of CORCYRA and sole member of KSD is chief executive officer and a director of the Issuer. Pursuant to Amendment No. 2 dated as of December 1, 2006, to the Purchase Agreement, CORCYRA and KPN agreed to split the purchase of the remaining 1,601,405 shares of Common Stock into two tranches rather than purchasing all of the remaining stock in one tranche on December 1, 2006. In accordance with the terms of Amendment No. 2 781,006 shares of the Remaining Stock were purchased by CORCYRA from KPN on December 1, 2006 paying $3.85 per share or an aggregate of $3,000,000. The balance of the Remaining Stock of 820,399 shares is scheduled to be purchased by CORCYRA from KPN on or before July 2, 2007; provided, however, that CORCYRA may accelerate the closing to an earlier month-end date as specified in such notice. Accordingly, pursuant to Rule 13d-3(d)(1), this Schedule 13D, as amended, reports beneficial ownership of 43% or 2,326,043 shares, consisting of the 1,505,644 shares that CORCYRA currently holds (representing about 27.8% of the Issuer's issued and outstanding shares as of November 9, 2006) and the 820,399 shares to be acquired by CORCYRA.

Item 1.    Security and Issuer.

          This statement on Schedule 13D, as amended (this "Statement") relates to the common stock, par value $0.001 per share ("Common Stock") of EuroWeb International Corp., a Delaware corporation (the "Issuer"). The principal executive offices of the Issuer are located at 468 North Camden Drive, Suite 256(I), Beverly Hills, CA 90210.

Item 2.    Identity and Background.

          (a) This Statement is being filed by CORCYRA, KSD (the sole shareholder of CORCYRA) and Yossi Attia ("Mr. Attia") (the sole officer and director of CORCYRA and sole member of KSD).

          (b) The business address of CORCYRA, is : Valdabeckiput 118, Pula, Croatia 52100. The business address of KSD and Mr. Attia is 1061 1/2 N. Spaulding Avenue, West Hollywood, CA 90046.

          (c) CORCYRA is currently a designated single asset company and is reviewing opportunities to merge or acquire one or more ongoing entities in order to maximize its resources. KSD Pacific, LLC is the sole owner of CORCYRA and Mr. Attia is the sole officer and director of CORCYRA and sole manager of KSD; Mr Attia is employed by the Issuer in a business that is unrelated to CORCYRA or KSD's business which, other than its ownership of CORCYRA, is unrelated. Mr. Attia is chief executive officer and a director of the Issuer.

- 5 -

(d)-(e) Neither CORCYRA, KSD nor Mr. Attia has, during the last five years, been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors), or been a party to a civil proceeding of a judicial or administrative body of competent jurisdiction resulting in a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, Federal or state securities laws or finding any violation with respect to such laws.

(f) CORCYRA is a Croatia corporation. Mr. Attia is a citizen of the United States and Israel and resides in California.

Item 3.   Source and Amount of Funds or Other Consideration.

Pursuant to a Stock Purchase Agreement dated as of January 28, 2005, by and between KPN Telecom B.V., a Netherlands corporation ("KPN") and CORCYRA (the "Purchase Agreement"), a copy of which is attached hereto as Exhibit 1, CORCYRA paid to KPN U.S. $1,000,000 to purchase 289,855 shares of Common Stock of the Issuer using personal funds of Mr. Moshe Har Adir, then CORCYRA's sole shareholder who contributed to CORCYRA for the purpose of purchasing such shares. Pursuant to Amendment No. 1 to the Stock Purchase Agreement dated as of April 28, 2006, a copy of which is attached as Exhibit 2, CORCYRA paid KPN U.S. $1,500,000 to purchase 434,783 shares of the Remaining Stock using personal funds of Mr. Har Adir contributed to CORCYRA for the purpose of purchasing such shares.

Pursuant to Amendment No. 2 dated as of December 1, 2006, to the Purchase Agreement a copy of which is attached hereto as Exhibit 9, CORCYRA and KPN agreed to split the purchase of the remaining 1,601,405 shares of Common Stock into two tranches rather than purchasing all of the remaining stock in one tranche on December 1, 2006. In accordance with the terms of Amendment No. 2 781,006 shares of the Remaining Stock was purchased by CORCYRA from KPN on December 1, 2006 paying $3.85 per share or an aggregate of $3,000,000.

On December 1, 2006, Mr. Moshe Har Adir confirmed that the letter to KPN, a copy of which is attached hereto as Exhibit 3, pursuant to which Mr. Har Adir had committed personally to fund CORCYRA's payment obligations under the Purchase Agreement remained in effect with regard to the Purchase Agreement as modified by Amendment No. 2 to the Purchase Agreement.

Item 4.   Purpose of Transaction.

As set forth below, CORCYRA has agreed to acquire from KPN an aggregate of 2,326,043 shares of Common Stock of the Issuer pursuant to the Purchase Agreement and the Amended Purchase Agreement. All dollar amounts referred to herein are in U.S. dollars. Pursuant to the Purchase Agreement, on February 1, 2005 (the "Initial Closing"), CORCYRA purchased 289,855 shares of Common Stock of the Issuer for $1,000,000 and had agreed to purchase KPN's remaining 2,036,188 shares (subject to appropriate adjustment) of Common Stock of the Issuer on April 30, 2006.

Subsequent to the filing of the initial Schedule 13D, however, the parties entered into Amendment No. 1 to the Purchase Agreement, a copy of which is attached as Exhibit 2. Pursuant to the Amended Purchase Agreement, CORCYRA and KPN agreed to split the purchase of the remaining 2,036,188 shares of common stock (the "Remaining Stock") into two tranches rather than purchasing the Remaining Stock in one tranche on April 30, 2006, as originally contemplated by the parties. In accordance with the terms of Amendment No. 1 to the Purchase Agreement, 434,783 shares of the Remaining Stock was purchased by CORCYRA from KPN on April 28, 2006. 1,601,405 shares constituting the rest of the Remaining Stock (the "Final Shares") was scheduled to be purchased by CORCYRA from KPN on December 1, 2006 (the "Final Closing").

- 6 -

Pursuant to Amendment No. 2, dated as of December 1, 2006 to the Purchase Agreement, a copy of which is attached hereto as Exhibit 9, CORCYRA and KPN agreed to split the purchase of the remaining 1,601,405 shares of Common Stock into two tranches rather than purchasing all of the remaining stock in one tranche on December 1, 2006. In accordance with the terms of Amendment No. 2 781,006 shares of the remaining stock was purchased by CORCYRA from KPN on December 1, 2006, paying $3.85 per share, or an aggregate of $3,000,000. The remaining 820,399 Final Shares are scheduled to be purchased by CORCYRA from KPN on July 2, 2007; provided, however, that CORCYRA may accelerate the Final Closing to an earlier month-end date as specified in such notice (with no penalty for accelerating the Final Closing); provided, further, that the Final Closing is subject to the satisfaction or waiver of all of the conditions to closing set forth in the Purchase Agreement and the Amended Purchase Agreement.

Pursuant to the terms of Amendment No. 2 to the Purchase Agreement, CORCYRA shall deliver to KPN a U.S. bank guarantee satisfactory to KPN that guarantees CORCYRA's remaining payment obligation of $2,929,476 constituting the Final Closing Purchase Price (the "Bank Guarantee"), as soon as practicable following December 1, 2006, but in any event no later than January 15, 2007. As soon as reasonably practicable following CORCYRA's delivery to KPN of the Bank Guarantee, KPN shall deliver to CORCYRA irrevocable instructions to the Escrow Agent to transfer to CORCYRA one or more certificates representing the 781,006 shares purchased on December 1, 2006. In the event CORCYRA is unable to deliver the Bank Guarantee on or before January 15, 2007, CORCYRA shall pay to KPN $250,000 (the "Advance"), and upon receipt of such payment, KPN shall deliver to CORCYRA irrevocable instructions to the Escrow Agent to transfer to CORCYRA one or more certificates representing such shares. Subject to the Final Closing, KPN will credit payment by CORCYRA of the Advance toward CORCYRA's payment of Final Closing Purchase Price.

CORCYRA was required to cumulate a monthly premium payment of $28,560 to be paid on December 1, 2006 (together, the "Premium Payments"). Of each Premium Payment, $14,403 was paid on December 1, 2006 and the remaining $14,157 is due at the Final Closing. At the Final Closing, CORCYRA will purchase the Final Shares for an amount (the "Final Closing Purchase Price") equal to the sum of (i) the amount listed on Exhibit 1 of Amendment No. 2 to the Purchase Agreement that corresponds to the date of the Final Closing plus (ii) the Additional Payment (as defined below) plus (iii) any Premium Payments due and payable by CORCYRA to KPN prior to the Final Closing but remaining unpaid. "Additional Payment" means, if positive, the product of (a) 820,399, (b) 0.35 and (c) the difference between (i) the average closing price per share of Common Stock of the Issuer on The Nasdaq Capital Market for the sixty (60) trading days ending on the second business day prior to the applicable Final Closing Date minus (ii) $3.45. In the event that Purchaser pays the Advance, the Final Closing Purchase Price is subject to reduction in the amount of the Advance. If CORCRYA shall default in the payment of any amount becoming due hereunder on the Final Closing Date (including without limitation by defaulting on its obligation to purchase the Final Shares), CORCYRA shall upon KPN's demand from time to time pay interest on such amount up to (but not including) the date of actual payment (as well as before judgment) at a rate per annum (computed on the terms of the actual number of days elapsed over a year of 360 days), to the extent permitted by law, equal to the prime rate of interest announced by Citibank, N.A. on July 2, 2007 plus 15%. The foregoing shall not limit any rights or remedies that would otherwise be available to KPN.

- 7 -

The Final Shares are being held in escrow pursuant to an Escrow Agreement dated as of January 28, 2005 by and between KPN, CORCYRA and JPMorgan Chase Bank N.A. (the "Escrow Agreement") as last amended pursuant to Amendment No. 2 (the Escrow Amendment) dated as of December 1, 2006 to the Escrow Agreement, copies of which are attached hereto as Exhibits 4 and 10, respectively, until the Final Closing Purchase Price is paid in full upon satisfaction of the closing conditions contained in the Purchase Agreement (and the Amended Purchase Agreement) or until the Purchase Agreement (and the Amended Purchase Agreement) is otherwise terminated in accordance with its terms. See Item 6 of this Schedule for a description of CORCYRA's voting rights with respect to the Final Shares.

In connection with the Initial Closing, KPN agreed to use its best efforts to cause the resignation of KPN's sole two representatives on the Board of Directors of the Issuer, and propose to the Issuer that two representatives of CORCYRA be designated to fill the vacancies created thereby. Accordingly, Hans Lipman and Daniel Kwantes resigned from the Board of Directors of the Issuer effective upon Initial Closing, and at a meeting dated January 31, 2005, the Board of Directors of the Issuer voted for Ilan Kenig and Yossi Attia to fill the vacancies created by the resignations of Messrs. Lipman and Kwantes. At the Annual Meeting of the Issuer held on June 2, 2005, the Issuer's shareholders elected Ilan Kenig and Yossi Attia to serve as the directors until the next annual meeting.

Pursuant to a proposal letter dated December 2, 2004 (the "Proposal") addressed to CORCYRA, Cukierman & Co. Consulting Ltd. ("Cukierman") will act as advisor in establishing a future strategic plan for the Issuer to enhance shareholder wealth, which may include, among other things, raising capital, entering into strategic alliances and partnerships and/or making acquisitions, rearranging the Issuer's assets and aggressively seeking opportunities that will enable the Issuer to grow. The Proposal on the scope of the business and strategic plan by Cukierman is attached hereto as Exhibit 6 and is an integral part of this Statement. Although Cukierman acted as the Issuer's investment banking advisors in connection with the sale of assets voted upon at the Issuer's May 15, 2006 shareholders meeting, Cukierman has no relationship with CORCYRA or any of its directors or affiliates.

Except as otherwise described herein and/or in the Purchase Agreement, as amended, and/or the Proposal, neither CORCYRA, KSD, nor Yossi Attia have any plans or proposals as of the date hereof that relate to or would result in (a) the acquisition by any person of additional securities of the Issuer or the disposition of any such securities, (b) an extraordinary corporate transaction, such as a merger, reorganization or liquidation, involving the Issuer or any of its subsidiaries, (c) a sale or transfer of a material amount of assets of the Issuer or any of its subsidiaries, (d) any change in the present board of directors or management of the Issuer, (e) any material change in the present capitalization or dividend policy of the Issuer, (f) any other material change in the Issuer's business or corporate structure, (g) any change in the Issuer's charter or By-laws or other actions which may impede the acquisition of control of the Issuer by any person, (h) causing a class of securities of the Issuer to be delisted from any national securities exchange or to cease to be authorized to be quoted on an inter-dealer quotation system of a registered national securities association, (i) causing a class of equity securities of the Issuer to be eligible for termination of registration pursuant to Section 12(g)(4) of the Exchange Act, or (j) any action similar to those enumerated in (a) through (i) above.

References to, and descriptions of, the Purchase Agreement, as amended, the Escrow Agreement, as amended, and the Proposal as set forth herein are qualified in their entirety by reference to the copy of such documents, respectively, included as Exhibits to this Schedule, and such agreements are incorporated herein in their entirety where such references and descriptions appear.

- 8 -

Item 5.   Interest in Securities of the Issuer.

(a) Pursuant to the Purchase Agreement and the Amended Purchase Agreement, CORCYRA acquired, and now holds directly approximately 27.8% or 1,505,644 shares of Common Stock of the Issuer. Mr. Yossi Attia has indirect beneficial ownership of the shares of Common Stock of the Issuer directly beneficially owned by CORCYRA. Pursuant to Amendment No. 2 to the Purchase Agreement, CORCYRA has agreed to purchase KPN's remaining 820,399 shares of Common Stock of the Issuer on July 2, 2007; provided, however, that upon fourteen days' prior written notice to KPN, CORCYRA may accelerate the closing to an earlier month-end date as specified in such notice. Accordingly, pursuant to Rule 13d-3(d)(1), this Statement reports beneficial ownership of 43% or 2,326,043 shares, consisting of the 1,505,644 shares of Common Stock of the Issuer that CORCYRA currently owns and the 820,399 shares of Common Stock of the Issuer to be acquired by CORCYRA. The beneficial ownership percentages reported above are based upon 5,414,370 shares of Common Stock of the Issuer issued and outstanding as of November 9, 2006. Neither CORCYRA, nor KSD own any other shares of the Issuer. Mr. Yossi Attia holds an option to purchase 100,000 shares of Common Stock of the Issuer exercisable at $3.40 per share.

(b) CORCYRA and KSD have shared disposition and voting power with respect to 724,638 shares of Common Stock of the Issuer which it holds. Pursuant to Rule 13d-3(d)(1), CORCYRA, KSD and KPN also may be deemed to have shared disposition and voting power with respect to an additional 1,601,405 shares of Common Stock of the Issuer to be acquired by CORCYRA in accordance with Amendment No. 1 and 2 to the Purchase Agreement.

(c) Other than as provided herein, no other transactions in the Common Stock of the Issuer were effected by CORCYRA, KSD or Yossi Attia in the past 60 days.

(d) Not Applicable.

(e) Not Applicable.

Item 6.   Contracts, Arrangements, Understandings or Relationships with Respect to Securities of the Issuer.

Pursuant to the Purchase Agreement, as amended, and the Escrow Agreement as amended, KPN will retain all voting and other rights associated with the Final Shares (including the 781,006 shares purchased on December 1, 2006 until they are delivered to CORCYRA) and will continue to be the beneficial owner of the Final Shares until the Final Closing Purchase Price is paid in full; provided, however, that so long as CORCYRA is not in default in its obligations under the Purchase Agreement, as amended, and the Purchase Agreement remains in effect, KPN has agreed to vote the Final Shares in accordance with instructions from CORCYRA, so long as such instructions are received sufficiently in advance of the applicable vote and such voting would not violate applicable law or require an amendment to any filings by KPN or CORCYRA with the Securities and Exchange Commission. Notwithstanding the foregoing, KPN is not obligated to vote the Final Shares in accordance with CORCYRA's instructions in connection with any matter (i) proposed by or on behalf of CORCYRA or any of its affiliates that CORCYRA did not previously disclose to KPN in this Statement, or (ii) as to which CORCYRA or any of its affiliates would have an interest that is different from the interests of the other stockholders of the Issuer, such as an interest that would be of a nature that would have to be disclosed pursuant to Item 1005(d) of Regulation M-A or Item 404 of Regulation S-K, if either of such provisions were applicable.

- 9 -

Under the Purchase Agreement (and the Amended Purchase Agreement), KPN has agreed to request that the Issuer grant CORCYRA registration rights over the Initial Shares at the Initial Closing which was granted on January 31, 2005 and transfer to CORCYRA at the Final Closing its registration rights that it acquired pursuant to the Amended and Restated Share Subscription Agreement dated December 13, 1999, between the Issuer, KPN and certain directors of the Issuer (the "Subscription Agreement"), a copy of which is attached hereto as Exhibit 7; provided, however, that in accordance with the terms of the Subscription Agreement, CORCYRA has undertaken to each of the parties to the Subscription Agreement in a form satisfactory to them, to be bound by all the obligations of KPN under the Subscription Agreement.

Pursuant to the Subscription Agreement, KPN purchased from the Issuer shares of Common Stock of the Issuer and received (i) piggy-back registration rights to have such shares of Common Stock registered under the Securities Act of 1933 (the "Securities Act") in the event the Issuer proposed to register any of its securities under the Securities Act for sale to the public (except with respect to registration statements on Forms S-4, S-8 or another form not available for registering such shares to the public), and (ii) demand registration rights to request Issuer to register under the Securities Act all or a portion of such shares of Common Stock it acquired under the Subscription Agreement, subject to certain conditions as provided therein. The Subscription Agreement further provides that in the event any of the shares sold thereunder are sold or transferred by KPN, the benefit of each of the obligations undertaken by the Issuer thereunder may be assigned to the purchaser or transferee who may enforce them as if it had been named as the subscriber in the Subscription Agreement; provided, however, that the purchaser shall, as a condition of the sale or transfer, undertake to each of the parties to the Subscription Agreement in a form satisfactory to them to be bound by all of the obligations of KPN thereunder.

Mr. Har Adir has delivered a letter to KPN, attached hereto as Exhibit 3, pursuant to which he has committed personally to fund CORCYRA's payment obligations under the Purchase Agreement, as amended.

Other than as set forth herein, there are no contracts, arrangements, understandings or relationships (legal or otherwise) among CORCYRA, KSD, or Yossi Attia and any other person or entity with respect to any securities of the Issuer, including, but not limited to, transfer or voting of any of the securities, finder's fees, joint ventures, loan or option arrangements, puts or calls, guarantees of profits, division of profits or loss, or the giving or withholding of proxies.

- 10 -

Item 7.   Materials to be Filed as Exhibits.

| Exhibit Number | Description |
| --- | --- |
| 1 | Stock Purchase Agreement dated as of January 28, 2005, by and between KPN Telecom B.V. and CORCYRA d.o.o. (incorporated by reference to Exhibit 1 of Schedule 13D filed by the Reporting Persons with the Securities and Exchange Commission on February 8, 2005) |
| 2 | Amendment No. 1 to the Stock Purchase Agreement dated as of April 28, 2005 to the Stock Purchase Agreement dated as of January 28, 2005, by and between KPN Telecom B.V. and CORCYRA d.o.o. (incorporated by reference from Exhibit 1 of Amendment No. 15 to Schedule 13D filed by Koninklijke KPN N.V. with the Securities and Exchange Commission on May 1, 2006) |
| 3 | Letter dated January 28, 2005 from Moshe Har Adir to KPN Telecom B.V. (incorporated by reference to Exhibit 2 of Schedule 13D filed by the Reporting Persons with the Securities and Exchange Commission on February 8, 2005) |
| 4 | Escrow Agreement dated as of January 28, 2005 by and between KPN Telecom B.V., CORCYRA d.o.o. and JPMorgan Chase Bank N.A. (incorporated by reference to Exhibit 3 of Schedule 13D filed by the Reporting Persons with the Securities and Exchange Commission on February 8, 2005) |
| 5 | Amendment No. 1 dated as of April 28, 2006 to the Escrow Agreement dated as of January 28, 2005 by and between KPN Telecom B.V., CORCYRA d.o.o. and JPMorgan Chase Bank N.A. (incorporated by reference from Exhibit 1 of Amendment No. 15 to Schedule 13D filed by Koninklijke KPN N.V. with the Securities and Exchange Commission on May 1, 2006) |
| 6 | Cukierman & Co Consulting Ltd. Proposal dated December 7, 2004. (incorporated by reference to Exhibit 4 of Schedule 13D filed by the Reporting Persons with the Securities and Exchange Commission on February 8, 2005) |
| 7 | Amended and Restated Share Subscription Agreement dated December 19, 1999 between EuroWeb International Corp., KPN Telecom B.V. and certain directors of EuroWeb International Corp. (incorporated by reference from Exhibit 1 of Schedule 13D of KPN Telecom B.V. filed with the Securities and Exchange Commission on February 24, 2000) |

- 11 -

| Exhibit Number | Description |
| --- | --- |
| 8 | Stock Purchase Agreement, dated as of August 31, 2006, by and between Moshe Har Adir, CORCYRA, d.o.o., a Croatian company and Shalom Attia, on the one hand, and KSD Pacific, LLC, a Nevada limited liability company, on the other hand (incorporated by reference to Exhibit 1 of Amendment No. 2 to Schedule 13D filed by the Reporting Persons with the Securities and Exchange Commission on September 5, 2006). |
| 9 | Amendment No. 2 dated as of December 1, 2006 to the Stock Purchase Agreement dated as of January 28, 2005, by and between KPN Telecom B.V. and CORCYRA d.o.o. (incorporated by reference from Exhibit 1 of Amendment No. 16 to Schedule 13D filed by Koninklijke KPN N.V. with the Securities and Exchange Commission on December 5, 2006). |
| 10 | Amendment No. 2 dated as of December 1, 2006 to the Escrow Agreement dated as of January 28, 2005, by and among KPN Telecom B.V., CORCYRA d.o.o and JPMorgan Chase Bank N.A. (incorporated by reference from Exhibit 2 of Amendment No. 16 to Schedule 13D filed by Koninklijke KPN N.V. with the Securities and Exchange Commission on December 5, 2006). |

- 12 -

SIGNATURE

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this Statement is true, complete and correct.

Dated: December 8, 2006

CORCYRA d.o.o.

By: /s/ Yossi Attia
----------------------------------------
Yossi Attia, sole officer and director

/s/ Yossi Attia
----------------------------------------
Yossi Attia, individually

# EXHIBIT 11

# EMVELCO CORP. (EMVL)

466 NORTH GAMDEN DRIVE
SUITE 2560,
BEVERLY HILLS, CA 90210
(310) 850-58
http://www.emvelco.com/

## SC 13D/A

**Filed on 06/29/2007**
File Number 005-57093

GSI

www.sibriary.com

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D. C. 20549
------------------

SCHEDULE 13D
Under the Securities Exchange Act of 1934
(Amendment No. 4) *

EMVELCO CORP.
(formerly Euroweb International Corp.)
(Name of Issuer)

Common Stock, $.001 par value
(Title of Class of Securities)

29247A109
(CUSIP Number)

KSD PACIFIC, LLC
c/o Elliot H. Lutzker, Esq.
Phillips Nizer LLP
666 Fifth Avenue, New York, New York 10103-0084
(212) 977-9700
(Name, Address and Telephone Number of
Person Authorized to Receive Notices and Communications)

June 21, 2007
(Date of Event which Requires Filing of this Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of Rule 13d-1(e), Rule 13d-1(f) or Rule 13d-1(g), check the following box |_|.

Note. Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See Rule 13d-7(b) for other parties to whom copies are to be sent.

* The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 (the "Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

CUSIP No.  Z9247A109

```
--------------------------------------------------------------------------
1    NAME OF REPORTING PERSON
     I.R.S. IDENTIFICATION NO. OF ABOVE PERSON (ENTITIES ONLY).

     GORGYRA d.o.o. - None
--------------------------------------------------------------------------
2    CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (SEE INSTRUCTIONS)
     (a)
     (b)   |X|
--------------------------------------------------------------------------
3    SEC USE ONLY


--------------------------------------------------------------------------
4    SOURCE OF FUNDS (SEE INSTRUCTIONS)

     N/A
--------------------------------------------------------------------------
5    CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED
     PURSUANT TO ITEMS 2(d) OR 2(e)                              |_|


--------------------------------------------------------------------------
6    CITIZENSHIP OR PLACE OF ORGANIZATION

     Republic of Croatia
--------------------------------------------------------------------------
                    7    SOLE VOTING POWER

                         0
                    ------------------------------------------------------
     NUMBER OF      8    SHARED VOTING POWER
      SHARES
   BENEFICIALLY          0
    OWNED BY       -------------------------------------------------------
      EACH         9    SOLE DISPOSITIVE POWER
    REPORTING
     PERSON             0
      WITH        -------------------------------------------------------
                   10    SHARED DISPOSITIVE POWER

                         0
--------------------------------------------------------------------------
11   AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON

     0
--------------------------------------------------------------------------
12   CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES
     (SEE INSTRUCTIONS)                                          |_|
--------------------------------------------------------------------------
13   PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)

     0.0%
--------------------------------------------------------------------------
14   TYPE OF REPORTING PERSON (SEE INSTRUCTIONS)

     OO
--------------------------------------------------------------------------
```
*See following page

- 2 -

CUSIP No. 29347A109

```
----------------------------------------------------------------------
1    NAME OF REPORTING PERSON
     I.R.S. IDENTIFICATION NO. OF ABOVE PERSON (ENTITIES ONLY).

     KSD Pacific, LLC - 20-5478892
----------------------------------------------------------------------
2    CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (SEE INSTRUCTIONS)
     (a)  _
     (b)  |X|
----------------------------------------------------------------------
3    SEC USE ONLY


----------------------------------------------------------------------
4    SOURCE OF FUNDS (SEE INSTRUCTIONS)

     PF (See Item 3)
----------------------------------------------------------------------
5    CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED
     PURSUANT TO ITEMS 2(d) OR 2(e)                              |_|


----------------------------------------------------------------------
6    CITIZENSHIP OR PLACE OF ORGANIZATION

     Nevada
----------------------------------------------------------------------
                    7    SOLE VOTING POWER

                         0
                    ------------------------------------------------
   NUMBER OF        8    SHARED VOTING POWER
    SHARES
 BENEFICIALLY            2,326,043*
   OWNED BY         ------------------------------------------------
    EACH            9    SOLE DISPOSITIVE POWER
  REPORTING
   PERSON                0
    WITH           ------------------------------------------------
                   10    SHARED DISPOSITIVE POWER

                         2,326,043*
----------------------------------------------------------------------
11   AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON

     2,326,043*
----------------------------------------------------------------------
12   CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES
     (SEE INSTRUCTIONS)                                          |_|
----------------------------------------------------------------------
13   PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)

     49.5% (Based on an outstanding number of shares of common stock of
     4,698,944 as of May 30, 2007.)
----------------------------------------------------------------------
14   TYPE OF REPORTING PERSON (SEE INSTRUCTIONS)

     OO
----------------------------------------------------------------------
```

* See following page

- 5 -

CUSIP No.  29247A109

---

1  NAME OF REPORTING PERSON
   I.R.S. IDENTIFICATION NO. OF ABOVE PERSON (ENTITIES ONLY).

   Yossi Attia - None
---
2  CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (SEE INSTRUCTIONS)
   (a) |_|
   (b) |X|
---
3  SEC USE ONLY

---
4  SOURCE OF FUNDS (SEE INSTRUCTIONS)

   PF (See Item 3)
---
5  CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED
   PURSUANT TO ITEMS 2(d) OR 2(e)                              |_|

---
6  CITIZENSHIP OR PLACE OF ORGANIZATION

   United States and Israel (dual citizenship).
---

| | | |
|---|---|---|
| | 7 | SOLE VOTING POWER |
| | | 50,000 |
| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | 8 | SHARED VOTING POWER |
| | | 2,326,043* |
| | 9 | SOLE DISPOSITIVE POWER |
| | | 50,000 |
| | 10 | SHARED DISPOSITIVE POWER |
| | | 2,326,043* |

---
11  AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON

   2,376,043*
---
12  CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES
    (SEE INSTRUCTIONS)                                         |_|

---
13  PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)

    50.5% (Based on an outstanding number of shares of common stock of
    4,698,944 as of May 30, 2007.)
---
14  TYPE OF REPORTING PERSON (SEE INSTRUCTIONS)

    IN
---

* See following page

- 4 -

* This Amendment No. 4 amends and supplements Items 1-7 of the Statement on Schedule 13D, as amended, filed by Corcyra d.o.o., a Croatia company, ("CORCYRA"), KSD Pacific, LLC, a Nevada corporation ("KSD"), and Yossi Attia, a United States and Israeli citizen (the "Reporting Persons"), with respect to the shares of common stock, par value $.001 per share (the "Common Stock") of Emvelco Corp., formerly known as Euroweb International Corp., a Delaware corporation ("Emvelco"). This is an exit filing for CORCYRA.

Pursuant to the Stock Purchase Agreement dated as of January 26, 2005 (the "Purchase Agreement"), by and between CORCYRA d.o.o. ("CORCYRA") and KPN Telecom B.V. ("KPN"), CORCYRA acquired from KPN, 289,855 shares of common stock of Euroweb International Corp., now known as Emvelco Corp. (the "Issuer"). Subsequently, the parties entered into Amendment No. 1 (the "Amended Purchase Agreement") dated as of April 28, 2006, to the Purchase Agreement. In accordance with the terms of the Amended Purchase Agreement, 434,783 shares of the Remaining Stock was purchased by CORCYRA from KPN paying approximately $3.45 per share. Pursuant to Amendment No. 2, dated as of December 1, 2006, to the KPN Purchase Agreement ("Second Amended Purchase Agreement"), CORCYRA and KPN agreed to split the purchase of the remaining 1,601,405 shares of Common Stock into two tranches rather than purchasing all of the remaining stock in one tranche. In accordance with the terms of the Second Amended Purchase Agreement, 781,006 shares of the Remaining Stock was purchased by CORCYRA from KPN on December 1, 2006 paying approximately $3.85 per share or an aggregate of $3,000,000. The balance of the Remaining Stock of 820,399 shares (the "Final Shares") is currently held in escrow and is scheduled to be purchased by CORCYRA from KPN on or before July 2, 2007.

As set forth in Amendment Nos. 2 and 3 to this Schedule 13D, KSD Pacific, LLC, a Nevada limited liability company ("KSD") purchased from Mosha Har Adir all of the issued and outstanding shares of capital stock of CORCYRA in exchange for $10,830,377. Yossi Attia, sole officer and director of CORCYRA and sole member of KSD is chief executive officer and a director of the Issuer.

On June 21, 2007, Mr. Yossi Attia transferred the 1,505,644 shares of common stock held and registered in the name of CORCYRA to KSD Pacific, LLC and shall similarly transfer the remaining 820,399 shares of common stock upon attaining possession pursuant to the terms of the Purchase Agreement, as amended, and shall execute all documents necessary to effectuate such transfer, including stock powers (the "Transfer"). In connection therewith, this Amendment No. 4 to the Schedule 13D is being filed to reflect the removal of CORCYRA as a reporting person with respect to the securities listed herein. This Transfer is a name change only and does not result in a change of beneficial ownership pursuant to Rule 13d-3, promulgated under the Securities Exchange Act of 1934, as amended. Accordingly, pursuant to Rule 13d-3(d)(1), this Schedule 13D, as amended, reports beneficial ownership of 49.5% or 2,326,043 shares, consisting of the 1,505,644 shares that KSD now holds as a result of the Transfer (representing about 32% of the Issuer's issued and outstanding shares as of May 30, 2007) and the 820,399 shares to be acquired by KSD through its ownership of CORCYRA.

Item 1. Security and Issuer.

    This statement on Schedule 13D, as amended (this "Statement") relates to the common stock, par value $.001 per share ("Common Stock") of Emvelco Corp., a Delaware corporation (the "Issuer"). The principal executive offices of the Issuer are located at 468 North Camden Drive, Suite 315, Beverly Hills, CA 90210.

- 5 -

Item 2. Identity and Background.

(a) This Statement is being filed by KSD Pacific, LLC ("KSD"), Corcyra d.o.o. ("CORCYRA"), and Yossi Attia ("Mr. Attia") (the sole member of KSD and the sole officer and director of CORCYRA).

(b) The business address of KSD is: 6327 W. 67th Street, Los Angeles, CA 90048. The business address of CORCYRA is: Valdabeckiput 118, Pula, Croatia 52100. The business address of Mr. Attia is: 1061 1/2 N. Spaulding Avenue, West Hollywood, CA 90046.

(c) KSD is currently a limited liability company with its principal business as real estate. CORCYRA is currently a designated single asset company and is reviewing opportunities to merge or acquire one or more ongoing entities in order to maximize its resources. KSD is the sole owner of CORCYRA and Mr. Attia is the sole officer and director of CORCYRA and sole member of KSD; Mr. Attia is employed by the Issuer in a business that is unrelated to KSD's or CORCYRA's business other than with respect to its ownership of KSD or CORCYRA. Mr. Attia is chief executive officer and a director of the Issuer.

(d)-(e) Neither KSD, CORCYRA, nor Mr. Attia has, during the last five years, been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors), or been a party to a civil proceeding of a judicial or administrative body of competent jurisdiction resulting in a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, Federal or state securities laws or finding any violation with respect to such laws.

(f) KSD is a Nevada corporation. CORCYRA is a Croatia company. Mr. Attia is a citizen of the United States and Israel and resides in California.

Item 3. Source and Amount of Funds or Other Consideration.

On June 21, 2007, Mr. Yossi Attia transferred the common stock held and registered in the name of CORCYRA d.o.o.into the name of KSD Pacific, LLC. This was a "cashless" transfer, as only the record holder of the common stock was changed from CORCYRA d.o.o to KSD Pacific, LLC. As KSD has and continues to own and control all of the capital stock of CORCYRA prior to and following the Transfer, the Transfer does not constitute a change in beneficial ownership pursuant to Rule 13d-3, promulgated under the Securities Exchange Act of 1934, as amended.

Item 4. Purpose of Transaction.

The purpose of this Statement is to report a change in the registration of the common stock of the Issuer's principal shareholder, described as the Transfer in this Amendment No. 4 to the Schedule 13D. For the avoidance of doubt, the Transfer shall not constitute a change in beneficial ownership in accordance with Rule 13d-3, promulgated under the Securities Exchange Act of 1934, as amended.

The Final Shares are being held in escrow pursuant to an Escrow Agreement, dated as of January 28, 2005, by and between KPN, CORCYRA and JPMorgan Chase Bank N.A. (the "Escrow Agreement") as last amended pursuant to Amendment No. 2 (the Escrow Amendment) dated as of December 1, 2006 to the Escrow Agreement, copies of which are attached hereto as Exhibits 4 and 10, respectively, until the Final Closing Purchase Price is paid in full upon satisfaction of the closing conditions contained in the Purchase Agreement, as amended, or until the Purchase Agreement, as amended, is otherwise terminated in accordance with its terms. See Item 6 of this Schedule for a description of voting rights with respect to the Final Shares.

- 6 -

References to, and descriptions of, the Purchase Agreement, as amended, and the Escrow Agreement, as amended, as set forth herein are qualified in their entirety by reference to the copy of such documents, respectively, included as Exhibits to this Schedule, and such agreements are incorporated herein in their entirety where such references and descriptions appear.

Item 5. Interest in Securities of the Issuer.

(a) Pursuant to the Purchase Agreement and the Amended Purchase Agreement, CORCYRA acquired, and held directly approximately 32% or 1,505,844 shares of Common Stock of the Issuer prior to the Transfer. Mr. Yossi Attia had indirect beneficial ownership of the shares of Common Stock of the Issuer that are directly beneficially owned by KSD following the Transfer. Pursuant to the Second Amended Purchase Agreement, CORCYRA has agreed to purchase KPN's remaining 820,399 shares of Common Stock of the Issuer on July 2, 2007. Accordingly, pursuant to Rule 13d-3(d)(1), this Statement reports beneficial ownership of 49.5% or 2,326,043 shares, consisting of the 1,505,844 shares of Common Stock of the Issuer that KSD now owns as a result of the Transfer and the 820,399 shares of Common Stock of the Issuer to be acquired by KSD and transferred to KSD within 60 days of this Statement. The beneficial ownership percentages reported above are based upon 4,698,944 shares of Common Stock of the Issuer issued and outstanding as of May 30, 2007. KSD does not own any other shares of the Issuer.

Mr. Yossi Attia holds an option to purchase 100,000 shares of Common Stock of the Issuer exercisable at $3.40 per share, of which 50,000 shares have already vested at the rate of 25,000 shares on September 22 of 2005 and 2006, respectively, with the remaining 50,000 shares vesting at a rate of 25,000 shares on September 22 of 2007 and 2008, respectively.

(b) As a result of the Transfer, KSD and Yossi Attia now have shared disposition and voting power with respect to 1,505,844 shares of Common Stock of the Issuer which it holds, and CORCYRA shall no longer participate in such shared disposition and voting power. Pursuant to Rule 13d-3(d)(1), KSD, Yossi Attia, and KPN also may be deemed to have shared disposition and voting power with respect to an additional 820,399 shares of Common Stock of the Issuer to be acquired by KSD through CORCYRA in accordance with the Second Amended Purchase Agreement.

(c) Other than as provided herein, no other transactions in the Common Stock of the Issuer were affected by KSD or Yossi Attia in the past 60 days.

(d) Not Applicable.

(e) Not Applicable.

Item 6. Contracts, Arrangements, Understandings or Relationships with Respect to Securities of the Issuer.

Pursuant to the Transfer, KSD shall effect its voting and disposition power of the 1,505,844 shares of Common Stock of the Issuer which are now registered in the name of KSD. KPN will retain all voting and other rights associated with the Final Shares and will continue to be the beneficial owner of the Final Shares until the Final Closing Purchase Price is paid in full; and provided that all of the conditions set forth in the Purchase Agreement, as amended, are satisfied or waived. KPN has agreed to vote the Final Shares in accordance with instructions from CORCYRA (for the purpose of this Item 6 and with respect to the Final Shares, all references to CORCYRA shall mean KSD's voting and disposition power as effectuated through CORCYRA pursuant to the Transfer), so long as such instructions are received sufficiently in advance of the applicable vote and such voting would not violate applicable law or require an amendment to any filings by KPN, CORCYRA or KSD with the Securities and Exchange Commission. Notwithstanding the foregoing, KPN is not obligated to vote the Final Shares in accordance with CORCYRA's instructions in connection with any matter (i) proposed by or on behalf of CORCYRA or any of its affiliates that CORCYRA did not previously disclose to KPN in this Statement, or (ii) as to which CORCYRA or any of its affiliates would have an interest that is different from the interests of the other stockholders of the Issuer, such as an interest that would be of a nature that would have to be disclosed pursuant to Item 1005(d) of Regulation M-A or Item 404 of Regulation S-K, if either of such provisions were applicable.

- 7 -

Under the Purchase Agreement, as amended, KPN has agreed to request that the Issuer grant CORCYRA registration rights over the 289,855 shares (the "Initial Shares") purchased at the Initial Closing which was granted on January 31, 2005 and transfer to CORCYRA at the Final Closing its registration rights that it acquired pursuant to the Amended and Restated Share Subscription Agreement dated December 13, 1999, between the Issuer, KPN and certain directors of the Issuer (the "Subscription Agreement"), a copy of which is attached hereto as Exhibit 7; provided, however, that in accordance with the terms of the Subscription Agreement, CORCYRA has undertaken to each of the parties to the Subscription Agreement in a form satisfactory to them, to be bound by all the obligations of KPN under the Subscription Agreement. In connection with the Transfer, and to the extent provided for in the Purchase Agreements, as amended, these registration rights and the Subscription Agreement shall be transferred from CORCYRA to KSD.

Other than as set forth herein, there are no contracts, arrangements, understandings or relationships (legal or otherwise) among KSD, CORCYRA, or Yossi Attia and any other person or entity with respect to any securities of the Issuer, including, but not limited to, transfer or voting of any of the securities, finder's fees, joint ventures, loan or option arrangements, puts or calls, guarantees of profits, division of profits or loss, or the giving or withholding of proxies.

- 8 -

Item 7.  Materials to be Filed as Exhibits.

| Exhibit Number | Description |
| --- | --- |
| 1 | Stock Purchase Agreement dated as of January 28, 2005, by and between KPN Telecom B.V. and CORCYRA d.o.o. (incorporated by reference to Exhibit 1 of Schedule 13D filed by the Reporting Persons with the Securities and Exchange Commission on February 3, 2005) |
| 2 | Amendment No. 1 to the Stock Purchase Agreement dated as of April 28, 2006 to the Stock Purchase Agreement dated as of January 28, 2005, by and between KPN Telecom B.V. and CORCYRA d.o.o. (incorporated by reference from Exhibit 1 of Amendment No. 15 to Schedule 13D filed by Koninklijke KPN N.V. with the Securities and Exchange Commission on May 1, 2006) |
| 3 | Letter dated January 28, 2005 from Moshe Har Adir to KPN Telecom B.V. (incorporated by reference to Exhibit 2 of Schedule 13D filed by the Reporting Persons with the Securities and Exchange Commission on February 3, 2005) |
| 4 | Escrow Agreement dated as of January 28, 2005 by and between KPN Telecom B.V., CORCYRA d.o.o. and JPMorgan Chase Bank N.A. (incorporated by reference to Exhibit 3 of Schedule 13D filed by the Reporting Persons with the Securities and Exchange Commission on February 3, 2005) |
| 5 | Amendment No. 1 dated as of April 28, 2006 to the Escrow Agreement dated as of January 28, 2005 by and between KPN Telecom B.V., CORCYRA d.o.o. and JPMorgan Chase Bank N.A. (incorporated by reference from Exhibit 1 of Amendment No. 15 to Schedule 13D filed by Koninklijke KPN N.V. with the Securities and Exchange Commission on May 1, 2006) |
| 6 | Cukierman & Co Consulting Ltd. Proposal dated December 2, 2004. (incorporated by reference to Exhibit 4 of Schedule 13D filed by the Reporting Persons with the Securities and Exchange Commission on February 3, 2005) |
| 7 | Amended and Restated Share Subscription Agreement dated December 13, 1999 between Euroweb International Corp., KPN Telecom B.V. and certain directors of Euroweb International Corp. (incorporated by reference from Exhibit 1 of Schedule 13D of KPN Telecom B.V. filed with the Securities and Exchange Commission on February 24, 2000) |

- 9 -

| | |
|---|---|
| 8 | Stock Purchase Agreement, dated as of August 31, 2006, by and between Moshe Har Adir, CORCYRA, d.o.o., a Croatian company and Shalom Attia, on the one hand; and KSD Pacific, LLC, a Nevada limited liability company, on the other hand. (incorporated by reference to Exhibit 1 of Amendment No. 2 to Schedule 13D filed by the Reporting Persons with the Securities and Exchange Commission on September 5, 2006). |
| 9 | Amendment No. 2 dated as of December 1, 2006 to the Stock Purchase Agreement dated as of January 28, 2005, by and between KPN Telecom B.V. and CORCYRA d.o.o. (incorporated by reference from Exhibit 1 of Amendment No. 16 to Schedule 13D filed by Koninklijke KPN N.V. with the Securities and Exchange Commission on December 5, 2006). |
| 10 | Amendment No. 2 dated as of December 1, 2006 to the Escrow Agreement dated as of January 28, 2005, by and among KPN Telecom B.V., CORCYRA d.o.o and JPMorgan Chase Bank N.A. (incorporated by reference from Exhibit 2 of Amendment No. 16 to Schedule 13D filed by Koninklijke KPN N.V. with the Securities and Exchange Commission on December 5, 2006). |

- 10 -

## SIGNATURE

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this Statement is true, complete and correct.

Dated: June 21, 2007

CORCYRA d.o.o.

By: /s/ Yossi Attia
-----------------------------------------
    Yossi Attia, sole officer

KSD Pacific, LLC

By: /s/ Yossi Attia
-----------------------------------------
    Yossi Attia, sole member

Yossi Attia

By: /s/ Yossi Attia
-----------------------------------------
    Yossi Attia, individually

- 11 -

# EXHIBIT 12

# PHILLIPS NIZER LLP

866 Fifth Avenue
New York, NY 10103-0084
212.877.8700
Fax 212.262.5152

600 Old Country Road
Garden City, NY 11530-2011
516.229.9400
Fax 516.228.9612

45 Essex Street
Hackensack, NJ 07601
201.646.1554
Fax 201.646.1754

www.phillipsnizer.com

Elliot H. Lutzker
212.841.0707
elutzker@phillipsnizer.com

August 6, 2007

_Via Facsimile and FedEx_
_(070-446-06-75)_

KPN Legal and Regulatory
Maanplein 55
2516 CK Den Hague
The Netherlands
Attn: Dirk Peter Velthuijsen, Senior Legal Counsel

       Re:    _Corcyra d.o.o/KPN Telecom B.V._
              _For Settlement Purposes Only Without Prejudice_

Dear Mr. Velthuijsen:

      I am writing to you on behalf of my firm's client Corcyra d.o.o ("Corcyra") in response to your undated letter to Corcyra received on July 30, 2007.

      In furtherance of my letters dated June 28, 2007 and June (July) 5, 2007 to KPN Telecom B.V. ("KPN"), please be advised that no decision has been made by the Board of Directors of EMVELCO Corp. concerning Yossi Attia's request to remove his personal guarantees on behalf of EMVELCO. Following a meeting of the Board next month, Mr. Attia will be in a better position to provide you with some degree of certainty as to a date when KSD Pacific, LLC ("KSD") will make final payment to KPN under the January 28, 2005 Stock Purchase Agreement, as amended (the "SPA").

      KSD has every intention of making its final payment to KPN, hopefully within the next 90 days, but no later than December 31, 2007. In view of the fact that Moshe Har Adir resides in Croatia and Corcyra sold its assets and stock, we believe it would be in all parties' best interests to work out a settlement prior to your commencing a lawsuit.

1011109.2

PHILLIPS NIZER⸀

KPN Telecom B.V.
August 6, 2007
Page 2

Since my client wants to make payment in full under the SPA, you can avoid the unnecessary time and expense of trying to serve all parties in foreign jurisdictions by agreeing to a standstill agreement.

We would appreciate your response prior to your August 15, 2007 deadline to commence litigation. If you wish to discuss this matter further, please do not hesitate to call me at (212) 841-0707.

Thank you for your consideration.

Very truly yours,

PHILLIPS NIZER LLP

Elliot H. Lutzker

cc:    Jacob S. Pultman, Esq.
       Chintan Panchal, Esq.
       Allen & Overy, Ltd.

# EXHIBIT 13

SEP-07-2007  16:35        PN LLP 26W                                    P.02/03

# PHILLIPS NIZER LLP

556 Fifth Avenue
New York, NY 10103-0084
212.977.9700
Fax 212.262.5152

600 Old Country Road
Garden City, NY 11530-2011
516.229.9400
Fax 516.229.9612

45 Essex Street
Hackensack, NJ 07601
201.646.1664
Fax 201.646.1764

www.phillipsnizer.com

Elliot H. Lutzker
212.841.0707
elutzker@phillipsnizer.com

September 7, 2007

**_Via Facsimile and FedEx_**
*(070-446-06-75)*

KPN Legal and Regulatory
Maanplein 55
2516 CK Den Hague
The Netherlands
Attn: Dirk Peter Velthuijsen, Senior Legal Counsel

    **Re:**   *Corcyra d.o.o/KPN Telecom B.V.*
      *For Settlement Purposes Only Without Prejudice*

Dear Mr. Velthuijsen:

   I am writing to you on behalf of my firm's client Corcyra d.o.o ("Corcyra").

   As I informed you in my letter dated August 6, 2007, the Board of Directors of EMVELCO Corp. will meet in Las Vegas, Nevada on September 17, 2007. Yossi Attia's request to remove all or a portion of his personal guarantees on behalf of EMVELCO indebtedness is to be addressed by the Board at such meeting.

   We will advise you shortly after the meeting as to the resolution of that matter. At that point in time, KSD Pacific, LLC will be in a position to advise KPN Telecom B.V. as to when it will be able to make payment to KPN.

   If KPN intends to take any action concerning this matter prior to September 17, 2007, we would appreciate your advising the undersigned. If you wish to discuss this matter further, please do not hesitate to call me at (212) 841-0707.

1017591.1

PHILLIPS NIZER℠

KPN Telecom B.V.
September 7, 2007
Page 2

Thank you for your consideration.

Very truly yours,

PHILLIPS NIZER LLP

Elliot H. Lutzker

cc: Jacob S. Pultman, Esq.
Chintan Panchai, Esq.
Allen & Overy, Ltd.
Yossi Attia

1017591.1

EXHIBIT 14

30-JUL-2007  15:00  FROM  KPN JURIDISCHE ZAKEN          TO  00012126106399          P.04/05



**BY MAIL & BY FAX**

Moshe Har Adir
Verudela 17
Pula-Croatia 52100

Date
30 July 2007
Subject
Demand for Payment

Our reference
19922-00648 NY:2549812.2

Contact person
D.P. Velthuijsen

Telephone
+31 (0)70 3434714

E-mail
dirkpeter.velthuijsen @kpn.com

Enclosure(s)
-

Dear Mr. Adir:

We refer to the Stock Purchase Agreement dated as of January 28, 2005, by and between CORCYRA d.o.o ("CORCYRA") and KPN B.V. (formerly KPN Telecom B.V.) ("KPN"), as amended by Amendment No. 1 dated April 28, 2006 and Amendment No. 2 dated December 1, 2006 (the "Purchase Agreement"). We also refer to your Commitment Letter to KPN dated as of January 28, 2005 and confirmed on April 28, 2006 and December 1, 2006, in connection with the Purchase Agreement.

KPN certifies that CORCYRA has failed to satisfy its obligations under the Purchase Agreement by failing to deliver to KPN payment of the Final Closing Purchase Price, as defined in Section 2.4(d) of Amendment No. 2 to the Purchase Agreement. We therefore demand immediate payment of the sum of US$2,679,476 plus interest as provided in Section 2.4(f) of Amendment No. 2 to the Purchase Agreement.

Payment should be made by wire transfer of immediately available funds, in U.S. dollars, to the following account:

Correspondent Bank:     ABN AMRO Bank New York
Swiftcode:              ABNAUS33
ABA code:               026-009-580

Beneficiary Bank:       ABN AMRO Bank Amsterdam
Swiftcode:              ABNANL2A
Account No.:            574070002941

For further credit to:  Koninklijke KPN NV
Account No.:            62.61.40.404

If, by August 15, 2007, KPN has not received such payment from you or CORCYRA, KPN will enforce its rights to the fullest extent of the law, including without limitation by filing an action for breach of contract.

KPN Legal & Regulatory        Telephone (070) 446 02 78      Correspondence address:      Royal KPN N.V.
Maanplein 55                  Fax (070) 446 06 75            Postbus 30000                Haaglanden
2516 CK Den Haag                                             2500 GA Den Haag             Chamber of Commerce

30-JUL-2007  15:00   FROM  KPN JURIDISCHE ZAKEN          TO  00012126106399        P.05/05

Accompanies letter dated
30 July 2007

Our reference
18972-00648 NY:2549812.2

KPN hereby expressly reserves all of its rights under the Purchase Agreement and any other
agreement or applicable law including, without limitation, KPN's rights relating to or arising out of
the guaranteed obligations described herein.

Any discussions or correspondence KPN may engage in with you concerning a potential remedy of
Corcyra's failure to satisfy its obligations described herein shall in no way be construed as a waiver of
any of KPN's rights or remedies under the Purchase Agreement or otherwise.

Very truly yours,

Dirk Peter Velthuijsen
Senior Legal Counsel

Copy          CORCYRA d.o.o
              Valdabeckiput 118, Pula, Croatia 52100
              Fax: +385 52 590 731

              Elliot H. Lutzker, Esq.
              Phillips Nizer LLP
              666 Fifth Avenue
              New York, NY 10103-0084
              Fax: 212 262 5152

              Jacob S. Pultman, Esq.
              Chintan Panchal, Esq.
              Allen & Overy LLP
              1221 Avenue of the Americas
              New York, NY 10020
              Fax: 212 610 6399



Date
30 July 2007

Our reference
10023-16936 NY:2531,283.1

Contact person
D.P. Velthuijsen

Telephone
+31 (0)70 3434714

E-mail
dirkpeter.velthuijsen @kpn.com

Enclosure(s)
-

**BY MAIL & BY FAX**

CORCYRA d.o.o.
Valdabeckiput 118, Pula, Croatia 52100
Attn: Moshe Har Adir / Yossi Attia
Fax: +385 52 590 731

Re: Stock Purchase Agreement dated January 28, 2005 by and between CORCYRA d.o.o.
("CORCYRA") and KPN B.V. (formerly KPN Telecom B.V.) ("KPN"), as amended by
Amendment No. 1 dated April 28, 2006 and Amendment No. 2 dated December 1, 2006 (the
"Purchase Agreement")

Dear Sirs:

Further to KPN's letter dated July 3, 2007, KPN is disappointed that CORCYRA has breached its
obligations under the Purchase Agreement. Simultaneously herewith KPN is sending the attached
demand for payment to Moshe Har Adir in accordance with the Commitment Letter from Moshe Har
Adir to KPN dated as of January 28, 2005 and confirmed on April 28, 2006 and December 1, 2006, in
connection with the Purchase Agreement.

If, by August 15, 2007, KPN has not received from either CORCYRA or Moshe Har Adir payment of
the sum of US$2,679,476 plus interest as provided in Section 2.4(f) of Amendment No. 2 to the
Purchase Agreement, KPN will enforce its rights to the fullest extent of the law, including without
limitation by filing an action for breach of contract.

Payment should be made by wire transfer of immediately available funds, in U.S. dollars, to the
following account:

Correspondent Bank:      ABN AMRO Bank New York
Swiftcode:               ABNAUS33
ABA code:                026-009-580

Beneficiary Bank:        ABN AMRO Bank Amsterdam
Swiftcode:               ABNANL2A
Account No.:             574070002941

For further credit to:   Koninklijke KPN NV
Account No.:             62.61.40.404

KPN Legal & Regulatory        Telephone (070) 446 02 78     Correspondence address:      Royal KPN N.V.
Maanplein 55                  Fax (070) 446 06 75           Postbus 30000                Haaglanden
2516 CK Den Haag                                            2500 GA Den Haag             Chamber of Commerce

Accompanies letter dated
30 July 2007

Our reference
10023-16950 NY:2551885.1

KPN hereby expressly reserves all of its rights under the Purchase Agreement and any other agreement or applicable law.

Very truly yours,

Dirk Peter Velthuijsen
Senior Legal Counsel

Copy          Elliot H. Lutzker, Esq.          KSD Pacific, LLC
              Phillips Nizer LLP               c/o Karis Corporation
              666 Fifth Avenue                 112 N. Curry Street
              New York, NY 10103-0084          Carson City, NV
              Fax: 212 262 5152               89703

              Jacob S. Pultman, Esq.          Yossi Attia
              Chintan Panchal, Esq.           1061 1/2 N. Spaulding Avenue
              Allen & Overy LLP               West Hollywood, CA  90046
              1221 Avenue of the Americas
              New York, NY 10020
              Fax: 212 610 6399

30-JUL-2007  15:00   FROM  KPN JURIDISCHE ZAKEN                TO  00012126106399            P.01/05

 **kpn**

KPN LEGAL & REGULATORY (CLR)
Mailing address:
P.O. Box 30.000
2500 GA  The Hague, the Netherlands

Visiting address
Maanplein 55, 4ᵗʰ floor
2516 CK  The Hague
Telefax: +31 70-44 60675

To              :   Allen & Overy LLP

Attn.           :   Messrs. Jacob S. Pultman and Chintan Panchal

Telefax;        :   1 212 610 6399

Subject         ;   CORCYRA

Number of pages :   5                              (this page included)

Date            :   30 July 2007

**Sent by:**

☐   René van Rooij
    (+31 70 44 60203)

☐   Reinier A. Beyen
    (+31 70 44 60982)

☒   Dirk Peter Velthuijsen
    (+31 70 34 34714)

☐   Michel E. Hoekstra
    (+31 70 44 62093)

☐   Craig G. Allwright
    (+31 70 44 60296)

☐   Kyong Soon A. Rijnders
    (+31 70 44 61097)

**Secretariat**
☐   Ina Waaijer (+31 70 44 60278)

**Secretary**
☐   Michel Onck (+31 70 44 61090)

**Paralegal**
☐   Merel Kampmeinert   (+31 70 44 62666)
☐   Marijke E.J. Robben  (+31 70 44 60278)

☐   **URGENT**